IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

THOMAS M. JACKSON and          )
PATRICIA G. JACKSON, as individuals )
and as representatives of the classes,    )
                                          )
        Plaintiffs,           )
                                          )
    v.                                )     2:12cv1262
                                          )     **Electronic Filing**
WELLS FARGO BANK, N.A. and      )
WELLS FARGO INSURANCE, INC.,  )
                                          )
        Defendants.          )

## OPINION

Thomas and Patricia Jackson ("plaintiffs") commenced this action on behalf of themselves and as members of three putative classes seeking redress for alleged improper settlement charges and damages caused by defendant Wells Fargo Bank, N.A.'s ("W. F. Bank") demand that unnecessary flood insurance be acquired for improved real estate plaintiffs purchased with a mortgage from W. F. Bank. Presently before the court are W. F. Bank and Wells Fargo Insurance, Inc.'s ("W. F. Insurance") motions to dismiss plaintiff's first amended class action complaint. For the reasons set forth below, the motions will be granted in part and denied in part.

It is well-settled that in reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "the court [is required] to accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the non-moving party." Rocks v. City of Philadelphia, 868 F.2d 644, 645 (3d Cir.1989). Under Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 561 (2007), dismissal of a complaint

pursuant to Rule 12(b)(6) is proper only where the averments of the complaint fail to raise plausibly, directly or inferentially, the material elements necessary to obtain relief under a viable legal theory of recovery. Id. at 544. In other words, the allegations of the complaint must be grounded in enough of a factual basis to move the claim from the realm of mere possibility to one that shows entitlement by presenting "a claim to relief that is plausible on its face." Id. at 570.

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). In contrast, pleading facts that are merely consistent with a defendant's liability is insufficient. Id. Similarly, tendering only "naked assertions" that are devoid of "further factual enhancement" falls short of presenting sufficient factual content to permit an inference that what has been presented is more than a mere possibility of misconduct. Id. at 1949–50. See also Twombly, 550 U.S. at 563 n. 8 (factual averments must sufficiently raise a "'reasonably founded hope that the [discovery] process will reveal relevant evidence' to support the claim.") (quoting Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 347 (2005) & Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 741 (1975)).

This is not to be understood as imposing a probability standard at the pleading stage. Iqbal, 556 U.S. at 678 ("The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."); Phillips v. County of Allegheny, 515 F.3d 224, 235 (3d Cir.2008) (same). Instead, "[t]he Supreme Court's Twombly formulation of the pleading standard can be summed up thus: 'stating ... a claim requires a complaint with enough factual matter (taken as true) to suggest the required element ... [and that provides] enough facts to raise a reasonable expectation that discovery will reveal

evidence of the necessary element.'" <u>Phillips</u>, 515 F.3d at 235; <u>see also</u> <u>Wilkerson v. New</u>

<u>Media Technology Charter School Inc.</u>, 522 F.3d 315, 321 (3d Cir.2008).

The facts read in the light most favorable to the non-moving party are as follows.  On

August 31, 2011, plaintiffs obtained a mortgage loan from W. F. Bank  for $107,500.00.

Amended Complaint at ¶ 7.  W. F. Bank charged plaintiffs $19.00 for a flood zone determination

that was performed by W. F. Insurance prior to closing.  <u>Id.</u> at ¶ 19.  The charge was reflected on

plaintiffs' HUD-1 settlement statement.  <u>Id.</u>

In conjunction with the mortgage plaintiffs received a Truth-in-Lending Act ("TILA")

Disclosure ("TILA Disclosure").  <u>Id.</u> at ¶ 8.  The initial version of the TILA Disclosure

erroneously stated that flood insurance was required for plaintiffs' property.  However, this error

was later corrected with both parties' consent.  With approval and consent of W. F. Bank, the

TILA Disclosure used at closing provided that flood insurance was not required for plaintiffs'

property.  <u>Id.</u>

Before closing plaintiffs obtained their own independent flood zone determination from

CoreLogic Flood Services ("CoreLogic").  <u>Id.</u> at ¶ 17.  CoreLogic determined that flood

insurance was not required on plaintiff's property.  <u>Id.</u>; Standard Flood Hazard Determination of

August 26, 2011, Completed by CoreLogic (Doc. No. 18-9).  This independent flood

determination cost plaintiffs $6.00, which is the standard amount CoreLogic charges for this

service.  <u>Id.</u> at ¶¶ 17, 21.

At closing plaintiffs signed a Standard Flood Hazard Determination ("SFHD") which had

been prepared by W. F. Insurance for W. F. Bank.  <u>Id.</u> at ¶ 9.  The parties at closing treated the

SFHD as indicating that flood insurance was not required for any portion of plaintiffs' property.

<u>Id.</u>

On November 7, 2011, W. F. Bank sent plaintiffs a form letter stating that flood insurance "is a requirement of your loan." Id. at ¶ 10; Letter of November 7, 2011 (Doc. No. 18-4). The letter indicated that if plaintiffs did not provide proof of flood insurance W. F. Bank would purchase it at plaintiffs' expense. Id. Plaintiffs repeatedly objected to this demand by calling the customer service number provided in the letter, but their calls were directed to voicemail and their messages were never returned. Id. at 11.

Plaintiffs wrote a letter to W. F. Bank on December 9, 2011, in which they informed it in clear and unequivocal terms that flood insurance was not required for their loan. As proof they enclosed a copy of the SFHD that they and W. F. Bank had signed at closing. Id.; Thomas Jackson's Letter of December 9, 2011(Doc. No. 18-5). W. F. Bank did not immediately respond to plaintiffs' letter. Feeling as if they had no choice, plaintiffs purchased a policy providing $250,000.00 in coverage from the National Flood Insurance Program ("NFIP") in order to comply with W. F. Bank's November 7, 2011, demand. Id. at ¶ 12.

After purchasing the insurance plaintiffs sent a second letter to W. F. Bank on December 19, 2011, informing it that they had acquired the demanded insurance and providing proof of the same. Id.; Thomas Jackson's Letter of December 19, 2011(Doc. No. 18-6). The letter further explained that plaintiffs' property was not in a Special Flood Hazard Area ("SFHA"); the loan would not have been taken out if it had been known that flood insurance was required; and at closing W. F. Bank had assured that plaintiffs were not required to obtain such insurance prior to signing the settlement documents. Id.

W. F. Bank responded to plaintiffs in a letter dated January 5, 2012. Id. at ¶ 13. Therein W. F. Bank acknowledged plaintiffs' concerns about the flood insurance requirement and contended that the SFHD used at closing was for plaintiffs' garage only, and included with the

letter a separate SFHD for plaintiffs' home. Id.; Letter of January 5, 2012, by Christopher Cory (Doc. No. 18-7). Plaintiffs had not received this separate determination for their residence at closing. Id. Further, the comment section of the SFHD form indicated that W. F. Insurance had made the determination regarding the status of plaintiffs' residence on August 23, 2011; however, the date of determination listed on the form is August 17, 2011. Id.; Standard Flood Hazard Determination of August 23, 2011, Section E, Comments (Doc. No. 18-3).

Upon receiving this letter plaintiffs spoke to an executive mortgage specialist at W. F. Bank. Id. at ¶ 14. During the telephone conversation plaintiffs expressed their dismay that W. F. Bank had not disclosed its flood insurance requirement at closing. Id. Thereafter, W. F. Bank sent a letter to plaintiffs stating that "flood insurance was not required on your loan at the time of closing" and that this was reflected in both the SFHD and the TILA Disclosure provided at closing. Id.; Letter of February 17, 2012 (Doc. No. 18-8).

By the time plaintiffs received this letter they had already refinanced with another bank and paid off their mortgage with W. F. Bank in order to free themselves from W. F. Bank 's flood insurance demand. Id. at ¶ 15. Plaintiffs' new lender did not require flood insurance for any part of plaintiffs' property, and specifically has determined that their home does not fall in a SFHA. Id.

Plaintiffs incurred substantial costs in refinancing their residence and paying off their loan with W. F. Bank. Id. at ¶ 16. W. F. Bank did not offer to reimburse plaintiffs for such costs, or for the flood insurance premiums that they incurred for the coverage purchased in response to W. F. Bank's November 7, 2011, form letter. Id.

Although W. F. Bank charged $19.00 for the SFHD, its actual cost to obtain the determination was closer to $5.00. Id. at ¶ 23. W. F. Insurance received this fee and kicked-

back or split the charge with W. F. Bank or W. F. Bank received the fee and did not pay the full amount to W. F. Insurance. Id. at ¶¶ 24, 26. This practice repeatedly has been utilized by defendants. Id. at ¶¶ 25, 27. W. F. Insurance typically kicks back a portion of the charge it earns from referral business from W. F. Bank through its "soft dollars" program and the pass-back of these amounts is reflected on the general ledger and is reported on a "Profitability Passback Report." Id. at ¶ 25. This charge did not reflect a reasonable fee in compliance with those authorized under the National Flood Insurance Act ("NFIA") and the practice of kick-backs or fee-splitting constituted an illegal arrangement under the Real Estate Settlement Procedures Act ("RESPA"). Id. at ¶¶ 22, 26.

Plaintiffs advance causes of action for (1) violation of TILA; (2) violation of RESPA; and (3) breach of contract/breach of the covenant of good faith and fair dealing against W. F. Bank. Plaintiffs advance causes of action for violation of RESPA and unjust enrichment against W. F. Insurance.

