IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THOMAS M. JACKSON and PATRICIA G. JACKSON, as individuals and as representatives of the classes,<br><br>Plaintiffs,<br><br>v.<br><br>WELLS FARGO BANK, N.A. and WELLS FARGO INSURANCE, INC.<br><br>Defendants. | Civil Action No.: 2:12-cv-01262-DSC<br><br>Judge David Stewart Cercone<br><br>ELECTRONICALLY FILED |

### DECLARATION OF THOMAS M. JACKSON AND PATRICIA G. JACKSON

1. We are the named Plaintiffs (Thomas M. Jackson and Patricia G. Jackson) in the above-captioned action, and have been married for over 18 years. We make the statements in this Declaration based upon personal knowledge, and would be competent to testify to the facts in this Declaration.

*Background Relating to Flood Zone Determination*

2. On August 31, 2011, we obtained a mortgage loan from Wells Fargo Bank ("WFB") in the amount of $107,500.

3. In connection with this mortgage loan, we received a Truth-in-Lending Disclosure ("TILA Disclosure"). The initial version of the TILA Disclosure erroneously stated that flood insurance was required for our property. However, this error was later corrected, and the TILA Disclosure was amended (with the approval and consent of WFB) to provide that flood insurance "is not required" for our property.

4. At the closing, we also signed a Standard Flood Hazard Determination ("SFHD"), which had been prepared by Wells Fargo Insurance, Inc. ("WFI") for Wells Fargo Bank, N.A. ("WFB"). This SFHD affirmatively indicated that flood insurance was not required.

5. In spite of these signed disclosures (including the TILA Disclosure), WFB sent us a form letter on or about November 7, 2011 – barely two months later – contending that flood insurance "is a requirement of your loan." This letter further stated that if we did not provide WFB with evidence of flood insurance, WFB would purchase such insurance for our property, at our expense.

6. We repeatedly objected to WFB's attempt to impose this previously-undisclosed flood insurance requirement on us. On at least two occasions, we called the customer service number listed on the form letter (866-826-4884), but our calls were rolled over to voice mail and our messages were not returned. In addition, we wrote a letter of protest to WFB on December 9, 2011, in which we "emphatically state[d] that flood insurance is not a requirement of our loan," and enclosed a copy of the SFHD that we signed at closing.

7. We initially received no response to our letter. As a result, we felt we had no choice but to purchase the coverage demanded by WFB, and did so.[1] Upon purchasing this coverage, Mr. Jackson sent a second letter to WFB on December 19, 2011, stating as follows:

> In compliance with your November 7, 2011, I have purchased additional flood insurance from the NFIP to increase my coverage to $250,000 [the amount demanded by WFB].
>
> * * *
>
> I still maintain that my property is not in a flood hazard area, that I would not have taken out the loan if I had known that flood insurance was required, and that your company assured me that I was not required to obtain flood insurance prior to my signing the settlement papers. Further, my obtaining additional flood

---

[1] The flood insurance coverage that we procured under protest in order to meet WFB's previously-undisclosed flood insurance requirement cost several hundred dollars.

insurance does not mean I am giving up any rights or remedies that I may have to appeal or have this matter reviewed and resolved in my favor.

8. On January 5, 2012, WFB finally sent us a letter responding to our concerns. In this letter, WFB contended that the SFHD was for the "garage only," and enclosed a separate flood zone determination for our "residence only." Notably, this purported flood zone determination for our residence had not been provided to us previously, and was not signed by us at the loan closing. Moreover, this purported flood zone determination for our residence bears indicia of fraud. The comments on the form (in Section E) state that WFI made a determination regarding the flood zone status of our residence on "8/23/11". However, the DATE OF DETERMINATION listed on the form is August 17, 2011.

