**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| THOMAS M. JACKSON and PATRICIA G. JACKSON, as individuals and as representatives of the classes, | **Case No. 2:12-cv-01262-DSC** |
| Plaintiffs, | **Judge David Stewart Cercone** |
| v. | **ELECTRONICALLY FILED** |
| WELLS FARGO BANK, N.A., and WELLS FARGO INSURANCE, INC, | |
| Defendants. | |

## OBJECTION OF WEI CYRUS HUNG

Adam E. Schulman (admitted *pro hac vice*)
CENTER FOR CLASS ACTION FAIRNESS
1718 M Street NW
Washington, DC 20036
Phone: (610) 457-0856
Email: shuyande24@gmail.com

Attorneys for Objector Wei Cyrus Hung

TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................................... I

TABLE OF AUTHORITIES .............................................................................................. II

INTRODUCTION ............................................................................................................... 1

I.     Objector Wei Cyrus Hung is a class member and intends to appear through counsel at the fairness hearing. .................................................................................................. 1

II.    The Court has a fiduciary duty to the absent members of the class. ........................... 4

III.   There is no legitimate reason why this settlement does not issue direct payments to known, eligible class members. .............................................................................................. 7

IV.    The claims-made process, in conjunction with other provisions of the settlement, unfairly enables class counsel to obtain a disproportionate amount of the settlement proceeds. ......... 13

       A.    Disproportionate fee request ....................................................................... 15

       B.    The clear sailing agreement ........................................................................ 18

       C.    The "kicker" / segregated fee fund ............................................................. 19

V.     Adequacy of representation is undermined by the enhancement payments afforded to named plaintiffs. .................................................................................................................. 21

VI.    In the alternative to denying settlement approval, the Court should limit counsel's fee award to 25% of the true constructive common fund. ........................................................... 24

       A.    Percentage-based award should be based upon actual claims made, not upon a fictitious 100% claims rate. ........................................................................... 25

       B.    The lodestar cross-check confirms the need to reduce class counsel's award ............ 31

CONCLUSION ................................................................................................................. 35

**TABLE OF AUTHORITIES**

**Cases**

*7-Eleven, Inc. v. Etwa Enter..*, No. 12-3336, 2013 U.S. Dist. LEXIS 83961 (D. Md. Jun 12, 2013) .......35

*Acosta v. Trans Union, LLC*, 243 F.R.D. 377 (C.D. Cal. 2007) ....................................................9

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ...............................................................22

*Boeing v. Van Gemert*, 444 U.S. 572 (1980)..........................................................26, 28, 29

*Bowling v. Pfizer, Inc.*, 922 F. Supp. 1261 (S.D. Ohio 1996) ......................................................31

*Broussard v. Meineke Disc. Muffler Shops*, 155 F.3d 331 (4th Cir. 1998)................................23-24

*DeLeon v. Bank of Am.*, No. 6:09-cv-1251, 2012 U.S. Dist. LEXIS 91124 (M.D. Fla. Apr. 20, 2012) ...9

*Dennis v. Kellogg Co.*, 697 F.3d 858 (9th Cir. 2012) ........................................................ 16, 17

*Dewey v. Voksvagen Aktiengesellschaft*, 681 F.3d 170 (3d Cir. 2012).........................................22

*Duhaime v. John Hancock Mut. Life Ins. Co.*, 989 F. Supp. 375 (D. Mass. 1997).........................31

*Erie County Retirees Ass'n v. County of Erie*, 192 F. Supp. 2d 369 (W.D. Pa. 2002)...................16

*Eubank v. Pella Corp.*, 753 F.3d 718 (7th Cir. 2014) ...................................................... 13, 19

*Fraser v. Asus Computer Int'l.*, No. C 12-00652 WHA, 2012 U.S. Dist. LEXIS 22338 (N.D. Cal. Feb. 19, 2013) ...........................................................................................................13

*Galloway v. Kan. City Landsmen, LLC.*, No. 4:11-1020-CV-W-DGK, 2012 U.S. Dist. LEXIS 147148 (W.D. Mo. Oct. 12, 2012) ...........................................................................7-8, 13

*Girsh v. Jepson*, 521 F.2d 153 (3d Cir. 1975). ...................................................................6

*Guerrero v. Wells Fargo Bank, N.A.*, 2014 U.S. Dist. LEXIS 122791 (N.D. Cal. Sept. 2, 2014) ............10

*Hensley v. Eckerhart*, 461 U.S. 424 (1983) ......................................................................32

*Howell v. Jbi, Inc.*, 298 F.R.D. 649 (D. Nev. 2014)...........................................................17

*In re AT&T Corp.*, 455 F.3d 160 (3d Cir. 2006)................................................................ 6, 7

*In re Baby Prods. Antitrust Litig.*, 708 F.3d 163 (3d Cir. 2013) ............................................*passim*

*In re Bayer Corp. Combination Aspirin Prods. Mktg. and Sales Practices Litig.*, No. 09-md-2023 (E.D.N.Y.) ....................................................................................................13

*In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935 (9th Cir.2011)....................................*passim*

*In re Cendant Corp. Litig.*, 264 F.3d 201 (3d Cir. 2001)..................................................25, 31-32

*In re Cendant Corp. Litig.*, 404 F.3d 173 (3d Cir. 2005).........................................................32

*In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722 (3d Cir. 2001) ............................... 25, 32-33, 34

*In re Classmates.com Consol. Litig.*, No. 09-cv-0045-RAJ, 2012 U.S. Dist. LEXIS 83480 (W.D. Wash. Jun. 15, 2012) ..................................................................................................................3

*In re Cmty. Bank of N. Va. & Guar. Nat'l Bank of Tallahassee Second Mortg. Litig.*, 418 F.3d 277 (3d Cir. 2005) .......................................................................................................................15-16

*In re Dry Max Pampers Litig.*, 724 F.3d 713 (6th Cir. 2013) ............................................*passim*

*In re General Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768 (3d Cir. 1995)...*passim*

*In re HP Inkjet Printer Litig.*, 716 F.3d 1173 (9th Cir. 2013). ...................................................31

*In re Infospace, Inc. Secs. Litig.*, 330 F. Supp. 2d 1203 (W.D. Wash. 2004). ................................35

*In re National Football League Players Concussion Injury Litig.*, __F.3d__, 2014 U.S. App. LEXIS 24466 (3d Cir. Dec. 24, 2014) ..........................................................................................6

*In re Nasdaq Market-Makers Antitrust Litig.*, 2000 U.S. Dist. LEXIS 304 (S.D.N.Y. Jan. 18, 2000) ......11

*In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333 (3d Cir. 2010) ............................................ 16, 34

*In re Prudential Ins. Co. Am. Sales Practices Litig.*,148 F.3d 283 (3d Cir. 1998) ..........................17

*In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294 (3d Cir. 2005) .................................................32

*Int'l Precious Metals Corp. v. Waters*, 530 U.S. 1223 (2000) ..................................................29

*Kakani v. Oracle Corp.*, No. C 06-06493 WHA, 2007 WL 179377, 2007 U.S. Dist. LEXIS 47515 (N.D. Cal. Jun. 19, 2007) ......................................................................................................5

*Lachance v. Harrington*, 965 F. Supp. 630 (E.D. Pa. 1997)......................................................16

*Manchouck v. Mondelez Int'l Inc.*, No. C 13-02148 WHA, 2013 U.S. Dist. LEXIS 80132 (N.D. Cal. Jun. 3, 2013) ...............................................................................................................9-10

*McDonough v. Toys 'R' Us.*, No. 06-cv-00242, 2015 U.S. Dist. LEXIS 7510 (E.D. Pa. Jan. 21, 2015) .13

*Murray v. GMAC Mortg. Corp.*, 434 F.3d 948 (7th Cir. 2006) .................................................22

*Nat'l Alliance for Accessability, Inc. v. Hull Storey Retail Group, LLC*, No. 10-cv-778-J-34JBT, 2012 U.S. Dist. LEXIS 125160 (M.D. Fla. Jun. 28, 2012) ........................................................34-35

*Newman v. Americredit Fin. Servs*, 2014 U.S. Dist. LEXIS 15728 (S.D. Cal. Feb. 3, 2014) .....................12

*Pearson v. NBTY, Inc.*, 772 F.3d 778 (7th Cir. 2014). ..............................................................*passim*

*Perdue v. Kenny A.*, 559 U.S. 542 (2010) ...............................................................................34

*Planned Parenthood of Central New Jersey v. Attorney General of the State of New Jersey.*, 297 F.3d 253 (3d Cir. 2002) ............................................................................................................32

*Radcliffe v. Experian Info. Solutions*, 715 F.3d 1157 (9th Cir. 2013) .................................22, 23, 24

*Redman v. RadioShack Corp.*, 768 F.3d 622 (7th Cir. 2014) ............................................5, 7, 18, 19, 28, 31

*Richardson v. L'Oreal USA, Inc.*, 991 F. Supp. 2d 181, (D.D.C. 2013) ............................................2, 15, 22

*Ross v. Trex Co.*, No. C 09-00670 JSW, 2013 U.S. Dist. LEXIS 74720 (N.D. Cal. May 28, 2013). ......13

*Seidman v. Am. Mobile Sys.*, 995 F. Supp. 612 (E.D Pa. 1997)........................................................16

*Singleton v. Domino's Pizza, LLC*, 976 F. Supp. 2d 665 (D. Md. 2013) .......................................16

*Smith v. Levine Leichtman Capital*, No. C 10-00010 JSW, 2012 U.S. Dist. LEXIS 163672 (N.D. Cal.
   Nov. 15, 2012) ..................................................................................................................... 9, 10

*St. Hilaire v. Indus. Roofing Co.*, 346 F. Supp. 2d 212 (D. Me. 2004)..........................................35

*Staton v. Boeing Co.*, 327 F.3d 938 (9th Cir. 2003) ..............................................................16, 23

*Strong v. Bellsouth Telecoms. Inc.*, 137 F.3d 844 (5th Cir. 1998).....................................19, 24, 29

*Sylvester v. Cigna Corp.*, 369 F. Supp. 2d 34 (D. Me. 2005)........................................................21

*Tarlecki v. Bebe Stores, Inc.*, No. C 05-1777 MHP, 2009 U.S. Dist. LEXIS 102531 (N.D. Cal. Nov. 3.
   2009) ........................................................................................................................................26

*Ursic v. Bethlehem Mines*, 719 F.2d 670 (3d Cir. 1983)...............................................................32

*Van Horn v. Nationwide Prop. & Cas. Ins. Co.*, 436 Fed. Appx. 496 (6th Cir. 2011) .................34

*Vassalle v. Midland Funding LLC*, 708 F.3d 747 (6th Cir. 2013) ......................................21-22, 23

*Vought v. Bank of Am., N.A.*, 901 F. Supp. 2d 1071 (C.D. Ill. 2012) .....................................18, 25

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 2005) ........................................26

*Walsh v. Popular, Inc.*, 839 F. Supp. 2d 476 (D.P.R. 2012)) .......................................................16

*Walter v. Hughes Communs., Inc.*, No. 09-2136 SC, 2011 U.S. Dist. LEXIS 72290 (N.D. Cal. July 6,
   2011) ........................................................................................................................................12

*Weeks v. Kellogg Co.*, No. 09-cv-8102, 2011 U.S. Dist. LEXIS 155472 (C.D. Cal. Nov. 23, 2011)........34