Defendants moves to dismiss on several bases. Generally, W. F. Bank contends that plaintiffs' breach of contract claims are predicated on what at best can be described as a mistaken determination of whether plaintiffs' property is within a SFHA and any claim based on such a determination essentially asserts a violation of the Federal Disaster Protection Act ("FDPA") and state law claims predicated on such violations are preempted under the NFIA. Plaintiffs' TILA claim purportedly fails because disclosure of flood insurance is not a required TILA disclosure, and therefore any inaccuracy about whether flood insurance was required did not violate TILA. Plaintiffs' RESPA claim assertedly is pled inadequately because the allegations of the first amended complaint contain little more than a formulaic recitation of the elements.

Plaintiffs assert that viable claims have been set forth at every count. They posit that because the TILA disclosures signed at closing indicated that flood insurance was not required, W. F. Bank's subsequent insistence that plaintiffs purchase flood insurance meaningfully changed the legal obligations between the parties in violation of 12 C.F.R. § 226.17(c)(1), which clearly violated TILA.

Similarly, plaintiffs maintain that a claim under RESPA sufficiently has been pled. They aver W. F. Bank either accepted kickbacks from W.F. Insurance or split fees with it in connection with the charge for a SFHD. Part of this asserted misconduct was the marking-up of the SFHD fee, which is averred to have significantly exceeded its actual cost. In addition, the program under which such fees were kicked back or split, the method of accounting for such transfers and the manner in which these illegal transfers were tracked and reported all have been identified. Plaintiffs thus assert that the level of factual specificity required for notice pleading has been satisfied.

Plaintiffs further maintain that their breach of contract claim(s) is not preempted because it is not based on a SFHD but instead is based on a provision of the mortgage which gives plaintiffs a contractual remedy for a violation of federal law, which therefore permits a contractual recovery for charging an unreasonable fee in violation of NFIA and RESPA. In addition, defendants' use of inflated charges and misleading information as to the flood zone status of the property purportedly implicates a breach of the covenant of good faith and fair dealing that is independent of any separate NFIA or RESPA violation.

W. F. Insurance generally maintains that plaintiffs' unjust enrichment claim fails because it is premised on conduct authorized by the FDPA, there is no private cause of action under that act and state law claims predicated on a SFHD are preempted under the NFIA. Furthermore,

plaintiffs cannot prove there was anything "unjust" about the transaction: the amount for the SFHD expressly was disclosed to plaintiffs and they received the actual benefit for which they bargained. There was no communications between plaintiffs and W. F. Insurance about the service or fee, plaintiffs do not identify any actions by it that can be found to be misleading, and each of the bases advanced to show the fee was inequitable is legally insufficient or sufficiently undermined by the record. Finally, W. F. Insurance alleges that plaintiffs' RESPA claim fails because it is predicated on conclusions that merely restate the statute's prohibitions.

Plaintiffs contend their RESPA claim against W. F. Insurance is adequate factually and consistent with the statute and controlling case law. Their unjust enrichment claim survives because defendants received the SFHD fee in connection with a scheme in violation of federal law, the amount charged was in violation of NFIA and plaintiffs received at best an incomplete and misleading SFHD, which was far below what was needed to supply the benefit of the bargain. Thus, what plaintiffs received was an unreliable and incomplete SFHD that was used to extract unlawful fees to plaintiffs' detriment, which supplies more than an adequate basis for an unjust enrichment claim.

**TILA**

W. F. Bank specifically contends that because flood insurance "is not a required TILA disclosure, any alleged mis-disclosure of whether flood insurance was required does not violate TILA." Plaintiffs purportedly cannot identify any specific TILA or Regulation Z provision that requires a disclosure of whether flood insurance is or is not required on a home mortgage. Furthermore, W. F. Bank complied with the property insurance disclosure that is required under TILA to exclude any premium from the finance charge when it accurately disclosed a form containing the following at closing:

if required, flood insurance may be obtained through any person of your choice.  If you choose to obtain flood insurance through the creditor, the terms of the policy will be N/A and the premium for that term will be N/A.

Thus, W. F. Bank argues that the only flood insurance information required under TILA was disclosed and plaintiffs' TILA claim cannot proceed.

Plaintiffs respond that W. F. Bank violated the TILA by requiring plaintiffs to purchase flood insurance on their property after the parties signed a TILA disclosure indicating that such insurance was not required.  In doing so W. F. bank adversely changed the terms of the mortgage agreement after the fact without (1) any change of the SFHA designation, (2) proper disclosures or (3) consent.  Such an alleged deviation from the disclosed TILA transaction violates TILA's requirement that the disclosures made by the lender in a closed-end credit transaction accurately reflect the legal obligations between the parties.

Plaintiffs have adequately pled a TILA claim.  In enacting TILA "Congress sought to remedy the 'divergent and often fraudulent practices by which credit customers were apprised of the terms of the credit extended to them.'"  Smith v. Fidelity, 898 F.2d 896, 897 (3d Cir. 1989) (quoting Johnson v. McCrackin–Sturman Ford, Inc., 527 F.2d 257, 262 (3d Cir. 1975)).  TILA's purpose is "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him." 15 U.S.C. § 1601(a).  As a remedial statute designed to "balance the scales 'thought to be weighed in favor of lenders,'" TILA "is to be liberally construed in favor of borrowers."  Smith, 898 F.2d at 897 (quoting Bizier v. Globe Financial Services, 654 F.2d 1, 3 (1st Cir. 1981)).

TILA "requires a creditor to disclose information relating to such things as finance charges, annual percentage rates of interest, and borrowers' rights ... and it prescribes civil liability for any creditor who fails to do so[.]"  Koons Buick Pontiac GMC, Inc. v. Nigh, 543

U.S. 50, 54 (2004).  The statute charges "the Federal Reserve Board with implementation of the Act, and the agency has imposed even more precise disclosure requirements via Regulation Z," which is codified at 12 C.F.R. §§ 226.1 et seq.  Arnett v. Bank of America, N.A., 874 F. Supp.2d 1021, 1037 (D. Ore. 2012) (quoting Hauk v. JP Morgan Chase Bank USA, 552 F.3d 1114, 1118 (9th Cir. 2009) and citing 15 U.S.C. § 1607).  "In particular, 15 U.S.C. § 1638 and 12 C.F.R. § 226.18, which govern closed-end transactions such as residential home loans, require that the creditor must disclose the credit's 'finance charge' before 'the credit is extended.'"  Id. (citing 15 U.S.C. §§ 1638(a)(3), 1638(b)(1); 12 C.F.R. §§ 226.17(b), 226.18(d)) (foot notes omitted).

Regulation Z provides that "[t]he disclosures shall reflect the terms of the legal obligations between the parties." 12 C.F.R. § 1026.17(c)(1).  This requirement is applicable to closed-end transactions.  Id. at § 1026.17.  To accomplish this the creditor must among other things disclose "insurance or debt cancellation under § 1026.18(n)."  Id. at § 1026(a)(1).  The creditor must provide the items required by § 1026.4(d) in order to exclude property insurance premiums from the finance charge.  Id. at § 1026.18(n).  Property insurance premiums may be excluded from the finance charge if it is disclosed that the insurance coverage may be obtained from another person; otherwise, if obtained through the creditor, "the premium for the *initial term of insurance* shall be disclosed."  Id. at §§ 1026.4(d)(2)(i) & (ii) (emphasis added).

W. F. Bank concedes for the sake of argument that its disclosure seeking to exclude any required insurance was inaccurate because from its perspective flood insurance was required as a condition of the mortgage.  There simply was a "mis-direction" as to this disclosure and having advised plaintiffs that they could obtain flood insurance from a third person, what was required to be disclosed was disclosed and no TILA violation can be established.

The difficulty with this position is that "TILA prohibits not only failures to disclose, but also false or misleading disclosures." Rossman v. Fleet Bank, N.A., 280 F.3d 384, 393 (3d Cir. 2002). The disclosures at closing indicated that flood insurance was not required for the extension of credit. The November 7, 2011, letter advised that flood insurance was required and demanded that proof of insurance be provided in 45 days. If proof was not provided, W. F. Bank indicated it was required to secure the insurance at plaintiffs' expense and the premium would be charged to the existing escrow account or, if such an account did not exist, then one would be created and plaintiffs' monthly payments would increase accordingly. Letter of November 7, 2011 (Doc. No. 18-4).

To the extent the initial TILA disclosure accurately indicated that flood insurance was not required as a condition of the credit, the November 7, 2011, letter could be found to have reflected a change of terms in the legal relationship between the parties by requiring additional insurance and advising that if not acquired immediately from a third person credit would be extended to cover *the initial term of the insurance* through the existing escrow account or one created for that purpose. Of course, these costs for the extension of credit were not disclosed at closing and properly excluded from the finance charges in accordance with 12 C.F.R. § 1026.4(d)(2)(ii). Conversely, if the TILA disclosures inaccurately indicated that flood insurance was not required as a condition of credit, then the disclosures could be found to be misleading in that they failed to apprise plaintiffs of an insurance requirement within the scope of 12 C.F.R. § 1026.18(n) that had not been excluded in accordance with 12 C.F.R. § 1026.4(d)(2).