9. After receiving this correspondence, we contacted WFB once again, and spoke to an Executive Mortgage Specialist at WFB. During this phone call, we expressed our dismay that WFB had not disclosed its flood insurance requirement to us at the closing of our loan. In response, WFB abandoned its position that the SFHD pertained to the "garage only," and sent us a follow-up letter stating as follows:

> This letter is in response to our telephone conversation on February 2, 2012, regarding the financing of your mortgage loan with Wells Fargo Home Mortgage ("WFHM"). You expressed concerns about the flood insurance requirement not being disclosed to you during the closing of your loan.
>
> **Our records reflect that flood insurance was not required on your loan at the time of closing. This is reflected on the Standard Flood Hazard Determination and the Truth-In-Lending Disclosure**, which I have enclosed.
>
> **We apologize for the incorrect information that was provided to you stating that flood insurance was required on your property.**

(emphasis added).

10. By the time we received this letter, however, we already had paid off our mortgage loan with WFB and had refinanced with another bank in order to free ourselves from

3

WFB's onerous flood insurance requirement. Our current lender does not require flood insurance for our property, and has determined that our home does not fall in a special flood hazard area.

11. The transaction costs associated with this payoff and refinancing were substantial. However, WFB did not offer to reimburse us for any of these transaction costs, and did not offer to reimburse us for the flood insurance premiums that we incurred for the coverage that we purchased in response to WFB's November 7, 2011 form letter. WFB simply offered us an empty and belated apology.

12. WFB had no right to demand flood insurance for our property. As noted above:

- The TILA Disclosure that we signed stated that flood insurance was "not required" (*see supra* at ¶ 5);

- The SFHD that we signed stated that flood insurance was "not required" (*see supra* at ¶ 6);

- Our current lender has determined that flood insurance is not required (*see supra* at ¶ 10); and

- Wells Fargo eventually admitted that "flood insurance was not required" (*see supra* at ¶ 9).

Moreover, prior to closing, we obtained our own independent flood zone determination from CoreLogic Flood Services ("CoreLogic"), which determined that flood insurance was "not required."

***Fairness of Class Action Settlement***

13. We are fully informed of the terms of the Settlement. We both attended the mediation at Mr. Kushner's offices in Pittsburgh, and have read the Settlement Agreement in its entirety. We also have had the opportunity to consult with our counsel regarding the terms of the Settlement.

14. In our opinion, the Settlement is fair, reasonable, and appropriate, both as to us and as to the members of the proposed Settlement Class.

15. We are pleased that Settlement Class Members who file claims will receive a refund equal to half of the amount that WFB charged for flood zone determinations during the Class Period (from August 30, 2011 and December 31, 2013). We believe that this represents a satisfactory resolution of the class claims relating to improper markups in connection with flood zone determinations

16. We also understand that WFB has stopped receiving "soft dollars" from Wells Fargo Insurance ("WFI") in connection with flood zone determinations, and are pleased that Wells Fargo decided to change its business practices in this regard after our lawsuit was filed.

17. We are proud to have played a role in achieving these results, and request that the Court approve the Settlement.

### *Representation of Class Members*

18. We would be honored to be appointed by the Court as a class representative in connection with the Settlement.

19. In connection with this case, we have (among other things): (1) spoke with counsel several times before filing the lawsuit; (2) provided counsel with documents and information relating to our claims; (3) regularly communicated with counsel throughout the litigation; (4) traveled to Pittsburgh for the mediation and personally attended the mediation; (5) reviewed numerous pleadings and other documents relating to the case, including the Complaint, our response to the Motion to Dismiss, and the Court's Order denying the Motion to Dismiss; and (6) reviewed our mediation statement, the Settlement Agreement, the exhibits to the Settlement Agreement, and a draft of the motion for preliminary settlement approval.

20. At all times, we have considered the interests of the Class members, and we will continue to do so if we are appointed as their class representatives. To our knowledge, we have no conflicts of interest with any of the Settlement Class members that would preclude us from serving as their class representatives.

### *Interactions with Class Counsel*

21. We also support our lawyers' request to be appointed as class counsel. We are pleased with the representation that they have provided to us and the other Settlement Class members, and are satisfied with the results they have achieved.

22. The lawyers that we have dealt with have been professional, have kept us informed of the proceedings, and have been responsive to our questions and concerns. We have no reservations about the work they have performed, and have appreciated the opportunity to work with them on behalf of the Settlement Class members.