*Weinberger v. Great Northern Nekoosa Corp.*, 925 F.2d 518 (1st Cir. 1991) ...............................18

*Wise v. Popoff*, 835 F. Supp. 977 (E.D. Mich. 1993) ..................................................................26

*Yarger v. ING Bank, FSB*, No. 11-154-LPS (D. Del.)....................................................................10

## Rules and Statutes

28 U.S.C. § 1711 *et seq.*.................................................................................................................28

42 U.S.C. § 1988............................................................................................................................34

Fed. R. Civ. P. 23 ...................................................................................................................*passim*

Fed. R. Civ. P. 23(a)(4).........................................................................................................5, 21-24

Fed. R. Civ. P. 23(e)..................................................................................................5, 14, 24, 27

Fed. R. Civ. P. 23(h) ............................................................................................. 14, 24, 28, 31

## Other Authorities

Advisory Committee Notes on 2003 Amendments to Rule 23 ...................................................24, 28, 31

Allen, Tiffaney, *Anticipating Claims Filing Rates in Class Action Settlements*, (Nov. 2008) ........................11

Am. Law Institute, *Principles of the Law of Aggreggate Litig.* § 3.05(c) (2010)................................................5

Am. Law Institute, *Principles of the Law of Aggreggate Litig.* § 3.05 Cmt. f (2010)........................................9

Brickman, Lester, LAWYER BARONS (2011) ...............................................................20

Brunet, Edward, *Class Action Objectors: Extortionist Free Riders or Fairness Guarantors*, 2003 U. CHI.
    LEGAL F. 403 (2003) ...............................................................................3

Coben, James Richard, *Creating a 21st Century Oligarchy: Judicial Abdication to Class Action Mediators*, 5
    PENN ST. Y. B. ARB. & MEDIATION 162 (2023) .............................................................5

Eisenberg, Theodore & Geoffrey Miller, *The Role of Opt-Outs and Objectors in Class Action Litigation:
    Theoretical and Empirical Issues*, 57 VAND. L. REV. 1529 (2004) .............................................25

Federal Judicial Center, *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide*
    (2010), *available at*
    http://www.fjc.gov/public/pdf.nsf/lookup/NotCheck.pdf/$file/NotCheck.pdf ..........................8

Federal Judicial Center, *Manual for Complex Litigation* § 21.612 (4th ed. 2004).........................................6

Fitzpatrick, Brian T., *An Empirical Study of Class Action Settlements and their Fee Awards*, 7 J. EMPIRICAL
    LEGAL STUD. 811 (2010) ..............................................................................16

Fitzpatrick, Brian T., *The End of Objector Blackmail?*, 62 VAND. L. REV. 1623 (2009) ..............................3

Henderson, William D., *Clear Sailing Agreements: A Special Form of Collusion in Class Action Settlements*,
    77 TUL. L. REV. 813 (2003)...........................................................................18

Isaacharoff, Samuel, *The Governance Problem in Aggregate Litigation*, 81 FORDHAM L. REV. 3165 (2013)
    ........................................................................................................28

Jancowicz, Tiffaney, et al., *Settlement Administration: Impacting Claims Filing Rates* (Feb. 18, 2014),
    *available at* http://media.straffordpub.com/products/crafting-class-settlement-notice-programs-
    due-process-reach-claims-rates-and-more-2014-02-18/presentation.pdf .........................................27

Karlsgodt, Paul & Raj Chohan, *Class Action Settlement Objectors: Minor Nuisance or Serious Threat to
    Approval*, BNA: CLASS ACTION LITIG. REPORT (Aug. 12, 2011)..........................................3

Klonoff, Robert H., *Making Class Actions Work: The Untapped Potential of the Internet*,69 U. PITT. L. REV.
    727 (2008)..............................................................................................12

Leslie, Christopher R., *The Significance of Silence: Collective Action Problems and Class Action Settlements*, 59

FLA. L. REV. 71 (2007)........................................................................................................25

Liptak, Adam, *When Lawyers Cut Their Clients Out of the Deal*, N.Y. TIMES (AUG. 13, 2013) ................... 2

MacLean, Pamela A., "Dealing for Dollars: Objectors allege that claims-made settlements short-

    change class members," CALIFORNIA LAWYER (Jun. 2011)............................................... 8-9

Rothstein, Barbara J. & Thomas E. Willging, *Managing Class Action Litigation: A Pocket Guide for Judges*

    (2010), *available at* www.fjc.gov/public/pdf.nsf/lookup/ClassGd3.pdf/$file/ClassGd3.pdf. .........8

Silver, Charles, *Due Process and the Lodestar Method: You Can't Get There From Here*, 74 TUL. L. REV.

    1809 (2000)............................................................................................................20, 25-26

Wolfman, Brian, *Judges! Stop Deferring to Class-Action Lawyers*, 2 U. MICH. J. L. REFORM 80 (2013).......32

Wolfman, Brian & Alan B. Morrison, *Representing the Unrepresented in Class Actions Seeking Monetary*

    *Relief*, 71 N.Y.U. L. REV. 439 (1996) .....................................................................................32

Zabcik, Brian, *Conscientious Objector*, AM. LAWYER (May 1, 2013), *available at*

    http://www.americanlawyer-

    digital.com/americanlawyer/lit2013spring/?lm=1367275927000&pg=11#pg11 .......................... 2-3

## INTRODUCTION

This Court now confronts a classic question of fiction versus reality. It has a choice. It can, as urged by the settling parties, defer to settling counsel and reflexively adopt the unsupportable notion that this settlement provides a $22 million benefit to class members. Or it can, as required by Fed. R. Civ. P. 23 and Third Circuit case law, scrutinize the facts, closely inspect the terms of settlement, and demand explanations and evidence from the settling parties, all to faithfully discharge its fiduciary duty to class members and ferret out the true state of affairs.

If it takes this latter course, it will see a few things. It will see that the claims-made device is superfluous here, and is mathematically calculated to depress class payouts. It will see that the $22 million valuation of class relief is a pie-in-the-sky mirage proffered for the purpose of justifying an oversized $1.5 million attorney award. It will see that the named representatives' objectivity has been compromised by conferring upon them an individual $25,000 settlement of their TILA claims. It will see that the basic edifice of this settlement is designed to ensure that class attorneys rake in what will likely turn out to be an excessive 40% of the settlement proceeds.

It would be error to approve the settlement and the fee award. The settling parties are entitled to reach an arms-length agreement that Wells Fargo's total settlement liability will only be about $3.7 million. They are not entitled to structure that liability so that class counsel collects more than their fair share of the proceeds

## I.   Objector Wei Cyrus Hung is a class member and intends to appear through counsel at the fairness hearing.

Objector Hung's mailing address is 737 S. Inman Road, West Covina, CA 91791. Declaration of Wei Cyrus Hung at ¶2. His email address is cyrushung@gmail.com. *Id.* During 2013, he obtained a loan for a mortgage on a property he purchased in Arizona. *Id.* at ¶4. He is therefore a member of the class as defined in the preliminary approval order and settlement agreement. On

January 13, 2015, Hung mailed via USPS certified mail a claim form to the settlement administrator. *Id.* at ¶8.

Hung's attorney, Adam Schulman of the non-profit Center for Class Action Fairness ("CCAF"), is representing him *pro bono*, has been admitted *pro hac vice*, and will appear at the Fairness Hearing, currently scheduled for March 5, 2015. There, Hung wishes to discuss matters raised in this Objection and reserves the right to make use of all documents entered on to the docket by any settling party or objector. Hung also reserves the right to cross-examine any witnesses who testify at the hearing in support of final approval. This objection supplements, and to any extent inconsistent, supersedes Hung's previous objection mailed to the settlement administrator in December 2014. *Id.* at ¶9.

CCAF, established in 2009, represents class members *pro bono* in class actions where class counsel employs unfair class action procedures to benefit themselves at the expense of the class. *See e.g., Pearson v. NBTY, Inc.*, 772 F.3d 778, 787 (7th Cir. 2014) (observing that CCAF "flagged fatal weaknesses in the proposed settlement" and demonstrated "why objectors play an essential role in judicial review of proposed settlements of class actions"); *In re Dry Max Pampers Litig.*, 724 F.3d 713, 716-17 (6th Cir. 2013) ("*Pampers*") (describing CCAF's client's objections as "numerous, detailed, and substantive.") (reversing settlement approval and certification); *Richardson v. L'Oreal USA, Inc.*, 991 F. Supp. 2d 181, 205 (D.D.C. 2013) (describing CCAF's client's objection as "comprehensive and sophisticated" and noting that "[o]ne good objector may be worth many frivolous objectors in ascertaining the fairness of a settlement.") (rejecting settlement approval and certification); Adam Liptak, *When Lawyers Cut Their Clients Out of the Deal*, N.Y. TIMES, Aug. 13, 2013, at A12 (calling CCAF's founder and president "[t]he leading critic of abusive class-action settlements").

CCAF has won millions of dollars for class members. *See, e.g.,* Brian Zabcik, *Conscientious Objector*, AM. LAWYER (May 1, 2013), *available at* http://www.americanlawyer-

digital.com/americanlawyer/lit2013spring/?lm=1367275927000&pg=11#pg11; *In re Classmates.com Consol. Litig.*, No. 09-cv-0045-RAJ, 2012 U.S. Dist. LEXIS 83480, at *29 (W.D. Wash. Jun. 15, 2012) (noting that CCAF's client "was relentless in his identification of the numerous ways in which the proposed settlements would have rewarded class counsel … at the expense of class members" and "significantly influenced the court's decision to reject the first settlement and to insist on improvements to the second").

Because it has been CCAF's experience that class action attorneys often employ *ad hominem* attacks in attempting to discredit objections, it is perhaps relevant to distinguish CCAF's mission from the agenda of those who are often styled "professional objectors." A "professional objector" is a specific legal term referring to for-profit attorneys who attempt or threaten to disrupt a settlement unless plaintiffs' attorneys buy them off with a share of the attorneys' fees. Some courts presume that such objectors' legal arguments are not made in good faith. Edward Brunet, *Class Action Objectors: Extortionist Free Riders or Fairness Guarantors*, 2003 U. Chi. Legal F. 403, 437 n.150 (2003). This is not CCAF's *modus operandi*. Paul Karlsgodt & Raj Chohan, *Class Action Settlement Objectors: Minor Nuisance or Serious Threat to Approval*, BNA: Class Action Litig. Report (Aug. 12, 2011) (distinguishing CCAF from professional objectors). CCAF refuses to engage in *quid pro quo* settlements and does not extort attorneys; and has never withdrawn an objection in exchange for payment. Instead, it is funded entirely through charitable donations and court-awarded attorneys' fees.

Nonetheless, to preempt any possibility of a false and unjustifiable accusation of objecting in bad faith and seeking to extort class counsel, Hung is willing to stipulate to an injunction prohibiting himself from accepting compensation in exchange for the settlement of this objection. Hung Decl. ¶10. *See* Brian T. Fitzpatrick, *The End of Objector Blackmail?*, 62 Vand. L. Rev. 1623 (2009) (suggesting inalienability of objections as solution to objector blackmail problem). Hung brings this objection

through CCAF in good faith to protect the interests of the class.