As this court previously has observed, there is a growing body of authority which recognizes that the practice of force-placing insurance under similar circumstances states a plausible claim for relief under TILA. See Morris v. Wells Fargo Bank N.A., No. 2:11cv474,

2012 WL 3929805, *12 (W.D. Pa. Sept. 7, 2012) ("The weight of authority recognizes that force-placing unauthorized insurance constitutes a new credit transaction involving new finance charges within the scope of 12 C.F.R. § 226.18 where the amount of the plaintiff's indebtedness is increased.") (collecting cases); accord Casey v. Citibank, N.A., 915 F. Supp.2d 255, 266-67 (N.D. N.Y. 2013) (". . . numerous courts have persuasively held that when a lender force-places insurance not contemplated in the mortgage agreement, the associated premiums are not exempt from disclosure under TILA.") (citing Wulf v. Bank of America, 798 F. Supp.2d 586, 598–99 (E.D. Pa. 2011); Hofstetter v. Chase Home Finance, LLC, 751 F. Supp.2d 1116, 1128 (N.D. Cal. 2010) (same - open-ended credit transaction); and Travis v. Boulevard Bank N.A., 880 F. Supp. 1226, 1229–30 (N.D. Ill. 1995) ("Defendant's purchase of the allegedly unauthorized insurance and the subsequent addition of the resulting premiums to Plaintiffs' existing indebtedness constituted a new credit transaction" requiring disclosure under TILA); Walls v. JPMorgan Chase, N.A., 2012 WL 3096660, *3-4 (W.D. Ky. July 30, 2012) (allegations that creditor adversely changed the terms of an open-ended home equity line of credit by force-placing additional flood insurance without consent and/or clearly and fully disclosing all charges that could be imposed at origination stated a claim for violation of TILA) (Heyburn, II, J.); Gooden v. Suntrust Mortgage, Inc., 2012 WL 996513 (E.D. Cal. March 23, 2012) ("Plaintiff adequately alleges that Defendant force placed unauthorized hazard insurance on Plaintiff's property, exceeding the amount required by the loan agreement and which required accurate and meaningful disclosures as well as changes to the policy's requirements, none of which Defendant provided.  Such allegations, if true, entitle Plaintiff to relief under TILA.").  Of course, whether the initial TILA disclosures were or were not accurate, whether the initial terms of credit were changed after the fact, and whether plaintiffs suffered any actual increase in indebtedness or

other recoverable form of injury or damages from any such conduct are issues of fact that are beyond the scope of the court's current review of the record.

Plaintiffs' burden at this juncture is to set forth a plausible showing of entitlement to relief after all facts are read and all reasonable inferences are drawn in their favor. They have met this burden and there is a reasonable expectation that discovery will produce evidence sufficient to support the claim. Consequently, W. F. Bank's motion to dismiss plaintiffs' TILA claim will be denied.

**RESPA**

Plaintiffs allege that W. F. Bank and W. F. Insurance violated RESPA by orchestrating a scheme to profit from flood zone determinations through the use of unlawful kickbacks or mark-ups. Specifically, W. F. Bank commissioned W. F. Insurance to perform flood zone determinations. A charge was imposed for this service that was well above the actual cost. W. F. Bank then received a kickback under a "soft dollars program" which was reported as earnings on the general ledger and tracked through a "Profitability Passback Report."

Defendants seek dismissal on the grounds that plaintiffs have failed to plead a sufficient factual basis to show a claim that is plausible on its face. They assert that plaintiffs' pricing allegations compare apples with oranges by utilizing the price for a one-time SFHD when plaintiffs were charged for a "life of the loan" determination, which by its nature is more costly. Similarly, plaintiffs have not alleged that the actual funds plaintiff paid were funneled through a kickback or mark-up scheme. In other words, all that plaintiffs have alleged are generalities and such conclusions are not the specific and particular factual matters needed to set forth a plausible showing of entitlement to relief.

RESPA was enacted to "to protect consumers from unfair business practices." Kay v. Wells Fargo & Co., 247 F.R.D. 572, 576 (N.D. Cal. 2007). The Act was promulgated to provide consumers with "greater and more timely information on the nature and costs of the [real estate] settlement process" and to protect them from "unnecessarily high settlement charges caused by certain abusive practices . . . ." 12 U.S.C. § 2601. To achieve these goals Congress sought to effectuate changes in the settlement process for residential real estate that among other things provide for "the elimination of kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement procedures." Id. at § 2601(a)(1).

To these ends Section 8(a) prohibits "any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person." Id. at § 2607(a). Section 8(b) prohibits unearned fees: "[n]o person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service . . . other than for services actually performed." Id. at § 2607(b).

RESPA's prohibitions are enforceable through a private cause of action. Section 8(d)(2) provides that "[a]ny person or persons who violate the prohibition or limitations of this section shall be jointly and severally liable to the person or persons charged for the settlement service involved in the violation in an amount equal to three times the amount of any charge paid for such settlement service." Id. § 2607(d)(2).

"Section 8(a) and section 8(b) proscribe specific types of abusive kickback and referral activities." Alston v. Countrywide Financial Corp., 585 F.3d 753, 759 (3d Cir. 2009). Section 8(a) eliminates kickback arrangements. Santiago v. GMAC Mort. Group, Inc., 417 F.3d 384, 389 (3d Cir. 2005). A kickback arrangement typically involves a fee for a settlement service, the

payment of that fee by the settlement provider to a third party vendor, and a return from the third party vendor to the settlement provider for the referral of service.[1]

Section 8(b) prohibits markups. <u>Santiago</u>, 417 F.3d at 389-90. A markup occurs when a settlement service provider charges a fee for a settlement service and then pays a portion of the fee to a third party vendor for preforming the service and keeps a portion for itself.[2] <u>Id.</u> at 389.

Markups and kickbacks cause the same type of injury to the consumer: they both result in the consumer being charged for a portion of a service charge fee that was not used to pay an earned fee for a service actually performed. <u>Id.</u> at 388-89; <u>Alston</u>, 585 F.3d at 760-61. Charges for nominal services and duplicative fees fall within the forms of prohibited conduct. <u>Santiago</u>, 417 F.3d at 398 ("Regulation X at 24 C.F.R. § 3500.14(c) specifically bars charges for 'nominal services' and states that 'duplicative fees' are unearned fees which violate the law."). Section 8(d) provides a remedy of three times the amount of the entire payment for the specific service "infected" by such an injury. <u>Alston</u>, 585 F.3d at 760.

RESPA is not a price control statute. <u>Santiago</u>, 417 F.3d at 388 & n.3. Overcharges in the form of unreasonable charges do not give rise to an actionable injury. <u>Id.</u> at 387-88. Nor is

---

[1] The United States Court of Appeals for the Third Circuit described the typical arrangement as follows:

> In a kickback arrangement, the consumer would give the settlement service provider $100 for a service, the mortgage service provider would give the third party vendor $100 for that service, and the third party vendor would return $20 to the settlement service provider as a kickback for the referral of service.

<u>Santiago</u>, 417 F.3d at 388-89.

[2] The <u>Santiago</u> court described this type of arrangement as follows:

> In a markup arrangement, the consumer still gives the settlement service provider $100 for a service, but the settlement service provider keeps $20 and gives the third party vendor $80 for the service.

<u>Id.</u> at 389.

an overcharge a prerequisite to proving a violation of either Section 8(a) or 8(b) and being entitled to a recovery under Section 8(d)(2). Alston, 585 F.3d at 760-61. Nevertheless, an overcharge is contrary to the requirement that a service cost bear a reasonable relationship to its market value and its existence may be used to prove an illegal kickback, markup or other violation within the purview of the statute. Santiago, 417 F.3d at 387, 389 & n.4.

A cause of action under RESPA generally is understood to have three elements. A violation of § 8(a) involves: "(1) a payment or thing of value; (2) given and received pursuant to an agreement to refer settlement business; and (3) an actual referral." Galiano v. Fidelity National Title Ins. Co., 684 F.3d 309, 314 (2d Cir. 2012) (citing Egerer v. Woodland Realty, Inc., 556 F.3d 415, 427 (6th Cir.2009). A violation of § 8(b) involves: (1) a payment or thing of value; (2) given and received for the completion of a settlement service; and (3) the retention of a portion of the payment or thing of value by the recipient without the recipient providing any part of the settlement service used in the closing. Santiago, 417 F.3d at 388.

Plaintiffs sufficiently have pled a plausible claim for relief under RESPA. Plaintiffs averments include the following. They obtained a mortgage from W. F. Bank on August 31, 2011, in the amount of $107,500.00. Plaintiffs were charged a $19.00 settlement fee for a SFHD. Plaintiffs independently obtained a SFHD for $6.00, which is the amount typically charged by a settlement vendor for this service. The actual cost for the SFHD underlying the $19.00 service fee was closer to $5.00. The amount charged significantly exceeded the actual cost for the determination used at closing.

Based on information and belief, W. F. Bank received a portion of the $19.00 fee in the form of a kickback from W. F. Insurance. W. F. Insurance returns a portion of the proceeds it earns on referral business from W. F. Bank. These proceeds are returned through its "soft

dollars" program and the pass-back is reflected on the general ledger and reported on a

"Profitability Passback Report."  In the alternative, W. F. Bank kept a portion of the $19.00

service fee as an unearned markup and passed on the remaining portion to W. F. Insurance.

As noted by plaintiffs, these averments advance factual allegations that the service fee

charge meaningfully exceeded the cost for the service actually provided.  Thus, they create a

basis to infer that there was an overcharge and a significant portion of the fee was not used to

acquire actual services used prior to closing.  They further allege that W. F. Insurance actually

performed the SFHD and then kicked a portion of the fee back to W. F. Bank for referring the

business to W. F. Insurance.  The program for transferring these fees, the method used to account

for the transfer and the report used to track it all have been specifically identified.  This level of

detail goes far beyond a bare reciting of the elements and is sufficient to nudge plaintiffs' RESPA

claim beyond the realm of possibility; it suffices to set forth a plausible showing of entitlement to

relief with a reasonable expectation that discovery will generate evidence to support the claim.