### *Resolution of Individual Truth-In-Lending Act Claim*

23. In addition to resolving our claims relating to flood zone determinations on a class-wide basis, the proposed settlement also resolves our Truth-In-Lending Act ("TILA") claim on an individual basis.

24. We agreed to negotiate the resolution of that claim on an individual basis because the facts of that claim are unique.

25. Shortly before we originated our mortgage loan with WFB, we received a Truth-in-Lending Disclosure ("TILA Disclosure") from WFB in connection with our mortgage. WFB's initial TILA Disclosure stated that flood insurance was required for our property. However, WFB later corrected this error, and at the closing of our mortgage loan, we signed an amended TILA Disclosure which stated that flood insurance was not required. *See* Exhibit 1.

26. Despite this amended TILA Disclosure, WFB sent us a letter on or about November 7, 2011 stating that flood insurance was required. This letter stated that WFB would purchase flood insurance coverage for us if we did not purchase it ourselves, and then charge us for the cost of the insurance.

27. After receiving this letter, we repeatedly called WFB's customer service at the phone number provided in the letter. Even though we repeatedly left messages at this number, nobody ever returned our calls. On or about December 9, 2011, we wrote and mailed WFB a letter emphatically stating that flood insurance was not a requirement of our loan. After these repeated attempts to resolve the flood insurance issue, we felt we had no choice but to purchase the coverage WFB demanded, so we purchased the additional insurance coverage, which cost several hundred dollars.

28. We would not have mortgaged our property with WFB if we had known it would require us to purchase flood insurance on the property. After purchasing the additional flood insurance coverage, on approximately December 19, 2011, we wrote a letter to WFB stating as much.

29. We found Wells Fargo's flood insurance requirement to be unreasonable and were so dismayed at the way WFB handled the issue that we decided to pay off the mortgage using money we had saved for retirement. In January 2012, we paid Wells Fargo $107,650, which was the outstanding balance on our mortgage. We took money out of two traditional Individual Retirement Accounts ("IRAs") and one Roth IRA to make this payment.

30. The withdrawals from our traditional IRAs resulted in $84,000 in taxable income for 2011 and 2012, and we had to pay approximately $21,200 in income tax because of these

withdrawals. In addition, we had to make withdrawals from an IRA to pay for these taxes, which resulted in approximately $5,000 in additional taxes for us in 2013.

31. As we are now retired and have no income, we will not have any more opportunities to contribute income to a retirement account. Before paying off the mortgage, our financial plan was to keep this money in our retirement accounts until 2018, when we would have been required to take minimal distributions from the accounts. Our plan was that after 2018, we would use those funds as cash for our retirement. In addition to the taxes we had to pay, our long term financial planning was seriously disrupted by having to pay off the mortgage, and we suffered a significant amount of lost investment income.

32. After additional correspondence with WFB, in which we expressed our dismay that the flood insurance requirement had not been disclosed to us at the time of closing, WFB eventually sent us a letter stating that flood insurance was not required on our loan at the time of closing and that WFB had provided "incorrect information" when it had stated flood insurance was required for our property. By the time we had received this letter, however, we had paid off our mortgage loan with WFB (in order to avoid the supposed flood insurance "requirement" imposed by WFB), and it was too late to undo the harm we had suffered.

33. As noted above, we suffered over $25,000 in adverse tax consequences as a result of paying off our mortgage with WFB. In addition, we lost out on significant investment income during the bull market period from the end of 2011 to the present, during which time the S&P 500 increased over 57% from 1,257.60 on December 30, 2011 to 1,970.07 as July 30, 2014. *See* Exhibit 2. Accordingly, we believe that the $25,000 payment we negotiated to settle our individual TILA claim represents a fair and reasonable compromise of that claim.

34. That said, our support for the class settlement is not contingent on whether the Court approves the settlement of our individual TILA claim. Pursuant to Paragraph 43 of the Settlement Agreement, we would (and do) support the class settlement without regard to the terms on which our individual TILA claim is resolved.

35. I declare under penalty of perjury that the foregoing is true and correct.

Dated: August 9, 2014

Patricia G. Jackson

Dated: August 9, 2014

Thomas M. Jackson