**II.      The Court has a fiduciary duty to the absent members of the class.**

"Class-action settlements are different from other settlements. The parties to an ordinary settlement bargain away only their own rights—which is why ordinary settlements do not require court approval. In contrast, class-action settlements affect not only the interests of the parties and counsel who negotiate them, but also the interests of unnamed class members who by definition are not present during the negotiations. And thus there is always the danger that the parties and counsel will bargain away the interests of unnamed class members in order to maximize their own." *Pampers*, 724 F.3d at 715. "Because class actions are rife with potential conflicts of interest between class counsel and class members, district judges presiding over such actions are expected to give careful scrutiny to the terms of proposed settlements in order to make sure that class counsel are behaving as honest fiduciaries for the class as a whole." *In re Baby Products Antitrust Litig.*, 708 F.3d 163, 175 (3d Cir. 2013) ("*Baby Prods.*") (quoting *Mirfasihi v. Fleet Mortgage Corp.*, 356 F.3d 781, 785 (7th Cir. 2004)); *accord In re General Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 785 (3d Cir. 1995) ("*GM Trucks*").

The Court's oversight role does not end at making sure that the settling parties engaged in properly adversarial arm's length settlement negotiations. "In class-action settlements, the adversarial process—or what the parties here refer to as their 'hard-fought' negotiations—extends only to the amount the defendant will pay, not the manner in which that amount is allocated between the class representatives, class counsel, and unnamed class members. For the economic reality [is] that a settling defendant is concerned only with its total liability, and thus a settlement's allocation between the class payment and the attorneys' fees is of little or no interest to the defense… And that means the courts must carefully scrutinize whether [class counsel's and the named representatives'] fiduciary obligations have been met." *Pampers*, 724 F.3d at 717-18 (internal quotations omitted).

While it is *necessary* that a settlement is at "arm's length" without express collusion between the settling parties, it is not *sufficient. See Redman v. RadioShack Corp.*, 768 F.3d 622, 628 (7th Cir. 2014) (calling it "naïve" to base confidence in settlement fairness on arm's length negotiations).   "While the Rule 23(a) adequacy of representation inquiry is designed to foreclose class certification in the face of 'actual fraud, overreaching or collusion,' the Rule 23(e) reasonableness inquiry is designed precisely to capture instances of unfairness not apparent on the face of the negotiations." *In re Bluetooth Headset Prods. Liab. Litig*, 654 F.3d 935, 948 (9th Cir. 2011) (*"Bluetooth"*) (internal quotation omitted). Due to the defendant's indifference as to the allocation of funds between the class, the named representatives and class, it is enough that the settlement evinces "subtle signs that class counsel have allowed pursuit of their own self-interest and that of certain class members to infect the negotiations." *Pampers*, 724 F.3d at 718 (quoting *Dennis v. Kellogg Co.*, 697 F.3d 858, 864 (9th Cir. 2012).[1]

"In reviewing a proposed settlement, a court should not apply any presumption that the settlement is fair and reasonable." Am. Law Institute, *Principles of the Law of Aggregate Litig.* § 3.05(c) (2010) (*"ALI Principles"*). "The burden of proving the fairness of the settlement is on the

---

[1] Nor should the Court defer to the proposed settlement because it was negotiated through a mediator. *Bluetooth,* 654 F.3d at 948-49 (neither presence of neutral mediator nor separation of fee negotiations from other settlement negotiations demonstrates that a settlement is fair). "There is no substitute for the requirement of district courts vetting the proposed settlement under Rule 23(e). It is also no answer to say that a private mediator helped frame the proposal. Such a mediator is paid to help the immediate parties reach a deal. Mediators do not adjudicate the merits. They are masters in the art of what is negotiable. It matters little to the mediator whether a deal is collusive as long as a deal is reached. Such a mediator has no fiduciary duty to anyone, much less those not at the table. Plaintiffs' counsel has the fiduciary duty. It cannot be delegated to a private mediator." *Kakani v. Oracle Corp.*, No. C 06-06493 WHA, 2007 WL 179377, 2007 U.S. Dist. LEXIS 47515, at *31 (N.D. Cal. Jun. 19, 2007); *see also* James Richard Coben, *Creating a 21st Century Oligarchy: Judicial Abdication to Class Action Mediators*, 5 PENN ST. Y.B. ARB. & MEDIATION 162, 163 (2013) (deference to mediators "is an abdication of judicial fiduciary duty to ensure that proposed class action settlements are fair to absent class members").

---

proponents." *Pampers*, 724 F.3d at 718 (compiling cases and authorities); *accord GM Trucks*, 55 F.3d at 785. A court should "independently and objectively analyze the evidence and circumstances before it in order to determine whether the settlement is in the best interest of those whose claims will be extinguished." *GM Trucks*, 55 F.3d at 785 (internal quotation omitted).

In this case, that burden is yet heightened because this settlement has been proposed before class certification. Delaying certification until settlement poses various problems, *see GM Trucks*, 55 F.3d at 786-800, and calls for heightened judicial scrutiny of the certification and the accompanying settlement. *Id.* at 807; *Pampers*, 724 F.3d at 721; *Bluetooth*, 654 F.3d at 946-47; Federal Judicial Center, *Manual for Complex Litigation* § 21.612 (4th ed. 2004).[2]

Be alert! In their final approval papers, the settling parties will doubtlessly focus on the nine factors for settlement fairness discussed in *Girsh v. Jepson*, 521 F.2d 153, 156-57 (3d Cir. 1975). It cannot be overemphasized that—like the factor test of other circuits—the *Girsh* test is not exhaustive. In more recent years, the Third Circuit has instructed that "because of a 'sea-change in the nature of class actions' since *Girsh* was decided in 1975, district courts should also consider other potentially relevant and appropriate factors." *In re AT & T Corp.*, 455 F.3d 160, 165 (3d Cir. 2006) (citing *In re Prudential Ins. Co. Am. Sales Practice Litig.*, 148 F.3d 283, 323 (3d Cir. 1998)). Such non-*Girsh* factors can be dispositive. In *Baby Products*, the Third Circuit reversed settlement approval even though there was no dispute that the district court correctly applied the *Girsh* factors. There, however, the district court abused its discretion by approving a settlement without investigating the number of claims that absent class members had made. *Baby Prods.*, 708 F.3d at 174-75.

So, the first step is "affirmatively seek[ing] out" the necessary claims data to ascertain class

---

[2] More generally, a recent Third Circuit decision outlaws the use of "conditional" class certifications at the time of preliminary settlement approval. *In re National Football League Players Concussion Injury Litig.*, __F.3d__, 2014 U.S. App. LEXIS 24466 (3d Cir. Dec. 24, 2014).

benefit. *Id.* at 175. But there is a vital second step: ensuring that class members and not their counsel are the "foremost beneficiaries" of the settlement. *Id.* at 179. Appeals courts will reverse when a settlement accords "preferential treatment" to class counsel or to the class representatives at the expense of absent class members. *See Pampers*, 724 F.3d at 718; *Pearson*, 772 F.3d at 781-83; *Redman*, 768 F.3d 622; *Bluetooth*, 654 F.3d at 947.

Preferential treatment to class counsel is the gist of Hung's objection here. He does not argue that this case must settle for an actual $22 million or even for $15 million or $10 million. His cardinal objection is that the settlement is unfair because class counsel is appropriating an excessive amount of the existing settlement value for itself, and the settling parties seek to gain approval of that arrangement. As such, the inevitable discussion of the *Girsh* factors should be seen for the red herring it is.

## III.   There is no legitimate reason why this settlement does not issue direct payments to known, eligible class members.

Structurally, this settlement is not overly complicated. The settling parties are aware of approximately 2.3 million class members through the defendants' records. Declaration of Kai Richter in Support of Motion for Attorneys' Fees ("Richter Fee Decl.") (Dkt. 93) at ¶22; *see also* Class Action Settlement Agreement ("Settlement") (Dkt. 87-1) ¶¶16-19 (outlining the process by which the defendants will compile and forward a class list to the administrator for purposes of notice).

However, rather than establishing a system of direct payment to the known class members in the agreed-upon discounted amount of $9.50, the parties erected an artificial and needless hurdle: the requirement that each class member file a claim form by postal mail. *See* Claim Form, Exhibit 2 to Settlement (Dkt. 87-1). This is commonly known as a "claims-made settlement." Its distinguishing characteristic is that "[w]ith the exception of the named plaintiff…[it] provides relief only to eligible class members who fill out paperwork and submit a valid claim." *Galloway v. Kan. City*

*Landsmen, LLC,* No. 4:11-1020-CV-W-DGK, 2012 U.S. Dist. LEXIS 147148, at *10 (W.D. Mo. Oct. 12, 2012).

The parties may retort that a claims process is unexceptional in class action settlement administration. As a general matter they are correct, but in this particular context they are not. When a claims-made process is employed—in lieu of direct payment mechanisms—the court should assure itself that there is a valid reason for its use. Often, a claims-made structure can be justified by the fact that the defendant either is unable to identify specific class members or is unable to identify the value of those class members' claims. Neither situation obtains here, where the defendants' records house the class members' identifying information, and where each class member is entitled to a set payment that does not vary due to individual circumstances.

"In too many cases, the parties may negotiate a claims process which serves as a choke on the total amount paid to class members. When the defendant already holds information that would allow at least some claims to be paid automatically, those claims should be paid directly without requiring claim forms". Federal Judicial Center, *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide* ("*FJC Guide*"), at 6 (2010), *available at* http://www.fjc.gov/public/pdf.nsf/lookup/NotCheck.pdf/$file/NotCheck.pdf. Here, the claims-made mechanism is employed for no ostensible reason other than to depress class recovery (and thus maximize the share of the settlement received by the attorneys). Accordingly, the settlement should be rejected as unreasonable.

The abuse of claims-made settlements to inflate attorneys' fees and deflate defendants' obligations to class members has been the subject of substantial criticism. *E.g.* Barbara J. Rothstein & Thomas E. Willging, *Managing Class Action Litigation: A Pocket Guide for Judges* 30 (2010)[3]; Pamela A.

---

[3]   This Federal Judicial Center publication is available online at www.fjc.gov/public/pdf.nsf/lookup/ClassGd3.pdf/$file/ClassGd3.pdf.

MacLean, "Dealing for Dollars: Objectors allege that claims-made settlements short-change class members," CALIFORNIA LAWYER (Jun. 2011). "Courts should approve direct pro rata or per capita distributions of the settlement proceeds when feasible, without requiring class members to submit claims. This is so even if the parties have proposed a traditional claims process." *ALI Principles* § 3.05 Cmt. f.

More and more frequently, courts are heeding this advice and refusing to accept superfluous claims processes. *Pearson v. NBTY, Inc.*, 772 F.3d 778 (7th Cir. 2014) (reversing an attorney-centric "selfish" arrangement where a needless claims process was employed instead of distributing checks to the known class members); *Smith v. Levine Leichtman Capital*, No. C 10-00010 JSW, 2012 U.S. Dist. LEXIS 163672, at *8 (N.D. Cal. Nov. 15, 2012) (expressing mystification at use of claims submission process when 75-80% of class members could already be identified); *DeLeon v. Bank of Am.*, No. 6:09-cv-1251, 2012 U.S. Dist. LEXIS 91124, at *62 (M.D. Fla. Apr. 20, 2012) (finding that a low-value claims-made settlement would "surely result in a low claims rate" and rejecting the claims procedure as "not reasonable"); *Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 391 (C.D. Cal. 2007) (questioning necessity of claims process and denying settlement approval). As Judge Alsup details in his well-respected notice to potential settling parties, "A settlement that imposes a claim procedure rather than cutting checks to class members for the appropriate amount may impose too much of a burden on class members… The best approach is to calculate settlement checks from defendant's records … and to send the checks to the class members along with a notice[4] that cashing the checks will be deemed acceptance of the release and all other terms of the settlement." *Manchouck v. Mondelez Int'l Inc.*, No. C 13-02148 WHA, 2013 U.S. Dist. LEXIS 80132, at *5 (N.D.