W. F. Bank's demand for specific detail as to the date, time or amount of the kickback or

fee split at this juncture is specious.  Plaintiffs have averred that the fee for the SFHD was used

to create a kickback or a fee split.  The mortgage loan, transaction date and general time frame in

which the kickback or fee split occurred have been identified.  They have advanced factual

averments that a settlement service was acquired under an affiliated arrangement, objective

pricing in the marketplace raises an inference that a portion of the charge was not consumed in

the provision of actual services needed for the closing, evidence of a general exchange of

proceeds between the entities in conjunction with the referral arrangement is known to exist, at

least a portion of the service fee for the settlement service was exchanged, and a portion of it was

in fact either kicked back for the referral business or retained without the recipient providing a

corresponding service utilized in the closing. At this juncture plaintiffs cannot be expected to have the ability to frame averments providing more specific details surrounding "how the kickback or fee split allegedly occurred" because any information beyond the above and the inferences to be drawn therefrom has only been in the exclusive control of defendants.

Plaintiffs' allegations also go far beyond those in <u>Galiano</u>. There, the plaintiffs alleged little more than (1) an industry wide practice by title insurers overcharging in the New York city real estate market pursuant to fixed rates approved by the New York Insurance department and (2) the assertion that 85 percent of the commissions charged in that market were used to promote ongoing business referral relationships through kickback and other illegitimate cost-shifting schemes. The court opined that the complaint alleged a kickback scheme "in a wholly conclusory and speculative manner." <u>Galiano</u>, 684 F.3d at 314.

In contrast, plaintiffs' allegations of an illegal scheme are grounded in specific facts and a contextual setting which in combination give rise to the existence (or an infer of the existence) of all necessary elements and a reasonable expectation that discovery will reveal evidence to support the claim. Nothing more is required at this juncture. <u>See</u> <u>Phillips</u>, 515 F.3d at 235 ("stating ... a claim requires a complaint with enough factual matter (taken as true) to suggest the required element ... [and that provides] enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element."); <u>cf.</u> <u>Ellsworth</u>, 908 F. Supp.2d at 1071, 1088-90 (Allegations that flood insurer's standard business practice was to pay kickbacks or commissions to banks acquiring force-placed policies from carrier, including to the defendant U. S. Bank, which practices were documented in other court opinions and publicly filed deposition testimony, sufficient to plead claims against insurer and bank for "unfair" business practices under California's Unfair Competition Law.).

W. F. Bank's reliance on the proposition that the fee charged was for a "life-of-the-loan" SFHD - which by its nature is more costly - likewise does not sufficiently undermine plaintiffs' allegations. The assertion that a portion of the fee for services was for continuing services beyond those actually performed and thus was a legitimate charge (or constitutes only an overcharge under the statute and regulations) does not as a matter of law displace the allegations raising an inference that (1) a referral relationship existed, (2) a portion of the service fee meaningfully exceeded the costs of the service actually provided, and (3) part of the relationship included the transfer or retention of a portion of the charge for the business referred. Any further consideration of such matters must await appropriate development of the record and the focused consideration of counsel.

Despite defendants' protestations, plaintiffs have advanced factual allegations that make a plausible showing that W. F. Bank not only changed a SFHD fee that significantly was above actual cost and not entirely consumed by the specific services provided, but also (1) received kickbacks from W. F. Insurance or (2) split the fee as part of an affiliated referral arrangement. In other words, when plaintiffs' averments are viewed in the light most favorable to them and they are given the benefit of all reasonable inferences to be drawn therefrom, plaintiffs' allegations go beyond a threadbare recitation of the elements and sufficiently set forth a plausible showing of entitlement to relief. Accordingly, defendants' motions to dismiss plaintiffs' RESPA claim(s) must be denied.

## BREACH OF CONTRACT

Plaintiffs assert that W. F. Bank breached paragraph 14 of the mortgage agreement which provides: "Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law." First Amended Complaint at ¶ 57. The fee for the SFHD allegedly was

prohibited under RESPA and NFIA.  Id. at ¶ 58.  W. F. Bank breached the covenant of good faith and fair dealing by agreeing at closing that the property was not in a SFHA and then informing plaintiffs after the fact that flood insurance was a condition of their mortgage.  This was done without an intervening change in the applicable FEMA flood zone map and for the purposes of gaining unwarranted contractual and legal advantages and maximizing its own revenue in conjunction therewith.  Id. at ¶¶ 62-64.

W. F. Bank maintains that plaintiffs' breach of contract claim reflects an improper attempt to circumvent the preemptive force of NFIA as modified by FDPA.  Specifically, W. F. Bank argues that plaintiffs' breach of contact claim(s) is founded on a misrepresentation of whether plaintiffs' property is within a SFHA.  According to W. F. Bank, plaintiffs' house is within a SFHA but their garage is not.  The August 17, 2011, determination by W. F. Insurance thus properly determined that plaintiffs were required to obtain flood insurance as a condition of their loan.  A TILA disclosure was prepared in accordance therewith.  The SFHD was refined by a re-assessment on August 23, 2011, which determined that only plaintiffs' garage was not within the applicable SFHA.  Thereafter, the August 17, 2011, determination was displaced by using the August 23, 2011, SFHD at closing and amending the TILA disclosure by hand to indicate plaintiffs were not required to obtain flood insurance on the entire property.

W. F. Bank further contends that it is required by federal law to monitor the flood zone status of improved property throughout the life of any mortgage it issues.  Pursuant to this duty it was required to rectify the mistake made at closing and have plaintiffs obtain the proper insurance coverage if the home was within a SFHA, which it was according to both determinations made by W. F. Insurance in August of 2011.  But even assuming that an inaccurate determination was made by W. F. Insurance, that determination was one that falls

within the scope the FDPA. There is no private cause of action under that statute and any state law claims predicated on a violation of it are preempted. And in any event plaintiffs have failed to plead sufficient facts to show that the fee charged for the "life-of-the-loan" SFHD was unreasonable, thereby rendering their breach of contract claim deficient under federal pleading standards. The implied covenant of good faith and fair dealing component of the claim fails because plaintiffs improperly implicate the covenant to contravene the expressed contractual provisions which authorized the $19.00 charge for the life-of-the-loan SFHD.

Plaintiffs counter that W. F. Bank's right to charge a SFHD fee expressly was limited by paragraphs 14 and 16 of the mortgage, which incorporated into the agreement the limits on fees established by federal, state and local law and the concomitant limitations on the exercise of W. F. Bank's discretion in conjunction therewith. Defendants violated the agreement by charging a fee that violated "the applicable law," which included RESPA's prohibition against fee splits and kickbacks and NFIA's authorization permitting only a reasonable flood zone determination fee. Thus, plaintiffs maintain that the allegations supporting defendants asserted violation of RESPA and NFIA also support plaintiffs' breach of contract claim for charging an illegal and unreasonable fee.

Plaintiffs further contend that their contract claim does not interfere with the objectives of NFIA and the case law referenced by defendants does not support the defense of preemption.[3] Similarly, the allegations pertaining to the SFHD fee support an independent violation of the covenant of good faith because they set forth an illegal scheme premised on the charging of inflated fees for the undisclosed purpose of self-enrichment. Thus, plaintiffs argue that all aspects of their breach of contract claim survive W. F. Bank's legal challenges.

---

[3] W. F. Insurance advances the defense of preemption in response to plaintiffs' quasi-contract claim against it.

The intent of the parties to a written agreement is to be ascertained in the first instance from the writing itself, and where the words contained in the written instrument are clear and unambiguous, the intent as reflected in the expressed language chosen by the parties must be given effect. Martin v. Monumental Ins. Co., 240 F.3d 223, 232-33 (3d Cir. 2001). "[T]he focus of interpretation is upon the terms of the agreement as manifestly expressed, rather than as, perhaps, silently intended." Steuart v. McChesney, 444 A.2d 659, 661 (Pa. 1982). Ascertaining the intent of the parties is a question of law under such circumstances. Seven Springs Farm, Inc. v. Croker, 801 A.2d 1212, 1216 (Pa. 2002) (quoting Community College of Beaver County v. Community College of Beaver, 375 A.2d 1267, 1275 (Pa. 1977)); Restatement (Second) of Contracts § 212, Comment d. In contrast, when the language chosen by the parties is ambiguous, deciding the intent of the parties becomes a question of fact for a jury. Community College of Beaver County, 801 A.2d at 1275; Allegheny Intern., Inc. v. Allegheny Ludlum Steel Corp., 40 F.3d 1416, 1424 (3d Cir. 1994).

"[A] contract is ambiguous under Pennsylvania law 'if, and only if, it is reasonably or fairly susceptible of different constructions and capable of being understood in'" more than one sense. Glenn Distributors v. Carlisle Products, 297 F.3d 294, 300 (3d Cir. 2002) (quoting Duquesne Light Co. v. Westinghouse Electric Corp., 66 F.3d 604, 614 (3d Cir. 1995)); accord Hutchison v. Sunbeam Coal Co., 519 A.2d 385, 390 (Pa. 1986) (A contract contains an ambiguity "if it is reasonably susceptible of different constructions and capable of being understood in more than one sense."). Such an ambiguity may arise where the provisions or terms used "are obscure in meaning through indefiniteness of expression" or have a double meaning. Id.