---

[4] The feasibility of sending such a notice directly with the claim payment immediately undercuts any counterargument that the "Attestation" and acknowledgment section somehow made the claim form indispensable.

Cal. Jun. 3, 2013).

That the claims process is superfluous is confirmed by the perfunctory claim form itself. *See* Claim Form, Exhibit 2 to Settlement (Dkt. 87-1). A class of known mortgagors, many of whom potentially send a check to the defendant every month, is exactly the type of class where a direct payment is feasible. *See Guerrero v. Wells Fargo Bank, N.A.*, 2014 U.S. Dist. LEXIS 122791 (N.D. Cal. Sept. 2, 2014) (Alsup, J.); *Yarger v. ING Bank, FSB*, No. 11-154-LPS (D. Del.), *settlement website available at* https://ingraterenewalsettlement.com/. If the parties contend that the claims process was necessary for those class members who changed their name and are unreachable with the defendant's record information, there are two responses. First, any underinclusiveness of the defendants' files (and thus valid use of a supplemental claims process) is not a reason to abandon a direct payment process for those class members who are included in the records. *See, Smith*, *supra*. Second, the parties bear the burden of proving reasonableness, which requires them to introduce evidentiary support that a claims mechanism was necessary. *See Pampers*, 724 F.3d at 719.

Hung requests that upon expiration of the claims deadline on January 30, the parties voluntarily submit the number of claimants to whom the parties would not have been able to yield payment on their own. This will demonstrate how necessary or not the claims process actually is. If they do not voluntarily submit such information, the Court is obliged to compel it of them.[5] To approve a settlement without an accounting of actual claims is reversible error under Third Circuit law. *Baby Prods*, 708 F.3d at 174; *GM Trucks*, 55 F.3d at 822 ("At the very least, the district court on remand needs to make some reasonable assessment of the settlement's value and determine the precise percentage represented by the attorneys' fees.").

---

[5] In this vein, the Court must also "affirmatively seek out such information" if the parties do not introduce the overall claims information (number of claims and value of those claims) of their own accord. *Baby Prods*, 708 F.3d at 174. To fail to do so would be reversible error. *Id.*

Hung strongly suspects that this accounting will show that no allowed claimants will come from outside those already detailed in the defendant's records. And if any such previously unidentified individuals come forward, it's rather unclear that any of them will be allowed to make a claim if the administrator's main verification reference point is in fact the defendants' files. *See* Settlement ¶33 ("The Claims Administrator shall review all Claim Forms submitted to verify and reasonably ensure that the Claim Form is a Valid Claim Form.").

The deleterious claims process here is even more disheartening because it does not even permit class members to submit claims electronically. Instead it requires class members to expend unnecessary time, effort, and expense trekking over to their post office to return the claim form by postal mail….all in hopes of receiving less than $10 six months or a year from doing so, after the settlement's effective date. It's nearly unheard of in 2015 for a claims-made settlement not to allow electronic claims filing. Even the now-discredited claims process in *Pearson*—a process constructed "with an eye toward discouraging the filing of claims" —permitted electronic submissions. 772 F.3d at 782-83. The settlement administrator here, Rust Consulting, has experience administering settlements with electronic claims procedures. Dkt. 87-3 at 5.

It has been common knowledge for more than 15 years that class members vastly prefer seamless electronic options.[6]  Not only are electronic submissions easier for class members, they

---

[6] Tiffaney Allen, *Anticipating Claims Filing Rates in Class Action Settlements* (Nov. 2008) ("online claims-filing tends to increase the overall claims rate, as it is a convenient option for class members of many demographics"), *available at* http://www.rustconsulting.com/Portals/0/pdf/Monograph_ClaimsFilingRates.pdf; *In re Bayer Corp. Combination Aspirin Litig.*, No. 09-md-2023, Declaration of Tricia M. Solorzano, Dkt. 195 (E.D.N.Y. Jan. 22, 2013) (attesting that over 90% of claimants chose to file electronically even where the class consisted of mostly elderly individuals); *Gascho v. Global Fitness Holdings, LLC*, No. 2:11-cv-426, Declaration of Jeffrey D. Dahl, Dkt. 126-1 (S.D. Ohio Jan. 23, 2014) (attesting that more than 97% of claims filed were submitted online);  *In re Nasdaq Market-Makers Antitrust Litig.*, 2000 U.S. Dist. LEXIS 304, at *14 (S.D.N.Y. Jan. 18, 2000) (recognizing that using "electronic claim forms is likely

minimize administrator expenses as well. So why would the defendant willingly add to an administrative expense that it is paying? Why would the defendant agree to add extraneous layers of administrative review, filtering and manual labor, when the administrative process could have been as seamless as cutting a check? The answer is simple. It's because the increase in administrative costs is more than offset by the gains in having to pay fewer class members.

Discouraging and deterring class participation, while maintaining the illusion of a large value settlement, is not an acceptable reason to use a claims process. Little wonder courts reject claims processes that spurn electronic submission. *E.g.*, *Walter v. Hughes Communs., Inc.*, No. 09-2136 SC, 2011 U.S. Dist. LEXIS 72290, *40-*41 (N.D. Cal. July 6, 2011) (rejecting a settlement with a postal-mail-only claims process because "[f]or unknown reasons, the parties have opted for an unnecessarily taxing claims procedure over [online or direct distribution] alternatives"); *Newman v. Americredit Fin. Servs.*, 2014 U.S. Dist. LEXIS 15728, at *17 (S.D. Cal. Feb. 3, 2014) ("the Court is not inclined to approve a settlement which makes it unnecessarily burdensome to submit a claim or opt out. The class members are required to submit claim forms and opt out requests by mail although the settlement administrator is obligated to provide a phone number and a website. The only justification offered for the mailing requirement is that the claim forms require an affirmation. Plaintiff does not explain why an affirmation could not be provided through an online form or by phone with adequate identification of the class member.") (internal citations omitted).

This Court should hold that depressing class relief is not a legitimate reason to use claims-made mechanism. "The fairness of the settlement must be evaluated primarily based on how it *compensates class members*." *Pampers*, 724 F.3d at 720 (emphasis in original). Although this Court cannot

---

to contribute to a far larger number of claims"); *see also* Robert H. Klonoff, *Making Class Actions Work: The Untapped Potential of the Internet,* 69 U. PITT. L. REV. 727, 751-52 (2008).

compel the settling parties to employ a direct payment process, it can and should refuse to approve a settlement until the parties do so of their own accord. *See Galloway*, 2013 U.S. Dist. LEXIS 92650, at *9 (W.D. Mo. Jul. 2, 2013) (noting how after initial settlement rejection settlement was "altered . . . from a "claims made" settlement to a "direct notification and payment" settlement"); *In re Bayer Corp. Combination Aspirin Prods. Mktg. and Sales Practices Litig.*, No. 09-md-2023 (E.D.N.Y. 2013) (parties voluntarily transmuted claims-made settlement to direct payment one after CCAF filed an objection); *McDonough v. Toys 'R' Us.*, No. 06-cv-00242, 2015 U.S. Dist. LEXIS 7510 (E.D. Pa. Jan. 21, 2015) (approving, on remand from the Third Circuit, a renegotiated settlement that provided for direct payments to more than 1 million class members whose contact information was available in the defendants' records when the previous settlement only provided relief to 24,000 claimants).[7]

The gratuitous and burdensome claims process is the first reason this Court should deny final approval. *See Eubank v. Pella Corp.* 753 F.3d 718, 724 (7th Cir. 2014) (repudiating settlement that "strews obstacles in the path of any [class member]"). As in *Baby Products*, the parties have not discharged their obligation to demonstrate that a "restrictive claims process [is] in the best interest of the class." 708 F.3d at 176.

## IV. The claims-made process, in conjunction with other provisions of the settlement, unfairly enables class counsel to obtain a disproportionate amount of the settlement proceeds.

A claims-made process doesn't merely benefit the defendant (by diminishing class value). What makes it a truly anti-class provision is that it enables class counsel to seek a disproportionate percentage of the settlement fund, by inflating the appearance—but not the reality—of class relief.

---

[7] Another viable option for the parties is limiting the release to those class members who submit claims forms. *See Fraser v. Asus Computer Int'l*, No. C 12-00652 WHA, 2012 U.S. Dist. LEXIS 181315, at *7-*10 (N.D. Cal. Dec. 21, 2012) (release should be limited to those who submit claim forms), *revised settlement granted preliminary approval* at 2013 U.S. Dist. LEXIS 22338 (N.D. Cal. Feb. 19, 2013); *Ross v. Trex Co.*, No. C 09-00670 JSW, 2013 U.S. Dist. LEXIS 74720, at *5 (N.D. Cal. May 28, 2013) (same as *Fraser*).

Note how the plaintiffs fixate on the maximum potential class recovery of $22 million. *See* Plaintiffs' Memorandum in Support of Preliminary Approval (Dkt. 86) at 13; Plaintiffs' Memorandum in Support of Motion for Attorneys' Fees ("Fee Memo") (Dkt. 92) at 5, 8-9. From this mirage of $22 million, class counsel can then proclaim itself to be seeking only an "**award [that] represents less than 6.4% of the total monetary benefits provided by the Settlement Agreement.**" Fee Memo at 9 (emphasis in original). In reality, however, actual class recovery will be little more than $2 million, assuming most of the 230,000+ claims currently submitted are approved as non-fraudulent and valid. *See* Richter Fee Decl. at ¶25.[8] $2 million is, of course, a far cry from $22 million.

Thus, this is a settlement where absent class members will recover roughly $2.1 million, their class member representatives will seek $25,000 unopposed and class counsel will seek $1.5 million unopposed. *See* Settlement ¶¶38, 43

It matters because in analyzing the fairness of a proposed settlement under Rule 23(e) and the reasonableness of fees under Rule 23(h), this Circuit has directed that district courts "need  to consider the level of direct benefit provided to the class." *Baby Prods.*, 708 F.3d at 170. As the Sixth Circuit has explained, one focus of evaluation is whether the settlement gives "preferential treatment" to the named plaintiffs or to class counsel. *Pampers*, 724 F.3d at 718 (internal quotation omitted).  "Such inequities in treatment make a settlement unfair" for neither class counsel nor the named representatives are entitled to disregard their "fiduciary responsibilities" and enrich themselves while leaving the class behind. *Pampers*, 724 F.3d at 718 (internal quotation omitted). And as the Seventh Circuit explained just two months ago, district courts must be "vigilant and realistic" in their review, nixing "selfish deal[s]" when they "disserve" the class. *Pearson*, 772 F.3d at 787.

---

[8] The precise calculation is 230,341 x $9.50 = $2,188,239.50. In the usual settlement, most class members tend to submit after receiving notice so this figure should not change appreciably by the final accounting.