In resolving a dispute about the parties' intent the court is to avoid ascribing an interpretation that conflicts with the plain meaning of the language used by the parties or otherwise alters the clear import of the contract. Amoco Oil Co. v. Snyder, 478 A.2d 795, 798 (Pa. 1984). Similarly, provisions of a contract are not to be treated as surplusage or redundant if any reasonable meaning consistent with the other parts can be given. Continental Ins. Co. v. McKain, 820 F. Supp. 890, 897 (E.D. Pa. 1993), aff'd, 19 F.3d 642 (3d Cir. 1994); Sparler v. Firemen's Ins. Co., 521 A.2d 433, 438 (Pa. Super. 1987).

Here, the parties chose to include a contractual restriction on the lender's ability to charge fees. That restriction was co-extensive with the limitations and prohibitions on fees expressly set forth in the contract and the applicable law.

The prohibitions established by RESPA appear to fall squarely within what the parties intended. The statute expressly prohibits kickbacks for referral business and fee splits undertaken where there is no actual settlement service provided by one of the parties receiving a portion of the fee. Such statutorily expressed prohibitions are incorporated into the parties' contract and a violation of them would constitute a breach of the agreement. The averments of the first amended complaint that set forth a viable claim under RESPA provide a foundation for a plausible breach of contract claim.

W. F. Bank's effort to displace the covenant of good faith and faith dealing in conjunction with this component of plaintiffs' breach of contract claim is misplaced. There is of course no independent cause of action for breach of the implied duty of good faith. Morris, 2012 WL 3929805 at *12; LSI Title Agency, Inc. v. Evaluation Servs., Inc., 951 A.2d 384, 391-92 (Pa. Super. 2008) (Pennsylvania does not recognize an action for breach of the covenant of good faith and fair dealing that is independent of a breach of contract claim.). In other words, the covenant

cannot be used to displace the expressed provisions of a contract. <u>Hutchinson</u>, 519 A.2d at 388. Nor can it be used to create an implied duty that duplicates a matter expressly covered in the parties' written agreement. <u>Id.</u>; <u>Stonehedge Square Limited Partnership v. Movie Merchants, Inc.</u>, 685 A.2d 1019, 1025 (Pa. Super. 1996).

Nevertheless, the covenant is to be taken into account in interpreting the expressed duties and obligations of the parties and assessing their performance of them. <u>Northview Motors, Inc.</u>, 227 F.3d at 91. Section 205 of the Restatement (Second) of Contracts (1979) indicates that "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." The Pennsylvania Superior Court has expressly adopted this section. <u>Creeger Brick and Bldg. Supply, Inc., v. Mid-State Bank and Trust Co.</u>, 560 A.2d 151, 153 (Pa. Super. 1989); <u>Baker v. Lafayette College</u>, 504 A.2d 247, 255 (Pa. Super. 1986).

Determining whether a party has complied with a duty or obligation in good faith "varies somewhat with the context." <u>Baker v. Lafayette</u>, 504 A.2d 247, 255 (Pa. Super. 1986). While a comprehensive listing of the examples of bad faith is not possible, the Pennsylvania courts have recognized that certain patterns of conduct may evidence bad faith. These include: "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance." <u>Somers v. Somers</u>, 613 A.2d 1211, 1213 (Pa. Super. 1992).

In the instant setting the covenant has been recognized as limiting a lender's exercise of its authority and discretion under a mortgage to matters and means that would not clearly contravene the purpose of a contractual provision and the mortgagor's reasonable expectations in conjunction therewith. <u>See</u> <u>Montanez v. HSBC Mortgage Corp.</u>, 876 F. Supp.2d 504, 513-15 (E.D. Pa. 2012) (DuBois, J.) (allegations that mortgagee exercised its discretion in a manner that

constituted a nefarious and secret scheme to profit from force-placed insurance raised a claim for breach of the covenant of good faith and fair dealing even though the mortgagee explicitly was entitled to "obtain insurance coverage at [its] option and plaintiffs' expense.") (surveying Pennsylvania law and collecting cases). In other words, "the duty of good faith limits the parties' ability to act unreasonably in contravention of the other party's reasonable expectations" and it "may be breached when a party exercises discretion authorized in a contract in an unreasonable way." Id. (quoting 3A Arthur L. Corbin, CORBIN ON CONTRACTS § 654A(B), at 89 (Supp. 1994) and Phila. Plaza–Phase II v. Bank of Am. Nat'l Trust & Savings Assoc., No., 2002 WL 1472337, *6 (Pa. Ct. Com. Pl. Phila. Cnty. June 21, 2009) (citing Burke v. Daughters of the Most Holy Redeemer, Inc., 26 A.2d 460, 461 (Pa. 1942)).

Here, plaintiffs have set forth allegations that give rise a plausible showing that W. F. Bank charged a SFHD fee that significantly was above actual cost and not entirely consumed by the specific services provided at closing. It then purposefully either received kickbacks from W. F. Insurance or split the fee as part of an affiliated referral arrangement. Other courts have held that allegations that a mortgagee has "exercised its discretion" in a similar manner state a claim for breach of contract under Pennsylvania law. Montanez, 876 F. Supp.2d at 515; Gallo v. PHH Mortgage Corp., 916 F. Supp.2d 537, 552 (D. N.J. 2012) (Allegations that mortgagee exercised its discretion to acquire flood insurance in an unreasonable manner and in bad faith by participating "in a 'scheme' to receive improper financial benefits through kickbacks, commissions, reinsurance premiums, and the like, and by manipulating the force-placed insurance process outlined in the contract to maximize its own profits schemes to gain improper financial benefits" stated a claim for breach of contract.). It follows that plaintiffs may utilize the covenant to advance and prove this aspect of their breach of contract claim.

Plaintiffs' attempt to forge a breach of contract claim based on the "reasonable fee" authorization in the FPDA stands on different footing. Plaintiffs have failed to advance allegations that identify a cognizable violation of the NFIA and thus have not pled an enforceable limitation established by the "applicable law." Thus, their efforts to convert the FPDA's "reasonable" fee authorization into a contractual limitation fails as a matter of law.

As an initial matter, defendants' contention that plaintiffs' contract claims are preempted by the NFIA is unavailing. NFIA was passed by Congress in order to "limit the damage caused by flood disasters through prevention and protective measures, spread the risk of flood damage among many private insurers and the federal government, and make flood insurance 'available on reasonable terms and conditions' to those in need of it." Van Holt v. Liberty Mutual Fire Ins. Co., 163 F.3d 161, 165 (3d Cir. 1998) (on rehearing) (quoting 42 U.S.C. § 4001(a)).

NFIA established the National Flood Insurance Program ("NFIP") and placed the Federal Emergency Management Agency ("FEMA") in charge of administering the program. Palmieri v. Allstate Ins. Co., 445 F.3d 179, 183 (2d Cir. 2006); see also 42 U.S.C. § 4017 (directing FEMA to establish a National Flood Insurance Fund in the U.S. Treasury). "Congress created this program in order to address the inability of the 'private insurance industry alone to make flood insurance available to those in need of such protection on reasonable terms and conditions.'" Padalino v. Standard Fire Ins. Co., 616 F. Supp.2d 538, 542 (E.D. Pa. 2008) (quoting 42 U.S.C. § 4001(b)). The NFIP is a federally subsidized insurance program and payment of all flood insurance claims is drawn from the National Flood Insurance Fund of the United States Treasury. Id. (citing 42 U.S.C. § 4017(a)).

The NFIA directed FEMA "to prescribe regulations establishing the general method or methods by which proved and approved claims for losses may be adjusted and paid for any

damage to or loss of property which is covered by flood insurance made available under the provisions of this title." 42 U.S.C. § 4019. These regulations are set out in the Code of Federal Regulations at 44 C.F.R. §§ 61.1 to 78.14.

FEMA initially administered the NFIP under a provision of NFIA known as Part A, 42 U.S.C. §§ 4251-56, which created a "pool of private insurance companies [that] issued policies and shared the underwriting risk[ ] with financial assistance from the federal Government." C.E.R.1988, Inc. v. Aetna Cas. & Sur. Co., 386 F.3d 263, 266 (3d Cir. 2004). Since 1978, the program has been administered under Part B of the NFIA, 42 U.S.C. §§ 4071-72. C.E.R., 386 F.3d at 266; 42 U.S.C. § 4041 (granting FEMA discretion to implement the Program under Part B). Part B provides for federal operation of the program with the assistance of private insurers.

FEMA created the Write-Your-Own ("WYO") insurance program in 1983. See 44 C.F.R. §§ 62.23 to 62.24. Under this program private insurers are permitted to write standard flood insurance policies ("SFIPs") in their own names provided the policies comply with federal law. 42 U.S.C. § 4051; 44 C.F.R. § 61.13(f). Although the private insurers write SFIPs, FEMA regulations set the terms and conditions of the policies, including the rate structures and premium costs. See 44 C.F.R. §§ 61.4(b), 62.23(a), (c), (d); 44 C.F.R. pt. 61, app. A(1) (setting forth SFIP terms for dwellings). WYO companies may not alter, amend, or waive the codified terms of a SFIP without prior government approval. Padalino, 616 F. Supp.2d at 542 (citing 44 C.F.R. §§ 61.4(b), 61.13(d), 61.13(f)).

WYO companies are fiscal agents of the United States. 42 U.S.C. § 4071(a)(1). But they are not general agents of the government. 44 C.F.R. § 62.23(g) ("A WYO Company shall act as a fiscal agent of the Federal Government, but not as its general agent."). They are "reimbursed for all 'cost incurred in the adjustment and payment of any claims for losses,' as well as any

litigation expenses associated with defending claims." Padalino, 616 F. Supp.2d at 542 (quoting 42 U.S.C. § 4017(d)(1) and citing 44 C.F.R. pt. 2, app. A, art. III(D)(2)).