## A.    Disproportionate fee request

The most common settlement defects are ones of allocation. This is because "the adversarial process—or 'hard-fought' negotiations—extends only to the amount the defendant will pay, not the manner in which that amount is *allocated* between the class representatives, class counsel, and unnamed class members." *Id.* at 717 (emphasis in original). Adversarial negotiation does not ensure that class relief is appropriately "commensurate with [the] fee award." *Id.* at 720. "[I]f the 'fees are unreasonably high, the likelihood is that the defendant obtained an economically beneficial concession with regard to the merits provisions, in the form of lower monetary payments to class members or less injunctive relief for the class than could otherwise have been obtained.'" *Id.* at 718 (quoting *Staton v. Boeing Co.*, 327 F.3d 938, 964 (9th Cir. 2003)).

Allocational issues cannot be waived away simply by structuring the settlement as a constructive common fund, rather than a traditional common fund. *See infra* § IV.C; *Pearson*, 772 F.3d at 786; *Pampers*, 724 F.3d at 717; *Bluetooth*, 654 F.3d at 943; *contra* Fee Memo (Dkt. 92) at 1 ("The requested fees and expenses will be paid separately…and **will not reduce the recovery to the Class**.") (emphasis in original). "[P]rivate agreements to structure artificially separate fee and settlement arrangements cannot transform what is in economic reality a common fund situation into a statutory fee shifting case." *GM Trucks*, 55 F.3d at 821. For either way, under a pure common fund structure or under a constructive common fund one, "the economic reality is that a settling defendant is concerned only with its total liability." *Pampers*, 724 F.3d at 717 (internal quotation omitted).

Nor are the issues resolved by delaying agreement on fees until after the terms of the settlement were negotiated. *Pearson*, 772 F.3d at 786; *Richardson*, 991 F. Supp. 2d 181, 204.[9] The only

---

[9] From the description of the mediation in the fee memorandum (Dkt. 92 at 4), it's not even clear whether the negotiation of fees and class relief occurred simultaneously. The Third Circuit is especially wary of simultaneous negotiations. *In re Cmty. Bank of N. Va. & Guar. Nat'l Bank of*

apparent way to effectively divorce class relief from fees is to reach an accord on class relief while simultaneously stipulating to litigate the issue of fees. *See Cmty. Bank*, 418 F.3d at 308. In other words, as long as the defendant willingly foots both bills, there is no way to avoid the "truism that there is no such thing as a free lunch." *Staton v. Boeing Co.*, 327 F.3d 938, 964 (9th Cir. 2003).

To determine whether the attorney award is disproportionate, the "ratio that is relevant is the ratio of (1) the fee to (2) the fee plus what the class members received." *Pearson*, 772 F.3d at 781 (quoting *Redman v. RadioShack Corp.*, 768 F.3d 622, 630 (7th Cir. 2014)). Here, class counsel reserves to themselves the right to seek $1.5 million, which equates to approximately 40.6% of the settlement proceeds. This surpasses the 38.9% figure that the Ninth Circuit recently referred to as "clearly excessive." *Dennis v. Kellogg Co.*, 697 F.3d 858, 868 (9th Cir. 2012). A proportionate attorney award adheres to the 25% of the fund benchmark established in the Ninth Circuit and followed by courts of this Circuit and around the country.[10] Although 40% to the attorneys is not the most lopsided request that CCAF has seen in its history, there should still be little doubt that it qualifies as a

---

*Tallahassee Second Mortg. Litig.*, 418 F.3d 277, 308 (3d Cir. 2005) (citing *Prandini v. Nat'l Tea Co.*, 557 F.2d 1015, 1021 (3d Cir. 1977)).

[10] *See e.g., Bluetooth*, 654 F.3d at 942; *In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 361 (3d Cir. 2010) (Weis, J., concurring and dissenting) ("There appears to be a perception in many district courts that the twenty-five percent 'benchmark' is an appropriate place to begin the fee analysis for most common fund purposes. Too often that is the end of the discussion, rather than a beginning point for determining whether a particular fee is reasonable."); *Erie County Retirees Ass'n. v. County of Erie*, 192 F. Supp. 2d 369, 381 (W.D. Pa. 2002) ("the 25% benchmark is often appropriate in these cases [of multi-million-dollar funds] in order to prevent a windfall to counsel."); *Seidman v. Am. Mobile Sys.*, 965 F. Supp. 612, 622 (E.D. Pa. 1997); *Lachance v. Harrington*, 965 F. Supp. 630, 648 (E.D. Pa. 1997); *Singleton v. Domino's Pizza, LLC*, 976 F. Supp. 2d 665, 685 (D. Md. 2013) (reducing fee award from 30% requested to 25%); *Walsh v. Popular, Inc.*, 839 F. Supp. 2d 476, 485 (D.P.R. 2012) (reducing fee award from 33.3% requested to 23%); *see generally* Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and their Fee Awards*, 7 J. Empirical Legal Stud. 811, 833 (2010) (analyzing 688 class action settlements in 2006 and 2007 and finding a mean of 25% and a median of 25.4% for the award of attorneys' fees "with almost no awards more than 35 percent").

---

disproportionate distribution of the settlement and as one certain warning sign of an inequitable settlement. *See Howell v. Jbi, Inc.,* 298 F.R.D. 649, 658 (D. Nev. 2014) (denying approval where class was only allotted 58.3% of the gross settlement).

But there is doubt, and it is generated by an argument that the proper denominator should include all of the unclaimed amounts that revert to the defendant. *See* Fee Memo at 7-9. When calculated in this way, 40% of the actual settlement can be turned into less than 6.4% of a much larger phantom settlement. But this latter calculation is pure fiction, and violates the principle that "[c]ases are better decided on reality than on fiction." *Pampers*, 724 F.3d at 721 (internal quotation omitted); *accord Dennis*, 697 F.3d at 868 (chronicling the problem of "fictitious" fund valuations that "serve[] only the 'self-interests' of the attorneys and the parties, and not the class."); *Baby Prods.*, 163 F.3d at 174 ("[the] inquiry needs to be, as much as possible, practical and not abstract."). Calculation of settlement value should not include unclaimed amounts that never leave the pocket of the defendant. *Pearson*, 772 F.3d at 781-82.

Naturally low claims rates are the "[t]he reality" here, and mean that the total value of this settlement is not even $4 million, much less than the $20+ million class counsel suggests.[11] This Court should deny final approval until class counsel are no longer "the foremost beneficiaries of the settlement." *Baby Prods.*, 708 F.3d at 179.

---

[11] Class counsel also suggests that the total settlement value should include expenses of administration. Fee Memo at 9 n.8. As a matter of law, class counsel's suggestion is error. *Redman*, 768 F.3d at 630; *Pearson*, 778 F.3d at 781; *cf. also In re Prudential Ins. Co. Am. Sales Practices Litig.,* 148 F.3d 283, 338 (3d Cir. 1998) ("[N]umerous courts have concluded that the amount of the benefit conferred logically is the appropriate benchmark against which a reasonable common fund fee charge should be assessed."); *Bluetooth*, 654 F.3d at 944 ("[T]he standard [under Rule 23(e)] is not how much money a company spends on purported benefits, but the value of those benefits to the class.") (quoting *In re TD Ameritrade Accountholder Litig.*, 266 F.R.D. 418, 423 (N.D. Cal. 2009)).

**B.**      **The clear sailing agreement**

In addition to a discrepancy between fees and class benefit, the settlement contains a second telltale indication of an unfair deal: a "clear sailing" agreement. *See Redman*, 768 F.3d at 637; *Bluetooth*, 654 F.3d at 947; *Pearson*, 772 F.3d at 780. A clear sailing clause stipulates that attorney awards will not be contested by the defendants. *See* Settlement ¶38. ("Defendants will not object to, oppose, or comment upon Plaintiffs' Counsel's request for, or Court approval of, an award of attorneys' fees…"). "Such a clause by its very nature deprives the court of the advantages of the adversary process." *Weinberger v. Great Northern Nekoosa Corp.,* 925 F.2d 518, 525 (1st Cir. 1991). The clause lays the groundwork for lawyers to "urge a class settlement at a low figure or on a less-than-optimal basis in exchange for red-carpet treatment on fees" and "suggests, strongly," that its associated fee request should go "under the microscope of judicial scrutiny." *Id.* at 518, 524-25; *accord Redman,* 768 F.3d at 637.

"Provisions for clear sailing clauses 'decouple class counsel's financial incentives from those of the class, increasing the risk that the actual distribution will be misallocated between attorney's fees and the plaintiffs' recovery. They potentially undermine the underlying purposes of class actions by providing defendants with a powerful means to enticing class counsel to settle lawsuits in a manner detrimental to the class." *Vought v. Bank of Am.*, 901 F. Supp. 2d 1071, 1100 (C.D. Ill. 2012) (quoting *Int'l Precious Metals Corp. v. Waters*, 530 U.S. 1223, 1224 (2000) (O'Connor, J., respecting the denial of the petition for a writ of certiorari)); *accord* William D. Henderson, *Clear Sailing Agreements: A Special Form of Collusion in Class Action Settlements*, 77 TUL. L. REV. 813, 816 (2003) (courts should "adopt a per se rule that rejects all settlements that include clear sailing provisions."). "[T]he defendant won't agree to a clear-sailing clause without compensation—namely a reduction in the part of the settlement that goes to the class members, as that is the only reduction class counsel are likely to consider." *Redman*, 768 F.3d at 637.

Clear-sailing is the second indication that the deal is skewed in favor of class counsel.

## C.     The "kicker" / segregated fee fund

Unlike with an all-inclusive pure common fund, the class benefits here are segregated from counsel's fee fund. The settlement agreement effectuates this by stipulating that fees and named representative payments will be paid separate and apart from class relief. Settlement ¶¶38-39, 43.[12] This segregation forms what is known as a "constructive common fund," colloquially known as a "kicker." *See, e.g., Pearson,* 772 F.3d at 786; *GM Trucks*, 55 F.3d at 820-21 (A severable fee structure "is, for practical purposes, a constructive common fund").

A constructive common fund structure is an inferior settlement structure for one principal reason—the segregation of parts means that the Court cannot remedy any allocation issues by reducing fee awards and/or named representative payments. *See Pearson*, 772 F.3d at 786; *Bluetooth*, 654 F.3d at 949. This constitutes the third red flag of a lawyer-driven settlement and begets a "strong presumption of…invalidity." *Pearson*, 772 F.3d at 787; *accord Redman*, 768 F.3d at 637 (segregation is a "defect"); *Eubank*, 753 F.3d at 723 (segregation is a "questionable provision"). This "kicker arrangement reverting unpaid attorneys' fees to the defendant rather than to the class amplifies the danger" that is "already suggested by a clear sailing provision." *Bluetooth*, 654 F.3d at 949. "The clear sailing provision reveals the defendant's willingness to pay, but the kicker deprives the class of that full potential benefit if class counsel negotiates too much for its fees." *Id.*

In a typical common fund settlement, the district court can reduce the fees requested by plaintiffs' counsel—and when it does so, the class will benefit from the surplus. *See Pearson*, 772 F.3d

---

[12] This is no cherry on top of the class's sundae. Despite purportedly not affecting class relief, in "economic reality" (*Pampers*, 724 F.3d at 717; *GM Trucks,* 55 F.3d at 820; *Strong v. BellSouth Telecomms., Inc.*, 137 F.3d 844, 849 (5th Cir. 1998)), the defendant will cut every check and is concerned only with its total liability. The interrelation between fees and class relief cannot be undone with the fiat of a single sentence.

at 786 (calling this the "simple and obvious way" to remedy a misallocation).  However, with a constructive common fund structure, a responsible trial court that reduces a 40% request to 25% can do nothing to remit additional value to class members. It is "not enough" simply to lower the fee request. *Pearson*, 772 F.3d at 787. Because the "economic reality" is that the defendant only cares about its total payment, this settlement structure is therefore worse for the class than a traditional common fund. *Pampers*, 724 F.3d at 717 (internal quotation omitted). The parties have hamstrung the Court, preventing it from returning the constructive common fund to natural equilibrium.