The FPDA is a part of the NFIA. It establishes certain purchase and compliance requirements that apply to loans made for the acquisition or construction of buildings or mobile homes on real property locate in a SFHA, and mandates that flood insurance be maintained on any such building or mobile home. See 42 U.S.C. § 4012a(a). This requirement applies "during the life of the property, regardless of transfer of ownership of such property." Id. To achieve this end "each Federal entity for lending regulation" must establish by regulation that each regulated lending institution providing a loan to a borrower acquiring such property requires the borrower to purchase flood insurance during the term of the loan. Id. at § 4012(b)(1)(A). In addition, flood insurance is required for any such loan made by a "Federal agency lender." Id. at § 4012(b)(2). All such lenders are required to accept private flood insurance as satisfaction of these requirements as long as the coverage provided meets the requirements of NFIA. Id. at §§ 4012(b)(1)(b) & 4012(b)(2).

Thus, before making or extending any loan secured by improved real property in a SFHA, all regulated lenders must perform a SFHD and require the borrower to purchase or maintain flood insurance where it is needed. Such lenders may use a third party to make the SFHD provided it guarantees the accuracy of the results. Id. at § 4104b(d).

On three occasions the United States Court of Appeals for the Third Circuit has considered arguments about whether, and if so, to what extent NFIA preempts state law claims against WYO carriers. In Linder & Assocs. Inc. v. Aetna Cas. & Sur. Co., 166 F.3d 547 (3d Cir. 1999), the court recognized that "federal common law governs the interpretation of [SFIPs]" and thus state statutory and case law regulation of the interpretation of such insurance policies is

28

preempted. Id. at 550. The need for uniform interpretations "throughout the country" and to avoid variation "from state to state" justifies the displacement of state law in this area. Id. (quoting Nelson v. Becton, 929 F.2d 1287, 1291 (8th Cir.1991)).

In Van Holt v. Liberty Mutual Fire Insurance Co., 163 F.3d 161 (3d Cir.1998) (on rehearing), the court held that "42 U.S.C. § 4072 vests district courts with original exclusive jurisdiction over suits by claimants against WYO companies based on partial or total disallowance of claims for insurance arising out of the [NFIA]." Id. at 166. Three principles compel this conclusion: a WYO carrier is a fiscal agent of the United States, FEMA regulations require the WYO to defend against such claims "but assure that FEMA will reimburse the WYO company for defense costs" and all flood insurance claims "are ultimately paid by FEMA." Id. Thus, federal district courts have original exclusive jurisdiction "over claims sounding in tort arising out of the investigation or adjustment of insurance policies arising out of the administration and sale of insurance under the NFIA." Id. at 167. The court then concluded that the district court properly had determined that the plaintiffs' claims lacked merit and accordingly declined to ground its holding in preemption. Id. at 169 n.6 ("The United States, stressing the need for nationwide uniformity in the law, asserts that the NFIA preempts the Van Holts' state law claims. Because we hold that the plaintiffs' state-law claims lack merit and that Liberty Mutual is entitled to summary judgment as a matter of law, we need not decide whether the NFIA preempts the state-law claims.").

In C.E.R., the court considered whether the NFIA "is sufficiently comprehensive to preempt a state tort suit arising from conduct related to the [NFIP's] administration." C.E.R., 386 F.3d at 265. The plaintiff had submitted a claim for damages allegedly sustained in two hurricanes. The defendant refused to pay the claim. After suit was filed the parties settled the

plaintiff's contract claim, leaving for resolution its tort claims: negligent adjustment resulting in lost income and business opportunities, tortious bad faith conduct and outrageous conduct giving rise to punitive damages. The district court held that these claims were not preempted and interlocutory appeal followed. Id. at 265-66.

After considering the general framework of the NFIP, FEMA's regulations and the general precedent established in Van Holt, the Third Circuit started its Supremacy Clause analysis "with the basic assumption that Congress did not intend to displace state law." Id. at 268. It then considered whether any of the three principles of preemption displaced the state law in question: express preemption, field preemption (or implied preemption) and conflict preemption. Id. at 269.

Express preemption occurs when Congress uses explicit language in a statute demonstrating its intent to preempt conflicting state law. Id. (citing Morales v. Trans World Airlines, Inc., 504 U.S. 374, 383 (1992)). Field preemption exists where "federal law so thoroughly occupies a legislative field as to make reasonable the inference that Congress left no room for the States to supplement it." Id. (quoting Cipollone v. Liggett Grp., Inc., 505 U.S. 504, 516 (1992)). Conflict preemption arises "when [1] it is impossible to comply with both the state and the federal law, or [2] when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Id. (quoting Green v. Fund Asset Mgmt., L.P., 245 F.3d 214, 222 (3d Cir. 2001)).

Although express preemption arguably applies to policies issued under Part B after 2002, see 42 C.F.R. pt. 61, app. A(1), art. IX (2002), the policy did not contain an exclusive federal law and federal forum clause and thus the state tort claims were not expressly preempted. Id. at 269. Although there was persuasive precedent from the Fifth Circuit, the C.E.R. court declined to

apply field preemption, reasoning that conflict preemption provided the narrower and more clearer path.  Id.  (citing West v. Harris, 573 F.2d 873, 881-82 (5th Cir.1978) ("Congress has undertaken to establish a comprehensive flood insurance program under the control of [FEMA] to achieve policies national in scope.").

Proceeding to the second prong of conflict preemption, the court held "that the application of state tort law would impede Congress's objectives."  Id. at 270.  It explained:

> Indisputably a central purpose of the Program is to reduce fiscal pressure on federal flood relief efforts.  See, e.g., Till v. Unifirst Fed. Sav. & Loan Ass'n., 653 F.2d 152, 159 (5th Cir.1981) ("Clearly, the principal purpose in enacting the Program was to reduce, by implementation of adequate land use controls and flood insurance, the massive burden on the federal fisc of the ever-increasing federal flood disaster assistance.").  State tort suits against WYO companies, which are usually expensive, undermine this goal.  Allowing suits to proceed, Aetna contends, results in one of two consequences–both bad.  If FEMA refused to reimburse WYO carriers for their defense costs, insurers would leave the Program, driving the price of insurance higher. The alternative, remuneration for losses incurred in such suits, would directly burden the federal Treasury.  And, indeed, our decision in Van Holt relied on the belief that "FEMA reimburses the WYO companies for their defense costs."  Van Holt, 163 F.3d at 165.

Id.  The court further reasoned that the holding in Van Holt - "that a state claim 'sounding in tort' but 'intimately related to the disallowance of [an] insurance claim' is essentially a contractual claim and therefore within the exclusive jurisdiction of the federal courts" - necessarily compelled the determination that the plaintiff's state law tort claims premised on an improper investigation and adjustment of the insurance claim were an incompatible obstacle to the achievement of the federal goals embodied in the NFIP and thus were preempted.  Id. at 272.

In support of its decision the C.E.R. court reasoned that "[t]he vast majority of courts have found that the NFIA preempts state law."  Id. at 272 n. 2.  (citing Gibson v. Am. Bankers Ins. Co., 289 F.3d 943, 949 (6th Cir.2002) ("[M]ost courts have consistently found that NFIA preempts state law claims that are based on the handling and disposition of [Policy] claims.").

The exception to this position is <u>Spence v. Omaha Indem. Ins.</u>, 996 F.2d 793 (5th Cir.1993), which "arose from misrepresentation in the procurement of a Policy." <u>Id.</u> Because the case before it involved a "misrepresentation in the adjustment of a claim," which several courts had held to be a distinguishing factor, the court declined to "decide today whether a case alleging misrepresentation in claims procurement would also be preempted." <u>Id.</u> (citing <u>Messa v. Omaha Prop. & Cas. Ins. Co.</u>, 122 F. Supp.2d 513, 521 (D.N.J. 2000) ("Policy procurement is an entirely different creature than claims handling.").

Here, defendants do not present any meaningful analysis on how the NFIA preempts plaintiffs' claims under each of the doctrinal approaches that are utilized to determine whether the assumption that Congress did not intend to preempt state law should be supplanted. Instead, they invoke the general notion of preemption, give their version of the historical facts and conclude that plaintiffs' claims should be deemed to be barred. Of course, such an approach is neither insightful nor enlightening.

Moreover, defendants fail to reference any statutory provision that expressly preempts plaintiffs' breach of contract claim. Plaintiffs' breach of contract claim does not pertain to the administration and adjustment of a claim for proceeds under a flood insurance policy. To the contrary, it pertains to conduct occurring in a mortgage transaction where, under plaintiffs' version of the facts, the improved property and thus the financial transaction did not require flood insurance. Furthermore, the breach assertedly is premised on activities that are in contravention of federal statutory law. Thus, plaintiffs' breach of contract claim is not expressly preempted.

Field preemption is not applicable for similar reasons. Plaintiffs do not seek to recover under a policy controlled by FEMA regulations. Nor do they seek relief based on conduct

involving the administration of such a policy.  In other words, there is no basis to assume that any recovery plaintiffs might obtain will be paid by the United States Treasury.  Thus, the underpinnings for field preemption are absent.