Fee segregation has the additional self-serving effect of protecting class counsel by deterring scrutiny of the fee request. *See Pearson*, 772 F.3d at 786 (calling it a "gimmick for defeating objectors"). A court has less incentive to scrutinize a request because the kicker combined with the clear-sailing agreement means that any reversion benefits only the defendant that had already agreed to pay that initial amount. Charles Silver, *Due Process and the Lodestar Method: You Can't Get There From Here*, 74 TUL. L. REV. 1809, 1839 (2000) (such a fee arrangement is "a strategic effort to insulate a fee award from attack"); Lester Brickman, LAWYER BARONS 522-25 (2011) (same; further arguing that reversionary kicker is *per se* unethical); *compare* Fee Memo at 1 (arguing that the formal fee segregation means that the fee award "will not reduce the recovery to the class" and that "the requested amount was agreed to by the Defendants"). Because "the adversarial process" between the settling parties cannot safeguard "the manner in which that [settlement] amount is *allocated* between the class representatives, class counsel, and unnamed class members," *Pampers*, 724 F.3d at 717 (emphasis in original), it is no surprise that the most common settlement defects are ones of allocation. Thus, a segregated-fee structure prevents the Court from exercising its discretion, in furtherance of its fiduciary duty, to cure the most endemic settlement ailment.

Despite the parties' assertions (*e.g.,* Dkt. 92 at 5-6), formally segregating the fee award exacerbates the problem; it does not remedy the inherent conflict. *See Pearson*, 772 F.3d at 786;

*Bluetooth*, 654 F.3d at 943.

> As Judge Posner notes,
>
>> Class counsel claim that often they negotiate for the benefits to the members of the class first, selflessly leaving for later any consideration of or negotiation for their award of attorneys' fees. That claim is not realistic. For we know that an economically rational defendant will be indifferent to the allocation of dollars between class members and class counsel. Caring only about his total liability, the defendant will not agree to class benefits so generous that when added to a reasonable attorneys' fee award for class counsel they will render the total cost of settlement unacceptable to the defendant.
>> *Pearson*, 772 F.3d at 786.

The $1.5 million attorney allotment should be considered part of a constructive common fund, and the fact that it is shielded from the class is inherently unfair. No settlement should be approved until the parties agree to modify the settlement so that any reduction in the proposed fee award reverts to the class. Ten years ago, in a case in federal court in the District of Maine, Chief Judge Singal hit the nail on the head in a way that is directly applicable here: "Stripped to its essence, the Court believes that three factors combined to create this untenable distribution scenario: (1) a claims made settlement premised on a 100 percent response rate, (2) a reverter clause, and (3) a clear sailing provision." *Sylvester v. Cigna Corp.*, 369 F. Supp. 2d 34, 52 (D. Me. 2005).

## V.     Adequacy of representation is undermined by the enhancement payments afforded to named plaintiffs.

Class counsel are not the only ones benefiting handsomely from the terms of the settlement. The Jacksons gain the right to seek an unopposed individual award of $25,000 in addition to the $9.50 due them under their regular claims. Settlement ¶43. This additional award is nearly 3000 times greater than that of a ordinary payment to an absent class member claimant. Such a discrepancy severs the ties necessary to bind the class representatives to the absent class members, rendering the representatives inadequate under Rule 23(a)(4) and the settlement unfair under Rule 23(e)(2). *Pampers*, 724 F.3d at 722 (representatives inadequate); *Vassalle v. Midland Funding LLC*, 708 F.3d 747,

756 (6th Cir. 2013) (settlement unfair); *Radcliffe v. Experian Info. Solutions*, 715 F.3d 1157, 1161 (9th Cir. 2013) (holding that the "incentive awards significantly exceeded in amount what absent class members could expect upon settlement approval" and thus "created a patent divergence of interests between the named representatives and the class"); *Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 952 (7th Cir. 2006) ($3000 to named plaintiff and minimal cash to absent class members is "untenable."), *Richardson*, 991 F. Supp. 2d at 205 ("Set against the recovery obtained on behalf of the absent class members, incentive awards of $1,000 are unfair.")

As a bedrock principle, the specifications of rule 23(a)(4) "demand undiluted, even heightened, attention in the settlement context." *Amchem Prods., Inc., v. Windsor*, 521 U.S. 591, 620 (1997); *Pampers*, 724 F.3d at 721. It is "altogether proper" to inspect the terms of settlement when evaluating whether adequacy is met. *Amchem*, 521 U.S. at 619-20; *accord GM Trucks*, 55 F.3d at 801 (providing that intra-class conflict can sometimes be discerned from "the very terms of the settlement"); *Pampers*, 724 F.3d at 722. "[T]he linchpin of the adequacy requirement is the alignment of interests and incentives between the representative plaintiffs and the rest of the class." *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 183 (3d Cir. 2012).

In *Pampers*, approximately 50 class representatives had signed off on a settlement that granted them "incentive awards" of $1000 each per affected child, awards amounting to $41,000 in the aggregate. Absent class members were entitled to no cash, other than the right to participate in a money-back guarantee program. The Sixth Circuit found that under the terms of the agreement, adequacy of representation was lost because in essence, "there [was] no overlap between" the deal obtained by the class representatives and that obtained by the class itself. 724 F.3d at 722. Upon attaining the defendant's consent to supercompensatory recovery, the class representatives had no remaining "interest in vigorously prosecuting the interests of unnamed class members." *Id.* In other words, they are no longer in the same boat as class members.

The Sixth Circuit found no comfort in the fact that bargaining for incentive awards was common practice. *Id.* It announced a general rule that courts "should be most dubious of incentive payments when they make the class representatives whole, or (as here) even more than whole; for in that case the class representatives have no reason to care whether the mechanisms available to unnamed class members can provide adequate relief." *Id.*

The parties may attempt to distinguish *Pampers* on the ground that at least this settlement entitles all class members to a minimal cash recovery. This is unavailing because a "[small cash payment] can only be described as de minimis, especially in comparison to the [enhancement award of several thousand dollars]" realized by the named plaintiffs. *Vassalle*, 708 F.3d at 756.

Also recently, in a case cited by *Pampers*, the Ninth Circuit disavowed disproportionate incentive awards. *Radcliffe*, 715 F.3d 1157. *Radcliffe* held that incentive awards conditioned upon endorsement of the settlement proposed were impermissible. But more than that, "the significant disparity between the incentive awards and the payments to the rest of the class members further exacerbated the conflict of interest caused by the conditional incentive awards." *Id.* at 1165. "There is a serious question whether class representatives could be expected to fairly evaluate whether awards ranging from $26 to $750 is a fair settlement value when they would receive $5,000 incentive awards." *Id.* In such situations there is a well-founded fear that named representatives will be "more concerned with maximizing [their own gain] than with judging the adequacy of the settlement as it applies to class members at large." *Id.* (quoting *Staton*, 327 F.3d at 977).[13]

These cases are important because they recognize the principle that "[t]he premise of a class action is litigation by representative parties adjudicates the rights of all class members, so basic due process requires that named plaintiffs possess undivided loyalties to absent class members."

---

[13] *Staton* had also repudiated disproportionate incentive awards.

*Broussard v. Meineke Disc. Muffler Shops*, 155 F.3d 331, 338 (4th Cir. 1998). Entering into a separate side-settlement creates a conflict of interest, one which cannot be assuaged by *ipse dixit* that the class representatives were aware of their duties and acted in accordance with them. *Compare Radcliffe*, 715 F.3d at 1166 (rejecting argument that conflict of interest was mitigated because "no actual conflict developed" according to named plaintiffs' "own testimony") *with* Declaration of Thomas M. Jackson and Patricia G. Jackson (Dkt. 88).

This settlement agreement offends Rule 23(a)(4).

## VI.   In the alternative to denying settlement approval, the Court should limit counsel's fee award to 25% of the true constructive common fund.

In the event that the Court overrules Hung's preceding objections, and reaches the question of what counsel award is reasonable under Rule 23(h), Hung asks the Court to reduce the award from that amount sought.[14] "Active judicial involvement in measuring fee awards is singularly important to the proper operation of the class action process." Advisory Committee Notes on 2003 Amendments to Rule 23. As a fiduciary for the class, the Court maintains a duty of keen oversight of all settlement proceedings. *See supra* §II. "[R]eview of the attorneys' fees component of a settlement agreement is . . . an essential part of its role as guardian of the interests of class members. To properly fulfill its Rule 23(e)[15] duty, the district court must not cursorily approve the attorney's fees provision of a class settlement or delegate that duty to the parties." *Strong v. BellSouth Telecomms., Inc.*, 137 F.3d 844, 850 (5th Cir. 1998) (constructive common fund); *GM Trucks*, 55 F.3d 768, 819-20 (requiring "a thorough judicial review of fee applications . . . in all class action settlements")

---

[14] Current indications are that the constructive common fund (the fee + the amounts claimed) will be slightly under $4 million. 25% of this is slightly under $1 million. Again, it will also be important to verify that most of the submitted claims are actually validated as legitimate.

[15] Rigorous oversight of fee awards is now also required by Rule 23(h).

(constructive common fund). Federal case law, in *Strong, GM Trucks,* and subsequent decisions,[16] has eschewed the unduly formalistic approach that the plaintiffs advance in their fee papers. *See* Fee Memo (Dkt. 92) at 1 (arguing that the because they are segregated, the fees "will not reduce the around that Class Members receive").

Judicial involvement is all the more important since it is to be expected that class members with small individual stakes in the outcome will not file objections. *GM Trucks*, 55 F.3d at 812; *Vought v. Bank of Am.*, 901 F. Supp. 2d 1071, 1093 (C.D. Ill. 2012) (citing, *inter alia*, a 1996 FJC survey that found between 42% and 64% of settlements engendered no filings by objectors); Christopher R. Leslie, *The Significance of Silence: Collective Action Problems and Class Action Settlements*, 59 FLA. L. REV. 71, 73 (2007). As such, the response from class members cannot be seen as something akin to an election or a public opinion poll. *See GM Trucks*, 55 F.3d at 813; Theodore Eisenberg & Geoffrey Miller, *The Role of Opt-Outs and Objectors in Class Action Litigation: Theoretical and Empirical Issues*, 57 VAND. L. REV. 1529, 1561 (2004) ("Common sense dictates that apathy, not decision, is the basis for inaction."); *contra* Fee Memo at 11-12.