Finally, conflict preemption does not apply.  Plaintiffs' claim does not present a scenario where (1) defendants will be unable to comply with both state and federal law or (2) recovery will create an obstacle to the accomplishment and execution of the full purposes and objectives reflected in NFIA.  Plaintiffs' contract claim is predicated on misconduct in connection with the procurement of a mortgage.  The misconduct did not mislead plaintiffs into acting to their detriment under the belief that flood insurance was not needed for their improved property.  To the contrary, the complaint alleges that W. F. Bank charged fees in part to advance its own financial interest and then sought to utilize an inaccurate determination about the need for flood insurance for its own and W. F. Insurance's financial interest.  Although not free from doubt, the courts that have considered claims of this nature have reasoned that such conduct does not implicate matters within the scope of the NFIA.  See generally Padalino v. Standard Fire Ins. Co., 616 F. Supp.2d 538 (E.D. Pa. 2008) (Surveying precedent and concluding that state law claims for breach of contract and tort arising in procurement of a SFIP were not preempted under express, field or conflict preemption and concluding that preemption in that area "would leave an entire area of the insurance field unregulated and immunize private insurers no matter how egregious their conduct.") (quoting Bleecker v. Standard Fire Ins. Co., 130 F. Supp.2d 726, 736-37 (E.D. N.C.2000); Fadel v. Nationwide Mutual Fire Ins. Co., 2012 WL 5878728 (W.D. Ky. Nov. 21, 2012) (Heyburn II, J.) (holding that "the better view is that NFIA does not preempt procurement fraud claims" and reasoning that "the NFIA only indemnifies insurance brokers sued for issues arising from FEMA's actions, not for the negligence or intentional acts of brokers

concerning the procurement of the insurance contract itself, a situation over which FEMA has little control."); Campo v. Allstate Ins. Co., 562 F.3d 751, 757 (5th Cir. 2009) (two factors compel the conclusion that NFIA does not preempt state-law procurement-based claims: "Congress, via its delegation of regulatory power to FEMA, has expressly preempted state law only as to handling-related claims. And, "Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted.") (citations omitted); Reeder v. Nationwide Mut. Fire Ins. Co., 419 F.Supp.2d 750, 763 (D. Md. 2006) ("Plaintiffs' [procurement-based] state law tort claims for negligence, intentional misrepresentation, negligent misrepresentation, fraud and deceit are not preempted by federal flood insurance law.") (following weight of authority); Williams v. Standard Fire Ins. Co., 892 F. Supp.2d 608, 613 (M.D. Pa. 2012) (NFIA does not preempt state law claims predicated on inaccurate determinations as to the need for flood insurance, particularly where no flood insurance policy is at stake; to the contrary, such claims may be necessary to achieve the federal objectives underlying the Act and the pertinent legislative history suggests such claims were contemplated by Congress.); Bleecker, 130 F. Supp.2d at 734 ("As NFIA does not provide a cause of action for an insurance agent's 'error or omission,' it is logical to conclude that Congress intended for plaintiffs to avail state law remedies to address an insurer's tortious misconduct."). The principles and reasoning utilized by these courts apply with equal force here where no flood insurance policy or coverage is at issue and the contract claim is predicated on alleged nefarious self-dealing in contravention of federal statutory law governing the mortgage transaction. Thus, plaintiffs' breach of contract claim is not preempted by NFIA.

In contrast, plaintiffs have failed to allege facts which will support a breach of contract claim predicated on a violation of section 4012a of the FDPA. The federal courts uniformly

have concluded that no private cause of action exists to enforce the provisions of the FDPA because "the federal treasury, not individual mortgagors like [the plaintiff], is the class the statute intends to protect." See e.g. Wentwood Woodside I, LP v. GMAC Commercial Mortg. Corp., 419 F.3d 310, 323 (5th Cir. 2005) (citing Till, 653 F.2d at 159–61 ("In short, appellants are not the especial beneficiaries of sections 4012a(b) and 4104a in view of the fact that the only duties imposed therein are upon the various federal regulatory agencies and the clear indication of concern not merely for borrowers but also for the federally insured lending institutions."); Hofbauer v. Northwestern Nat'l Bank, 700 F.2d 1197, 1201 (8th Cir.1983) ("We conclude that 42 U.S.C. §§ 4012a(b) and 4104a do not create an implied federal right of action for damages. Because the three recent appellate opinions we have cited thoroughly analyze the issues, we forego further discussion."); Arvai v. First Fed. Sav. & Loan Ass'n, 698 F.2d 683, 684 (4th Cir.1983) (mortgagors are not within the class sought to be protected by the Act and there is no suggestion in the legislative history to create an implied cause of action for violation of its provisions); Mid–America Nat'l Bank of Chicago v. First Sav. & Loan Ass'n of South Holland, 737 F.2d 638, 642 (7th Cir.) ("Absent any indication that Congress intended a federal cause of action in favor of borrowers against lenders under Sections 4012a(b) and 4104a, this Court is not in a position to create such a cause of action."), cert. denied, 469 U.S. 1160 (1984)).

The great weight of authority likewise holds that recognition of common law claims predicated on a violation of the FDPA would be an improper intrusion into a federally regulated area where Congress chose to forego creating a right of enforcement in the borrower. See e.g. Lukosus v. First Tennessee Bank Nat. Ass'n., 2003 WL 21658263, *2 (W.D. Va. July 9, 2003) (although the body of federal authority holding that there is no implied cause of action under the FDPA does not preclude recognition of a state-law claim based on a standard of conduct derived

therefrom, "those state courts that have considered the issue have rejected any such common law cause of action, based in part on principles of federalism.") (citing <u>Mid–Am. Nat'l Bank of Chicago v. First Sav. & Loan Ass'n of S. Holland</u>, 515 N.E.2d 176, 180 (Ill. App. Ct. 1987) (holding that violation of FDPA cannot be used to create a duty giving rise to common law misrepresentation action); <u>R.B.J. Apartments, Inc. v. Gate City Sav. & Loan Ass'n</u>, 315 N.W.2d 284, 289 (N.D. 1982) (same as to common law negligence action); <u>Bigler v. Centerbank Mortgage Co.</u>, 1994 WL 711168, at *2 (Conn. Super. Ct. Dec. 12, 1994) (same as to negligence, misrepresentation and fraud actions)), <u>aff'd</u>, 89 Fed. Appx. 412 (4th Cir. 2004); <u>Guyton v. FM Lending Services, Inc.</u>, 681 S.E.2d 465, 474-75 (N.C. Appeals) (2009) (following the reasoning of <u>Wentwood</u> and declining to recognize common law claims predicated on a violation of § 4104a(a)(1) because (1) the statute does not place an unconditional duty to provide notice on the service provider but instead imposes only a conditional duty based on actual gained knowledge and (2) recognizing a common law cause of action would "inappropriately circumvent the widely-accepted understanding that Congress did not intend to create a federal private right of action under [the FDPA]."); <u>Callahan v. Countrywide Home Loans, Inc.</u>, 2006 WL 2993178 (N.D. Fla. Oct. 20, 2006) ("it would implicate serious federalism concerns to allow such claims to stand, and, consequently, most states dealing with this issue have held that these federalism concerns preclude any state common law action based on a violation of the [FDPA].") (citing among other cases <u>Jack v. City of Wchita</u>, 933 P.2d 787 (Kan. Ct. App. 1997); <u>Lehmann v. Arnold</u>, 484 N.E.2d 473 (III. App. Ct. 1985); <u>Dollar v. NationsBank of Ga., N.A.</u>, 534 S.E.2d 851 (Ga. Ct. App. 2000); and <u>Pippin v. Burkhalter</u>, 279 S.E.2d 603 (S.C. 1981)).

The concerns echoed throughout these cases provide sufficient justification to support the conclusion that the Supreme Court of Pennsylvania would hold that plaintiffs cannot maintain a

common law breach of contract claim based on § 4012(a)(h)'s authorization for third-parties who provide flood zone determinations to the regulated lenders to charge a reasonable fee for their services. "The plain language of section 4012a establishes that it applies only to 'regulated lending institutions' that are regulated in the sense that they are subject to the oversight of a 'Federal entity for lending regulation[.]'" <u>Wentwood</u>, 419 F.3d at 322. The statute permits the regulated entities to rely on third-party flood zone determinations and authorizes the charging of a fee in conjunction therewith. While the authorization in subsection (h) can be read to create a restriction on the amount charged for such services, such a reading is not natural or intuitive given that Congress placed the direct responsibility for implementing the FDPA section of the NFIA on the federal regulatory agencies.

Second, the purpose of enacting the FDPA was to reduce the burden on the federal government in funding flood disaster relief. <u>Till</u>, 653 F.2d at 158. Its overall concern is to protect the lenders whose deposits are insured by the federal agencies. <u>Id.</u> at 159. The subsection delineates the circumstances under which the borrower may be charged a fee. These circumstances do not correlate with any expressed intent to protect the borrower, but instead pertain to events within the legislative scheme that correlate to a change in the lender's interest in the property. None of these interests or concerns provides justification for imposing common law liability as a means for regulatory compliance.

Third, the FDPA is a broad regulatory scheme designed to allow federal regulatory agencies to implement and enforce flood insurance and flood zone notice requirements. <u>Hofbauer</u>, 700 F.2d at 1201; <u>Till</u>, 635 F.2d at 160. Within this scheme Congress provided for enforcement mechanisms including the issuance of cease and desist orders, the imposition of administrative remedies, the termination of improper or misplaced practices and authorization to

prevent or correct violations. <u>Till</u>, 635 F.2d at 160. "Existence of this administrative scheme of enforcement is strong evidence that Congress intended the administrative remedy to be exclusive." <u>Id.</u>; <u>Transamerica Mortg. Advisors, Inc. v. Lewis</u>, 444 U.S. 11, 20 (1979) (where a statute expressly provides for particular modes of enforcement and remedies, courts must be chary of reading others into it because the designation of such measures negates the use of other modes).