## A.    Percentage-based award should be based upon actual claims made, not upon a fictitious 100% claims rate.

To minimize the likelihood of unreasonable fee awards, the law of this Circuit recognizes that the percentage-of-recovery ("PoR") fee methodology is the generally superior method to use. *In re Cendant Corp. Litig.*, 264 F.3d 201, 256 (3d Cir. 2001) (citing *Court Awarded Attorney Fees: Report of the Third Circuit Task Force*, 108 F.R.D. 237, 256 (1985)); *GM Trucks*, 55 F.3d at 821 ("[T]he court should probably use the percentage of recovery rather than the lodestar method as the primary determinant."); *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 734 (3d Cir. 2001); *see generally* Charles Silver, *Due Process And The Lodestar Method: You Can't Get There From Here*, 74 TUL. L. REV.

---

[16] *E.g., Pearson*, 778 F.3d at 786; *Pampers*, 724 F.3d 713; *Bluetooth*, 654 F.3d 935.

1809, 1812 (2000) (observing "solid consensus that the contingent percentage approach minimizes conflicts more efficiently than the lodestar….").

The PoR method "directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 121 (2d Cir. 2005). In contrast, judicial reliance on the lodestar will "create an unanticipated disincentive to early settlements, tempt lawyers to run up their hours, and compel district courts to engage in a gimlet-eyed review of line-item fee audits." *Id.*

Plaintiffs correctly recognize the primacy of the PoR methodology (Fee Memo at 8 & n.6). However, when they get into the PoR analysis (Fee Memo at 8-9), they commit the grievous error mentioned *supra* §IV.A, of using a faulty denominator. As a result, they calculate their request to be 6.4% of the fund. Fee Memo at 9. This "total benefits" methodology is outmoded, "premised upon a fictive world," and transgresses the principle that cases—especially class action cases—should be decided based upon "reality." *Pampers*, 724 F.3d at 721; *accord Pearson*, 772 F.3d at 781 ("The 14.2 million 'benefit' to class members was a fiction…").

Admittedly, some courts that have awarded fees on a percentage-of-recovery basis have made the calculation on the basis of the entire fund, not just the amount of the fund that is claimed by the class. *E.g., Boeing v. Van Gemert*, 444 U.S. 572 (1980); *see also* Fee Memo at 9 n. 7 (citing *Lake Forest Partners, L.P. v. Sprint Comm'ns Co.,L.P.*, 2013 WL 3048919, *2 (W.D. Pa. Jun. 17, 2013) and *Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423, 437 (2d Cir. 2007) (both following *Boeing*)).[17]

---

[17] As a threshold matter, even if *Boeing* was applicable to this case, it would not render the claims data irrelevant. For example, a court may choose to depart downward from the 25% benchmark, due to the class' apathetic reaction that is demonstrated by the absence of claims. *Baby Prods.*, 708 F.3d at 178-79; *Tarlecki v. Bebe Stores, Inc.*, No. C 05-1777 MHP, 2009 U.S. Dist. LEXIS 102531, at *12 (N.D. Cal. Nov. 3, 2009). Or alternatively, a trial court can in its discretion determine that "a more reasonable fee results from calculating a percentage of the actual recovery." *Wise v. Popoff*, 835 F. Supp. 977, 982 (E.D. Mich. 1993).

But *Boeing* is inapplicable to case at bar for at least three reasons

**First**, *Boeing* has no relevance to adjudicating a Rule 23(e) objection that a settlement is unfairly slanted toward class counsel. *Boeing* involved a litigated judgment where Boeing was ordered to deposit a sum total in escrow at a commercial bank. After an extensive notice and search program, 47% of the class's potential claims had been accounted for. 444 U.S. at 476 n.4. No settlement was involved. *See also Pearson*, 772 F.3d at 782 (distinguishing *Boeing* as a case where the "harvest created by class counsel was an actual, existing judgment fund").

While the Second Circuit's *Masters* decision did involve a settlement, it did not address the distinction between a fee that follows a litigated judgment and one that follows an agreed-upon settlement award. The opportunities for abuse are far greater in the settlement context. To illustrate, the Third Circuit has expressed a concern that class counsel not be "penalized" where "individual damages are simply too small to motivate them to submit claims."[18] This concern has force where counsel obtain the maximum judgment available to them under law. It does not have force, however, in the context of settlements where claims are capped at a stipulated percentage of the amounts sought under the complaint. For then, the parties can contrive to make the value of the award so feeble ($9.50 here) as to dissuade an average class member from taking the time to make a claim at all. Tiffaney Janowicz et al., *Settlement Administration: Impacting Claims Filing Rates* (Feb. 18, 2014) at 24, *available at* http://media.straffordpub.com/products/crafting-class-settlement-notice-programs-due-process-reach-claims-rates-and-more-2014-02-18/presentation.pdf (last visited Nov. 30, 2014) (describing how claims rates vary with the amount available). Also, the *Masters* court did not confront the ubitquitous Rule 23(e) allocation problem present in typical settlements because there class counsel were the appellants, and were challenging only the insufficiency of the fee award.

---

[18] *Baby Prods.*, 708 F.3d at 178.

*Pearson*, *Pampers*, and *Redman*, in contrast to *Masters* and *Boeing*, were appeals brought by objecting class members. These cases, none of which were considered by the decisions class counsel rely upon, are compelling: the amount claimed by class members is the relevant benchmark.[19]

**<u>Second</u>,** *Boeing* was superseded by the 2003 amendments to Federal Rule of Civil Procedure 23, which created Rule 23(h), and the subsequent passage of the Class Action Fairness Act in 2005 (28 U.S.C. §1711 *et seq.*). *See* Samuel Isaacharoff, *The Governance Problem in Aggregate Litigation*, 81 FORDHAM L. REV. 3165, 3171-72 (2013) (describing *Boeing* as marking an "older line of cases" that eventually "prompted legislative rejection of compensating lawyers on the face value of the settlement, regardless of the take-up rate of the benefits by class members"); *Baby Prods*, 708 F.3d at 179 n.13 ("Although we do not deal with a coupon settlement, [28 U.S.C. § 1712] supports the proposition that the actual benefit provide to the class is an important consideration when determining attorneys' fees."). The new rules reflect common-sense intuitions. Attorneys' fees should be tied directly to what clients receive, and permitting a class member to fill out a claim form in order to receive a check simply is not equivalent to getting money to that class member directly. *See* Notes of Advisory Committee on 2003 Amendments to Rule 23 (directing courts "to scrutinize the manner and operation of any applicable claims procedure" when awarding fees).

**<u>Third</u>,** to whatever extent it remains valid and applies to settlement proceedings at all, *Boeing* applies only to cases with actual common funds, not constructive common funds like this one.[20] *Pearson* is directly on point, reversing a district court that premised its calculation of settlement value on the fiction that $3/class member was "made available" to the 4.7 million class members who

---

[19] In dicta and without analysis, *Baby Products* suggested that *Boeing* applies to the settlement context as well as to litigated judgments. 708 F.3d at 177.

[20] *Baby Products*, by contrast, involved an actual common fund from which the fees were paid. 708 F.3d at 169.

received direct notice of the settlement. *Pearson*, 772 F.3d at 781. There was no actual fund, no litigated judgment, and no "reasonable expectation…that more members of the class would submit claims than did," and thus *Boeing* was inapplicable. *Id.* at 782; *accord Strong v. Bellsouth Tel. Inc.*, 137 F.3d 844, 852 (5th Cir. 1998) (*Boeing* only applies to "traditional common fund" not a claims-made settlement where "no fund was established at all"). *Boeing* itself recognizes this distinction. *Boeing*, 444 U.S. at 479 n.5 (expressly reserving decision on whether its common-fund analysis applies to claims-made scenarios). Thus, the *Strong* class counsel's fee award was properly based on actual class-member participation—the real value of the settlement—rather than the "phantom" value assigned by class counsel. 137 F.3d at 852.

Public policy demands that fee awards should be attuned to the result actually achieved for the class. *See Int'l Precious Metals Corp. v. Waters,* 530 U.S. 1223, 120 S. Ct. 1237  (2000) (O'Connor, J) (respecting denial of certiorari) (total benefit rule could "undermine the underlying purposes of class actions by providing defendants with a powerful means to enticing class counsel to settle lawsuits in a manner detrimental to the class" and "could encourage the filing of needless lawsuits"). If this Court encourages a circuit split with *Pearson* and *Strong* and endorses class counsel's proposed rule that equates a settlement that awards cash directly to class members with a settlement employing a restrictive claims process, settling parties will always agree to the more burdensome claims process that ensures class counsel extracts the maximum amount of fees and defendants pay the minimum amount of money to settle the case. Unnamed class members will be inadequately represented.

A hypothetical demonstrates the absurd incentives class counsel's interpretation creates. Imagine two settlements of the hypothetical class action *Coyote v. Acme Products*:

| Settlement One | Settlement Two |
|---|---|
| Acme Products mails a $50 check to each of one million class members who purchased their mail-order rocket roller skates. | One million members have the right to fill out a twelve-page claim form requesting detailed product and purchase information, with a notarized signature attesting to its |

accuracy under penalty of perjury. The claim form must be hand-delivered in person between the hours of 8:30 a.m. and 9:30 a.m., on July 4, 2014, at Acme's offices in Walla Walla, Washington. Class members with valid claim forms receive $100.

It would be malpractice for a class attorney to refuse Settlement One and insist on Settlement Two. Virtually all class members would prefer Settlement One to Settlement Two. A defendant would prefer Settlement Two to Settlement One as substantially cheaper. But under class counsel's proposed interpretation of *Boeing*, Settlement Two is worth four times as much as Settlement One, and entitles the class attorneys to four times as much in attorneys' fees. Instead, this Court should prefer the rule that "gives class counsel an incentive to design the claims process in such a way as will maximize the settlement benefits actually received by the class." *Pearson*, 772 F.3d at 781.

Class counsel might attempt to distinguish this case from the hypothetical Acme "Settlement Two"; after all, the settlement permitted claimants to file claims by postal mail rather than hand-deliver them, and included a prepopulated claim form with class notice. But making that argument concedes Hung's point that valuing "potential" benefits is improper without taking into account the likelihood that a class member will *actually* obtain the benefit. If it is improper to fully value Acme "Settlement Two" because only 0.01% of the class will make claims, why is it appropriate to value this settlement by its "potential" benefits when it has a claims process where less than 11% of the class will *actually* make claims? There is no principled dividing line: the way to judge the validity of a claims process—and to incentivize class counsel to maximize the result actually obtained by the class—is to rely solely on the amount that the claims process will *actually* pay the class.

A fee award needs to be attuned to the result actually achieved for the class, to the money the settlement actually puts in class members' hands. *See, e.g., Baby Prods.*, 708 F.3d at 179 (reversing district court that hypothesized $8 million in class value instead of making a genuine inquiry);

*Redman*, 768 F.3d at 633 ("the reasonableness of a fee cannot be assessed in isolation from what it buys"; "hours can't be given controlling weight in determining what share of the class action settlement pot should go to class counsel"); *In re HP Inkjet Printer Litig.*, 716 F.3d 1173, 1182 (9th Cir. 2013) ("Plaintiffs attorneys don't get paid simply for working; they get paid for obtaining results."). Absent class members can only be protected if class counsel negotiates for a process that maximizes payment to the class, but if fees are based on "potential" benefits, class counsel has the incentive to inflate the hypothetical number of claims as much as possible so as to ensure itself the maximum baseline from which to draw its fee.