Fourth, Congress did provide for private enforcement in other sections of the NFIA. <u>See</u> <u>e.g.</u> 42 U.S.C. §§ 4053, 4072. Such distinctions are strong evidence that Congress did not intend enforcement in other areas to be maintained by private third parties. <u>Touche Ross & Co. v. Redington</u>, 442 U.S. 560, 572 (1975).

The purpose and structure of the FDPA militates against the recognition of a state law cause of action predicated on its provisions. <u>Lehmann</u>, 484 N.E.2d at 423. The statute does not directly confer any benefits on borrowers or impose any direct burdens on lenders. It provides for regulatory supervision of lending institutions with an administrative enforcement scheme to assure compliance and provide corrective measures. In devising this approach Congress necessarily balanced the competing interests of borrowers, lenders, and federal lending regulators and took into account federal financial interests in crafting the statute. Deference and principles of federalism sufficiently counsel against the use of common law to enforce the statute under such circumstances. <u>Id.</u>; <u>accord</u> <u>R.B.J. Apartments</u>, 315 N.W.2d at 290 ("The separation-of-powers doctrine and principles of federalism militate against the adoption of the federal statute as the standard of care in a state negligence action when no private cause of action, either explicit or implicit, exists in the federal statute.").

The authority declining to recognize a basis for common law liability pursuant to the FDPA is overwhelming. We thus predict that the Supreme Court of Pennsylvania would follow these tenets and view the use of state contract law in this arena to be an unwarranted intrusion into a federal legislative domain.[4]

**UNJUST ENRICHMENT**

Plaintiffs advance an unjust enrichment claim against W. F. Insurance based on allegations that it allegedly (1) participated in an unlawful kickback and/or fee splitting scheme in violation of RESPA; (2) charged an unreasonable SFHD fee in violation of FDPA; and (3) provided a SFHD that was misleading and useless. W. F. Insurances contends that the claim is barred and preempted by the FDPA, a violation of RESPA has not been adequately pled and plaintiffs cannot show that retention of the $19.00 fee was inequitable and unjust.

As explained above, plaintiffs have sufficiently pled a violation of RESPA and the doctrine of preemption does not bar the use of common law contract principles to obtain relief based on such conduct. In contrast, such principles cannot be used to establish liability predicated on a violation of § 4012a(h). Thus, the component of W. F. Insurance's motion left for discussion is the contention that plaintiffs cannot show the SFHD fee was retained under circumstances that will support liability for unjust enrichment.

W. F. Insurance argues that plaintiffs' unjust enrichment claim is self-defeating because plaintiffs agreed to pay the SFHD fee in their closing contract with W. F. Bank and received the

---

[4] Moreover, even assuming such a cause of action should be recognized, plaintiffs would still have to plead facts that show a violation of the federal provision in question. In the instant context such a showing would require plaintiffs to plead that the federal regulatory agency supervising W. F. Bank in conjunction with the mortgage transaction has determined through administrative action that the fee charged was not reasonable under the applicable regulations and/or guidelines. Plaintiffs have failed to plead that any such administrative action has occurred. Thus, their breach of contract claim predicated on § 4012a(h) fails for this reason as well.

benefit of a life-of-the-loan determination as a result of the fee, thus precluding any finding of unjust enrichment. In addition, plaintiffs have failed to allege that W. F. Insurance made a misrepresentation to them in conjunction with the benefit they received. Finally, W. F. Insurance maintains that there is no basis to conclude that the SFHD fee was unreasonable or the SFHA determination was inaccurate.

Under Pennsylvania law a claim of unjust enrichment or quasi-contract has the following elements: (1) the plaintiff conferred a benefit on the defendant; (2) the defendant appreciated the benefit; and (3) the defendant accepted and retained the benefit under circumstances that make it inequitable or unjust for it to do so. Global Ground Support, LLC v. Glazer Enterprises, Inc., 581 F. Supp.2d 669, 675 (E.D. Pa. 2008) (citing Com. ex. rel. Pappert v. TAP Pharm. Prods., Inc., 885 A.2d 1127, 1137 (Pa. Commw. 2005) and Torchia v. Torchia, 499 A.2d 581, 582 (Pa. Super. 1985)). "The polestar of [this] inquiry is whether the defendant has been unjustly enriched; the intent of the parties is irrelevant." Id. (quoting Limbach v. City of Phila., 905 A.2d 567, 577 (Pa. Commw. 2006)). In other words, recovery is appropriate where there is "both (1) an enrichment, and (2) an injustice resulting if recovery for the enrichment is denied." Id. (quoting Samuels v. Hendricks, 445 A.2d 1273, 1275 (Pa. Super. 1982) (quoting Meehan v. Cheltenham Twp., 189 A.2d 593, 595 (Pa. 1963) (emphasis in original)).

W. F. Insurance's contention that a misrepresentation is needed to maintain a claim against it is unavailing. First, a plaintiff "need not have directly dealt with each defendant in order to allege a claim of unjust enrichment . . . ." Global Ground Support, 581 F. Supp.2d at 676. "The claim simply requires that a plaintiff 'confer' benefits on a defendant; there is no requirement that the plaintiff 'directly confer' those benefits." Id. (citing Baker v. Family Credit Counseling Corp., 440 F. Supp.2d 392, 420 (E.D. Pa. 2006); Com. ex rel. Pappert v. Tap Pharm.

Products, Inc., 885 A.2d 1127, 1137–38 (Pa. Commw. 2005) (a plaintiff does not have to plead that it directly conferred a benefit in order to maintain an unjust enrichment claim); and D.A. Hill Co. v. CleveTrust Realty Investor., 573 A.2d 1005, 1009 (Pa.1990) (subcontractor could recover from owner on unjust enrichment theory even if they did not have a direct contractual relationship)).

Second, "a showing of knowledge or wrongful intent on the part of the benefited party is not necessary in order to show unjust enrichment. Rather, the focus is on the resultant unjust enrichment[,] not on the party's intention." Torchia, 499 A.2d at 583 (quoting Crossgates Realty, Inc. v. Moore, 420 A.2d 1125, 1128 (Pa. Super. 1980)). In other words, a showing that a defendant either "wrongfully secured or passively received a benefit" under circumstances that make its retention unconscionable is sufficient. Torchia, 499 A.2d at 582 (quoting Roman Mosaic & Tile Co. v. Vollrath, 313 A.2d 305, 307 (Pa. Super. 1973)).

Plaintiff has sufficiently stated an unjust enrichment claim. First, plaintiff has alleged that the commission W. F. Insurance received came at her "ultimate expense." Second, they adequately have alleged that the commission was received as part of an undisclosed kick-back or fee splitting scheme in violation of RESPA. The allegations underlying these assertions collectively are sufficient to create a showing that a benefit was conferred upon W. F. Insurance under circumstances that would make its retention unjust.

In contrast, in the absence of a RESPA violation the mere showing that the SFHD fee was unreasonable or the SFHA determination was inaccurate would not provide grounds for equitable relief. Such injuries may give rise to a breach of contract claim for money damages against W. F. Bank. They do not, however, provide grounds for equitable relief against W. F. Insurance. See Meehan, 189 A.2d at 596 (adopting section 110 of the Restatement of

41

Restitution and observing that where a third party benefits from a contract entered into between two other parties, in the absence of some misleading by the third party, the mere failure of performance by one of the contracting parties does not give rise to a right of restitution against the third party.); Torchia, 499 A.2d at 233 (To sustain a claim of unjust enrichment the claimant must show that the party against whom recovery is sought either wrongfully secured or passively received a benefit and there would be unconscionable injustice in permitting the benefit to be retained without compensation.); Samuels v. Hendricks, 445 A.2d 1273, 1275 (Pa. Super. 1982) ("In order to recover, there must be both (1) an enrichment, and (2) an injustice resulting if recovery for the enrichment is denied.") (quoting Meehan, 189 A.2d at 595)).

It follows that plaintiffs cannot maintain an unjust enrichment claim against W. F. Insurance based solely on a showing that the SFHA determination was inaccurate or the SFHD fee was unreasonable. Accordingly, W. F. Insurance's motion will be granted as to these grounds for maintaining their unjust enrichment claim and denied in all other aspects.[5]

**CONCLUSION**

For the reasons set forth above, W. F. Bank's motion to dismiss will be granted as to plaintiffs' breach of contract claim to the extent it (1) seeks to advance a cause of action for breach of the covenant of good faith and fair dealing as an independent basis for recovery and (2) is predicated on a violation of the reasonable fee authorization in section 4012a(h) of the FDPA. W. F. Insurance's motion to dismiss will be granted as to plaintiffs' claim for unjust enrichment to the extent it seeks relief based solely on a showing that the SFHA determination was

---

[5] Of course, evidence that has a bearing on whether (1) the SFHD was or was not accurate or (2) a portion of the SFHD fee was not used to pay for the services rendered at closing may well be relevant to plaintiffs' remaining RESPA, breach of contract and unjust enrichment claims.

inaccurate or the SFHD fee was unreasonable.  The motions will be denied in all other aspects.

An appropriate order will follow.


Date: November 6, 2013


                                        s/ David Stewart Cercone
                                        David Stewart Cercone
                                        United States District Judge



cc:     Michele R. Fisher, Esquire
        E. Michelle Drake, Esquire
        Kai H. Richter, Esquire
        Daniel B. Huyett, Esquire
        Jason A. Risk, Esquire
        Steven J. Adams, Esquire

        (*Via CM/ECF Electronic Mail*)