For this reason the Advisory Committee Notes counsel that the "fundamental focus is the result actually achieved for class members" and advise "defer[ring] some portion of the fee award until actual payouts to the class are known." Notes of Advisory Committee on 2003 Amendments to Rule 23(h); *accord Baby Prods.*, 708 F.3d at 179. Even before Rule 23(h), courts deferred or staggered fees just so, to account for success or failure of the claims process. *E.g., Duhaime v. John Hancock Mut. Life Ins. Co.*, 989 F. Supp. 375, 380 (D. Mass. 1997); *Bowling v. Pfizer, Inc.*, 922 F. Supp. 1261, 1283-84 (S.D. Ohio 1996), *aff'd Bowling v. Pfizer, Inc.*, 102 F.3d 777 (6th Cir. 1996).[21]

If this Court determines that *Boeing* is still good law and is applicable here, Hung wishes to preserve that issue for appeal. He believes that it has been legislatively superseded and that it should, ideally, be judicially reversed through interpretation of 23(h).

**B.    The lodestar cross-check confirms the need to reduce class counsel's award.**

While the Third Circuit has been a leader in adopting the percentage-based fee approach, it nevertheless has steadfastly encouraged district courts to employ a lodestar cross-check "to ensure

---

[21] Here, deferring should not be necessary given that approved claims data should be known before the fairness hearing, assuming that the parties promptly submit the claims data unto the record.

that the proposed fee award does not result in class counsel being paid a rate vastly in excess of what any lawyer could reasonably charge per hour, thus avoiding a "windfall" to…counsel." *In re Cendant Corp. Litig.*, 264 F.3d 201, 285 (3d Cir. 2001). "The lodestar cross-check serves the purpose of alerting the trial judge that when the multiplier is too great, the court should reconsider its calculation under the percentage-of-recovery method, with an eye toward reducing the award." *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 306 (3d Cir. 2005); *see also Bluetooth*, 654 F.3d at 945 (cross-check is used to "confirm that a percentage of recovery amount does not award an exorbitant hourly rate") (quoting *GM Trucks*, 55 F.3d at 821 n.40). Because of the potential to discourage hasty undervalued settlements with generous attorney payments, one noted commentator has even gone so far as to call the lodestar cross-check "essential." Brian Wolfman & Alan B. Morrison, *Representing the Unrepresented in Class Actions Seeking Monetary Relief*, 71 N.Y.U. L. REV. 439, 503 (1996); *see also* Brian Wolfman, *Judges! Stop Deferring to Class-Action Lawyers*, 2 U. MICH J. L. REFORM 80, 84-85 (2013) (describing risk of cheap, quick and undervalued settlement).

The Third Circuit's preeminent case on the lodestar cross-check is *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722 (3d Cir. 2001). There, the district court granted a percentage-based fee award that equated to a lodestar cross-check multiplier of 7 using the district court's findings, or 10 by the objector's calculation. *Id.* at 742. The Third Circuit concluded that such an award could not stand.

> "Either of these multipliers (Kirby's multiplier of 7 or the Trust's multiplier of 10) is substantially higher than any of the multipliers in the cases charted above, which range from 1.35 to 2.99, and is also significantly higher than the 'large' 5.1 multiplier in *In re Prudential*, which we questioned because 'the court offered little explanation as to why a multiplier was necessary or appropriate.' 148 F.3d at 340-41. In allowing such a high multiplier in this case without even calculating it, much less explaining how it is justified, the District Court strayed from all responsible discretionary parameters in the awarding of Kirby's attorneys' fees. In all the cases in which high percentages were applied to arrive at attorneys' fees, the courts

explained the extensive amount of work that the attorneys had put into the case, and appropriately the lodestar multiplier in those cases never exceeded 2.99. This range is consistent with the principle that "'multiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied.'" *In re Prudential*, 148 F.3d 283, 341 (3d Cir. 1998) (quoting 3 Herbert Newberg & Alba Conte, Newberg on Class Actions, § 14.03 at 14-5 (3d ed. 1992)). In this case, the District Court judge made clear that he wanted to reward Kirby for Kirby's quick and beneficial settlement of the case, and that may be a good reason for the fee award to exceed the lodestar, but not to the exclusion of all other factors. On remand of this case to the District Court, **we strongly suggest that a lodestar multiplier of 3 (the highest multiplier of the cases reviewed above) is the appropriate ceiling for a fee award**, although a lower multiplier may be applied in the District Court's discretion. 243 F.3d at 742 (emphasis added)

Here, even taking class counsel's time submissions at face value,[22] the proposed multiplier is 5.68, nearly double the "strongly suggest[ed]" "ceiling" of *Cendant PRIDES*. Class counsel point out that other district courts in this Circuit have previously awarded multipliers exceeding 5.68, but none of those appear to have considered the "ceiling" established by *Cendant PRIDES*. Fee Memo at 21-22 (citing, *e.g.*, *Stop & Shop Supermarket Co.v. SmithKline Beecham Corp.*, 2005 WL 1213926 (E.D. Pa. May 19, 2005)). *Cendant II*'s footnote allusion to an apparent "mid-single digits" multiplier,[23] when the issue had not been pressed, the district court had made no findings, and the fee award amounted

---

[22] Hung appreciates class counsel's timely submission of contemporaneous billing records. *See* Dkt. 93-1. Although he has not flyspecked the reasonableness of each time entry, he would encourage the Court (1) to make sure that all the tasks listed were beneficial to the class and thus properly compensable. *See Planned Parenthood of Central New Jersey v. Attorney General of State of New Jersey*, 297 F.3d 253, 266 (3d Cir. 2002); *Hensley v. Eckerhart*, 461 U.S. 424, 440 (1983) (hours spent on non-beneficial pursuits should be excluded); (2) to ensure that the amounts of time spent on each task were not excessive or duplicative. *See* 297 F.3d at 268-270; and (3) to make certain that the rates charged are appropriately calibrated to the type of task performed. *See Ursic v. Bethlehem Mines*, 719 F.2d 670, 677 (3d Cir. 1983) ("A Michelangelo should not charge Sistine Chapel rates for painting a farmer's barn."). Given that 65% of the hours expended were expended by two of the most of expensive attorneys on the case, the *Ursic* top-heavy billing concern is present here. If the Court reduces the base lodestar by even 10%, the proposed multiplier would climb to 6.3.

[23] 404 F.3d 173, 183 n.4 (3d Cir. 2005).

---

to 1.7%, should not be viewed as rolling back the Third Circuit's definitive statements in *Cendant PRIDES*.

Moreover, these cases all preceded the Supreme Court's most forceful admonition to date against excessive use of lodestar multipliers in *Perdue v. Kenny A.*, 559 U.S. 542 (2010).[24] *Kenny A.* delineates a "strong presumption that the lodestar is sufficient" without an enhancement multiplier. *Id.* at 546. *Kenny A.* allocates "the burden of proving that an enhancement is necessary [to] the fee applicant." *Id.* at 553. *Third* and most significantly, it holds that a lodestar enhancement for performance is justified only in "rare and exceptional" circumstances where "specific evidence" demonstrates that an unenhanced "lodestar fee would not have been adequate to attract competent counsel." *Id.* at 554.

Class counsel's final two reasons (Fee Memo at 23) in opposition to a fee reduction based on lodestar cross-check ring hollow. Due to the nature of class action work, it is true that in every case, some hours will need to be expended on future case-related work after the fee petition. Such hours loom in every instance and provide no reason not to consider the lodestar multiplier as it sits at the time of the fee submissions.[25]

----

[24] *Kenny A*'s limitation on enhancements was made in the context of interpreting 42 U.S.C. § 1988's language of "reasonable" fee awards, but there's little justification for claiming that "reasonable" in § 1988 means something different than "reasonable" in class action fee awards made under Fed. R. Civ. P. 23(h). *See e.g.*, *In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 361 (3d Cir. 2010) (Weis, J. concurring/dissenting) (referring to *Perdue* as an "analogous statutory fee-shifting case."); *Van Horn v. Nationwide Prop. & Cas. Ins. Co.*, 436 Fed. Appx. 496, 500 (6th Cir. 2011); *Weeks v. Kellogg Co.*, No. 09-cv-8102, 2011 U.S. Dist. LEXIS 155472, at *129-*135 & n.157 (C.D. Cal. Nov. 23, 2011) (citing *Kenny A* and finding "little basis for an application of a multiplier" when calculating lodestar cross-check); *cf. also GM Trucks*, 55 F.3d at 822 (3d Cir. 1995) ("[T]o the extent that the district court relied on the lodestar method, it erred by applying a multiplier" for contingency after *City of Burlington v. Dague*, 505 U.S. 557 (1992)).

[25] Class counsel was wise not to attempt to inflate their lodestar with projected future hours. Courts do not permit fee applicants to include anticipated future time in their claimed lodestar. *See Nat'l Alliance for Accessibility, Inc. v. Hull Storey Retail Group, LLC*, No. 10-cv-778-J-34JBT, 2012 U.S.

Second, the hours expended in the ongoing *Morris* action provide no reason to overlook the lodestar cross-check here. There was a good reason class counsel chose not to include those hours in the lodestar calculation here. Work spent on other cases is non-compensable. *E.g., In re Infospace, Inc. Secs. Litig.*, 330 F. Supp. 2d 1203, 1214 (W.D. Wash. 2004). Hours spent on *Morris* will be compensable upon successful resolution of that litigation, but they should not be double-counted via the backdoor here. Nor should they be taken into account when evaluating what a reasonable lodestar cross-check multiplier would be in this matter.

## CONCLUSION

For the foregoing reasons, this settlement should be rejected as unfair and unreasonable. At the very least, the fee request must be reduced.

---

Dist. LEXIS 125160, at *14 (M.D. Fla. Jun 28, 2012) ("Plaintiffs provide no legal support for recovering fees based on anticipated future time. The law is settled that in calculating the lodestar, the Court must use 'the number of hours reasonably **expended** on the litigation,' and the movant 'should submit evidence supporting the hours worked.'") (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983) and adding emphasis); *7-Eleven, Inc. v. Etwa Enter.*, No. DKC 12-3336, 2013 U.S. Dist. LEXIS 83961, at *14 (D. Md. Jun. 12, 2013) ("Plaintiff has not identified any authority that would entitle it to an award of 'anticipated legal fees and costs,' nor is the court aware of any."); *St. Hilaire v. Indus. Roofing Co.*, 346 F. Supp. 2d 212, 215 (D. Me. 2004) (rejecting "Plaintiff's bald projection of reasonable future fees without corroborating support in the record").

I am the objector and I endorse my attorney's arguments in support of the objection.

Wei Cyrus Hung
Objector

Dated:  January 29, 2015                    Respectfully submitted,


                                            */s/  Adam E. Schulman*
                                            Adam E. Schulman (admitted *pro hac vice*)
                                            CENTER FOR
                                            CLASS ACTION FAIRNESS
                                            1718 M Street NW, No. 236
                                            Washington, DC 20036
                                            Telephone:  (610) 457-0856
                                            Email:  shuyande24@gmail.com


                                            *Attorneys for Wei Cyrus Hung*

## CERTIFICATE OF SERVICE

I certify that I have filed the foregoing document through the Court's ECF system, which has effectuated service of this Objection upon all attorneys in this case who are registered for electronic filing.

In addition, I have caused a copy of this Objection to be served via First Class Mail to the Class Administrator at the following address:

Jackson v Wells Fargo
C/O Settlement Administrator
PO BOX 1955
Faribault, MN 55021-6151

January 29, 2015                              */s/ Adam E. Schulman*
                                              Adam E. Schulman