## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THOMAS M. JACKSON and PATRICIA G. JACKSON, as individuals and as representatives of the classes, | **Civil Action No.: 2:12-cv-01262-DSC** |
| Plaintiffs, | **Judge David Stewart Cercone** |
| | **ELECTRONICALLY FILED** |
| v. | |
| WELLS FARGO BANK, N.A. and WELLS FARGO INSURANCE, INC. | |
| Defendants. | |

### WELLS FARGO'S RESPONSE TO WEI CYRUS HUNG'S OBJECTION TO THE CLASS ACTION SETTLEMENT

**TABLE OF CONTENTS**

*Page*

I.   INTRODUCTION ........................................................................................1

II.  OVERALL SETTLEMENT COMPENSATION FAIRLY
     RECOMPENSES THE CLASS FOR ITS WEAK CLAIMS ........................3

III. THE SETTLEMENT'S CLAIMS-MADE STRUCTURE IS
     UNASSAILABLE .......................................................................................9

     A.   Claims-Made Settlements Are Common And Routinely
          Approved ........................................................................................9

     B.   Use Of A Claims-Made Process Is Reasonable In This Case.............11

     C.   The Claims Procedure Is Not Burdensome .........................................14

IV.  THE ATTORNEY FEE PROVISIONS ARE NO REASON TO
     DISAPPROVE THE PROPOSED SETTLEMENT ....................................15

     A.   The Attorney Fees Are Not Disproportionate To Actual Class
          Recovery...........................................................................................15

     B.   The Clear Sailing And Kicker Clauses Caused No Harm .................16

V.   THE ADDITIONAL OBJECTIONS ARE MERITLESS............................18

VI.  CONCLUSION..........................................................................................19

**TABLE OF AUTHORITIES**

*Page(s)*

**CASES**

*Acosta v. Trans Union, LLC,*
   243 F.R.D. 377 (C.D. Cal. 2007) ...........................................................................11

*In re Baby Products Antitrust Litig.,*
   708 F.3d 163 (3d Cir. 2013)...................................................................................4

*Casey v. Citibank, N.A.,*
   2014 WL 4120599 (N.D.N.Y. Aug. 21, 2014) ....................................................10

*Cotton v. Hinton,*
   559 F.2d 1326 (5th Cir. 1977) ...............................................................................7

*De Leon v. Bank of America,*
   2012 WL 2568142 (M.D. Fla. April 20, 2012)....................................................11

*Dennis v. Kellogg Co.,*
   697 F.3d 858 (9th Cir. 2012) ...............................................................................16

*In re Educational Testing Service Praxis Principles of Learning and Teaching,*
   *Grades 7–12,*
   2006 WL 3332829 (E.D. La. Nov. 15, 2006) ......................................................10

*Eichenholtz v. Brennan,*
   52 F.3d 478 (3d Cir. 1995)....................................................................................3

*Evans v. Jeff D.,*
   475 U.S. 717 (1986)...............................................................................................8

*Fladell v. Wells Fargo Bank, N.A.,*
   2014 WL 5488167 (S.D. Fla. Oct. 29, 2014).......................................................10

*Freeman v. Quicken Loans, Inc.,*
   __ U.S. __, 132 S.Ct. 2034 (2012)........................................................................6

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Products Liab. Litig.,*
   55 F.3d 768, 784 (3d Cir. 1995)....................................................................3, 4, 7

*Girsh v. Jepson,*
   521 F.2d 153 (3d Cir. 1975)........................................................................ *passim*

*Hall v. Bank of America,*
   2014 WL 7184039 (S.D. Fla. Dec. 17, 2014) ......................................................10

*Hamilton v. Sun Trust Mortgage, Inc.,*
   2014 WL 5419507 (S.D. Fla. Oct. 24, 2014).......................................................10

**TABLE OF AUTHORITIES**

*Page(s)*

*Isby v. Bayh,*
  75 F.3d 1191 (7th Cir. 1996) .................................................................3

*In re Lawnmower Engine Horsepower Mktg. & Sales Practices Litig.,*
  733 F.Supp.2d 997 (E.D. Wis. Aug. 16, 2010)......................................10

*Lazy Oil Co. v. Wotco Corp.,*
  95 F.Supp.2d 290 (W.D. Pa. 1997).............................................3, 4, 5, 8

*Lipuma v. Am. Express Co.,*
  406 F.Supp.2d 1298 (S.D. Fla. 2005) ....................................................10

*Martina v. L.A. Fitness Int'l, LLC,*
  2013 WL 5567157 (D.N.J. Oct. 8, 2013)..................................................9

*McLennan v. LG Electronics USA, Inc.,*
  2012 WL 686020 (D.N.J. Mar. 2, 2012)...................................................9

*Milliron v. T-Mobile USA, Inc.,*
  2009 WL 3345762 (D.N.J. Sept. 10, 2009), *as amended* (Sept. 14, 2009),
  *aff'd,* 423 F. App'x 131 (3d Cir. 2011)..................................................10

*Mirakay v. Dakota Growers Pasta Co.,*
  2014 WL 5358987 (D.N.J. Oct. 20, 2014).................................................9

*Mulroy v. Nat'l Water Main Cleaning Co. of New Jersey,*
  2014 WL 7051778 (D.N.J. Dec. 12, 2014).................................................9

*Nichols v. SmithKline Beecham Corp.,*
  2005 WL 950616 (E.D. Pa. Apr. 22, 2005) ..............................................9

*Pearson v. NBTY, Inc.,*
  772 F.3d 778 (7th Cir. 2014) .................................................................11

*Perry v. FleetBoston Fin. Corp.,*
  229 F.R.D. 105 (E.D. Pa. 2005)...............................................................9

*Sabol v. Hydroxatone LLC,*
  2013 WL 6154432 (D.N.J. Nov. 22, 2013) ...............................................9

*Saccoccio v. JP Morgan Chase Bank, N.A.,*
  297 F.R.D. 683 (S.D. Fla. 2014)..........................................................9, 10

*Santiago v. GMAC Mortg. Group, Inc.,*
  417 F.3d 384 (3d Cir. 2005)......................................................................6

*Schulte v. Fifth Third Bank,*
  805 F.Supp.2d 560 (N.D. Ill. 2011) .....................................................9, 10

TABLE OF AUTHORITIES

*Page(s)*

*Stoetzner v. U.S. Steel Corp.*,
   897 F.2d 115 (3d Cir. 1990) .............................................................................4

*Trombley v. Nat'l City Bank*,
   826 F.Supp.2d 179 (D. D.C. 2011) ...............................................................10

*Turner v. Murphy Oil, USA, Inc.*,
   472 F.Supp.2d 830 (E.D. La. 2007) ................................................................8

*Uhl v. Thoroughbred Tech. & Telecommc'ns, Inc.*,
   309 F.3d 978 (7th Cir. 2002) ..........................................................................9

*In re Warfarin Sodium Antitrust Litig.*,
   391 F.3d 516 (3d Cir. 2004) ............................................................................9

*Weber v. Gov't Employees Ins. Co.*,
   262 F.R.D. 431 (D.N.J. 2009) .........................................................................9

STATUTES, RULES

United States Code
   Title 12, § 2607 ...............................................................................................6
   Title 42, § 4012a .............................................................................................5

Federal Rules of Civil Procedure
   Rule 23 .........................................................................................................1, 8

OTHER AUTHORITIES

8 Newberg on Class Actions § 24:126 (4th ed.) ...........................................................8

*Smith v. Levine Leichtman Capital Partners, Inc.*, 3:10-cv-00010-JSW, Order
   Denying Motion for Approval of Class Action Settlement, Dkt. 291
   (N.D. Cal. Nov. 15, 2012) ............................................................................11

# I.

## INTRODUCTION

Two primary considerations should guide this Court in exercising its discretion under Fed. R. Civ. P. 23(e):  (1) Have defendants paid a fair amount to settle the class' claims against them?  And (2) is the settlement fairly distributed among class members, class representatives, and class counsel?

The Center for Class Action Fairness's ("Center's") objection on behalf of Wei Cyrus Hung ignores the first of these considerations.  Hung expressly eschews any argument "that this case must settle for an actual $22 million or even for $15 million or $10 million" or, indeed, any other sum.  Hung Obj., 7.  Hung avoids any analysis of the strength or weakness of the class' claims in this action.  He says nothing about procedural hurdles to class recovery, such as the substantial barrier a contested class certification motion would need to overcome.

Hung says nothing about the overall fairness of the settlement for good reason.  Analysis of the *Girsh* factors shows that the settlement is, indeed, fair to class members.  Their claims are weak.  A contested class certification motion would likely fail.  The approximately $6 million that Wells Fargo will pay under the proposed settlement in cash payments to settlement class members, administrative costs, and attorney fees is more than fair recompense for the release and dismissal of the class' claims.

Hung objects only to the allocation as between class members and class counsel of the reasonable total settlement amount Wells Fargo has agreed to pay.  That objection, in turn, is based primarily on the Center's crusade[1] against claims-made settlements as inherently suspect

---

[1]    Like many another Crusader, the Center spends pages proclaiming the purity of its purpose.  Hung Obj., 2-3.  Yet, it would be naïve to accept its self-assessment at face value.  To survive, the Center must attract charitable donations.  *Id.*, 3.  It does so by filing high profile, heavily

(Fn. cont'd)

and improper.  Courts have not joined the Center's crusade.  Claims-made settlements are com-mon-place and commonly approved because they serve valuable functions.  Here, for example, a claims process is needed because Wells Fargo's records do not reveal which of the 2.3 million class members paid the $19 flood hazard determination fee which is at issue in this case.

Furthermore, direct payment would dramatically increase administrative costs and thereby decrease total compensation paid class members unless the total settlement amount is dramatically increased.  But Wells Fargo will not pay more to resolve the class' claims.  As al-ready stated—and as Hung concedes—the total sum Wells Fargo has agreed to pay is fair.  It was a sum extensively negotiated in adversarial fashion before a neutral mediator.  Given that fact, the choice before this Court is not between the settlement that the parties have proposed and the Center's dream settlement but between the proposed settlement and none at all.  That choice is easily made.  Once it is, a claims-made settlement that spends more on claims payments and less on administrative costs is by far the preferable procedure.

Nor is the claims process in this case unduly burdensome or designed to discourage class members from filing claims.  All they must do is write their name, address, and loan number (if known) on a post-card claim form, and deposit it in the nearest mailbox.  It is far less of a burden than class members would bear were they required to prove their claims in court.

The rest of Hung's objection is equally lacking in merit.  Plaintiffs' attorneys' fee request is not disproportionately high.  Certainly not when compared with the benefits made available to the class.  Not even when compared with the total compensation actually to be paid under the

---

(Fn. cont'd)

publicized objections to class settlements based on a standard set of objections, particularly to claims-made settlements and *cy pres* funds.  *See* <http://centerforclassactionfairness.blogspot.com/>.  The Center pursues its own financial interest in presenting Hung's objection, just as much as Wells Fargo and plaintiffs' attorneys do in opposing it.

settlement.  Nor can Hung show any actual harm from the "clear sailing" or so-called "kicker" provisions of the settlement.  Those clauses may have sidelined Wells Fargo, but they have not deprived the Court of an adversarial presentation on the propriety of plaintiffs' attorney fee request.

In short, the proposed settlement pays the class a fair sum for the settlement of its far-from-compelling claims.  The settlement's claims-made feature is reasonable and justified by the particular circumstances of this case.  The Court retains complete discretion in approving attorneys' fees, within the parties agreed upon cap.  Attorneys' fees disagreements from objectors do not call for jettisoning a settlement that affords the class appropriate compensation for its claims.

## II.

## OVERALL SETTLEMENT COMPENSATION FAIRLY RECOMPENSES THE CLASS FOR ITS WEAK CLAIMS

"The law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation." *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Products Liab. Litig.*, 55 F.3d 768, 784 (3d Cir. 1995) (citation omitted) ("*GM Trucks Litig.*").[2]

"The decision of whether to approve a proposed settlement of a class action is left to the sound discretion of the district court."  *Girsh v. Jepson,* 521 F.2d 153, 156 (3d Cir. 1975).

---

[2]   *See also Eichenholtz v. Brennan*, 52 F.3d 478, 486 (3d Cir. 1995); *Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996) ("Federal courts naturally favor the settlement of class action litigation….  Although such settlements must be approved by the district court, its inquiry is limited to the consideration of whether the proposed settlement is lawful, fair, reasonable, and adequate.") (citations omitted); *Lazy Oil Co. v. Wotco Corp.*, 95 F.Supp.2d 290, 329 (W.D. Pa. 1997) ("The settlement of disputed claims, especially of complex class action litigation, is favored by courts as a matter of public policy.  This principle is well established in the Third Circuit.") (citations omitted).

> The role of a district court is not to determine whether the settlement is the fairest possible resolution—a task particularly ill-advised given that the likelihood of success at trial (on which all settlements are based) can only be estimated imperfectly. The Court must determine whether the compromises reflected in the settlement—including those terms relating to the allocation of settlement funds—are fair, reasonable, and adequate when considered from the perspective of the class as a whole."

*In re Baby Products Antitrust Litig.*, 708 F.3d 163, 173-74 (3d Cir. 2013).

"Taking into account the strong public policy favoring settlement, trial courts are directed to approve class action settlements that are 'fair, adequate, and reasonable.' " *Lazy Oil Co.*, 95 F.Supp.2d at 330 (*citing Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115, 118 (3d Cir. 1990)). "In the Third Circuit, the nine factors identified in *Girsh v. Jepson*, 521 F.2d 153, 156-57 (3d Cir. 1975), outline the standard to be applied in determining whether a settlement should be approved as 'fair, adequate, and reasonable.' "[3] *Id.* (*citing GM Trucks Litig.*, 55 F.3d 785-86, 804-06).

The *Girsh* factors weigh heavily in favor of the proposed settlement. Factor One, complexity, expense and likely duration of the case, certainly does. The complaint was filed two and a half years ago. Though substantial discovery has been undertaken since then, the case remains at an early procedural stage otherwise. Wells Fargo's challenges to the legal sufficiency of plaintiffs' claims remain unresolved. No class certification motion has yet been made. No summary judgment motion has been filed. No trial date is set. "The delay and uncertainty, as

---

[3]   The nine *Girsh* factors are " (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation."

well as the mounting expense, of continued litigation are factors supporting settlement." *Lazy Oil Co.*, 95 F.Supp.2d at 331 (citations omitted).

Factor Two, class reaction, likewise favors the proposed settlement. Only 354 class members have opted out—less than .0002% of the 2.3 million settlement class. *See* J. Botzet Decl. re Motion for Approval of Settlement at ¶ 14. A grand total of ten objections to the settlement have been filed. By contrast, about 300,000 claims forms have been submitted. *Id.* at ¶ 17. There could hardly be a more favorable reaction from class members.

The settlement is also supported by Factor Three (stage of proceedings; amount of discovery). Substantial discovery has taken place since the action was filed. *See* Settlement Agreement, ¶ 6. More was undertaken in the *Morris* case from which this case stemmed. And the parties engaged in a full-day mediation with court-appointed mediator Louis B. Kushner, *see id.*, ¶ 5, during which the parties exchanged additional information informally.

Factors Four and Five, the risks of establishing liability and damages, too, weigh heavily in favor of this settlement. Plaintiffs challenge a $19 flood hazard determination fee. Federal law requires Wells Fargo to obtain a flood hazard determination before closing a home loan in order to determine whether the home is located in a Special Flood Hazard Area ("SFHA") and so must be insured against flood damage. *See* 42 U.S.C. § 4012a(b)(1), (e)(1). Plaintiffs contend that the $19 fee is excessive because a single flood hazard determination can be obtained from Corelogic for $6. 1st Amended Compl., ¶ 21. Plaintiff's comparison is inapt. The $19 fee is charged not just for a single flood hazard determination, but is, instead, a single payment not only for the initial determination but also for life-of-loan monitoring and re-determinations of flood risk in response to FEMA's frequent re-delineation of SFHAs.

Plaintiffs' RESPA claim is equally weak.  Plaintiffs could not prove a fee-split in violation of 12 U.S.C. § 2607(b) because Wells Fargo Insurance charged Wells Fargo Bank $19 per borrower for its flood hazard determination services and Wells Fargo Bank passed that $19 charge on to borrowers without markup.  "In order to establish a violation of § 2607(b), a plaintiff must demonstrate that a charge for settlement services was divided between two or more persons." *Freeman v. Quicken Loans, Inc.*, __ U.S. __, 132 S.Ct. 2034, 2044 (2012).  RESPA does not forbid a single settlement service provider, such as Wells Fargo Insurance, from charging an allegedly excessive fee, so long as the provider does not divide the fee with another entity.  *See Santiago v. GMAC Mortg. Group, Inc.*, 417 F.3d 384, 387 (3d Cir. 2005).  Since Wells Fargo Bank passed through Wells Fargo Insurance's $19 flood hazard determination fee without markup, there was no fee split and hence no violation of § 2607(b).

Plaintiffs' kickback theory under § 2607(a) of RESPA is equally frail.  To establish a violation of that subsection, plaintiffs would have to prove that Wells Fargo Insurance gave Wells Fargo Bank "a fee, kickback or thing of value" in exchange for its referral of flood hazard determination business.  Plaintiffs based their claim on "management accounting credits" ("MACs") that Wells Fargo Bank received for referring the flood hazard business to Wels Fargo Insurance.  1st Amended Compl., ¶¶ 24, 25.  A MAC is not a thing of value.  It buys nothing at the store.  It exists solely within Wells Fargo's accounting system as a means of tracking the source of revenue across Wells Fargo divisions and affiliates.  No cash is transferred with MACs.  MACs cannot be bought or sold.  Nor can MACs be exchanged for money or property.  Plaintiffs cannot show that MACs are things of value and so cannot prove their kickback claim.

Factor Six, the risks of maintaining the class action through the trial, again favors the proposed settlement.  No class has yet been certified, and it is doubtful that any contested class

certification motion could be granted for lack of any feasible means of ascertaining the membership of a class of borrowers who paid the $19 flood hazard determination charge.  Wells Fargo's records do not reliably reflect who paid the fee.  Plaintiffs have not suggested any other means of segregating borrowers who paid the fee from those who did not.[4]

Finally, Factors Eight and Nine, the range of reasonableness of the settlement fund in light of the best possible recovery and to a possible recovery in light of all the attendant risks of litigation, shows the settlement to be reasonable.  On plaintiffs' common law claims, their best possible recovery is $13 per borrower, the difference between Wells Fargo Insurance's $19 fee for an initial flood certification plus life-of-loan monitoring and Corelogic's different $6 single determination fee.  Under the settlement, Wells Fargo will pay each claimant $9.50 or 73% of his or her best possible recovery.  Admittedly, the claim payment represents a considerably smaller percentage of the best possible recovery under RESPA, but, for the reasons already mentioned, plaintiffs' RESPA claims are frail at best, justifying a lower recovery through settlement.

In evaluating the settlement, the district court is to compare class members' recovery under the settlement with their likely recovery at trial, " 'appropriately discounted for the risk of not prevailing .' "  *GM Trucks Litig.*, 55 F.3d at 806.  And, in doing so, the Court must "guard against demanding too large a settlement based on its view of the merits of the litigation; after all, settlement is a compromise, a yielding of the highest hopes in exchange for certainty and res-olution." *Id.* (*citing Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977)).

> If there are issues of fact and questions of law which make any recovery problematical, the determination of what amount of money constitutes a fair settlement is not a matter of mathematical science.  The court is in no position to substitute its judgment for

---

[4]    Factor Seven (defendant's ability to withstand a larger judgment) is not of significance in this case.  Wells Fargo would be able to bear any judgment likely to be rendered in this case.

> that of honest and competent attorneys, who, after exhaustive discovery, have made a determination that the settlement represents a fair and realistic appraisal of their clients' chances of ultimate success.

*Lazy Oil Co.,* 95 F.Supp.2d at 331-32.

When, as here, the settlement has resulted from protracted, difficult arms-length negotiations between experienced counsel for the parties, all of whom recommend the settlement, "the Court can rely upon the judgment of counsel in evaluating the settlement." *Id.* at 332. Taken as a whole, therefore, the proposed settlement is "fair, adequate and reasonable," offering fair recompense for dismissal and release of the class' claims in this case. Hung does not contend otherwise. He has not challenged the settlement's fairness in general.

By conceding the overall fairness of the proposed settlement, Hung has largely forfeited the fight before it has begun. The Court's powers under Fed. R. Civ. P. 23(e) are limited. It can only approve or disapprove the proposed settlement as a whole. It has no power to modify particular terms that it or an objector finds distasteful. 8 Newberg on Class Actions § 24:126 (4th ed.) ("[T]he courts have held that their function is not to modify the terms of a proposed settlement; but rather to approve or disapprove of the proposed settlement 'as a whole.'") (citing *Evans v. Jeff D.*, 475 U.S. 717, 727 (1986)); *Turner v. Murphy Oil, USA, Inc.*, 472 F.Supp.2d 830, 843 (E.D. La. 2007) ("[T]he Court is also limited in that it may not make unilateral modifications or alterations to the proposed settlement, but rather may only accept or reject the agreement as a whole."). Since the proposed settlement, as a whole, is "fair, adequate and reasonable," it should be approved despite whatever perceived flaws Hung finds in a few of its particular provisions.[5] Hung "must do more than just argue that [he] would have preferred a

---

[5] Hung cautions the Court to "Be Alert" that the *Girsh* factors are not an exclusive list of all potentially relevant and appropriate factors to be considered in evaluating a class action

(Fn. cont'd)

different settlement structure ….” *Uhl v. Thoroughbred Tech. & Telecommc'ns, Inc.*, 309 F.3d 978, 987 (7th Cir. 2002).

## III.

## THE SETTLEMENT'S CLAIMS-MADE STRUCTURE IS UNASSAILABLE

Contrary to Hung's onslaught, the proposed settlement is not fatally defective due to its claims-made structure. *See* Hung Obj., 7-13. A claims-made settlement is proper and is justified here by the particular circumstances of this case.

**A.     Claims-Made Settlements Are Common And Routinely Approved**

"There is nothing inherently suspect about requiring class members to submit claims forms in order to receive payment." *Saccoccio v. JP Morgan Chase Bank, N.A.*, 297 F.R.D. 683, 696 (S.D. Fla. 2014) (*quoting Schulte v. Fifth Third Bank*, 805 F.Supp.2d 560, 593 (N.D. Ill. 2011)) (quotation marks omitted). Claims-made settlements are common-place and commonly approved in this Circuit[6] and elsewhere. Courts have repeatedly overruled objections that class settlements should provide for direct payment rather than require class members to file claims in

---

(Fn. cont'd)
settlement. Hung Obj., 6. While additional factors may be relevant in particular cases, as Hung contends, the *Girsh* factors remain the primary yardstick for assessing class action settlements in this Circuit. The Court cannot simply ignore them as Hung does.

[6]     *See, e.g.*, *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 539 (3d Cir. 2004); *Mulroy v. Nat'l Water Main Cleaning Co. of New Jersey*, No. CIV.A. 12-3669 WJM, 2014 WL 7051778, at **5-6 (D.N.J. Dec. 12, 2014); *Mirakay v. Dakota Growers Pasta Co.,* No. 13-CV-4429 JAP, 2014 WL 5358987, at **1, 5 (D.N.J. Oct. 20, 2014); *Sabol v. Hydroxatone LLC*, No. 2:11-CV-04586-KM-MAH, 2013 WL 6154432, at **2, 22 (D.N.J. Nov. 22, 2013); *Martina v. L.A. Fitness Int'l, LLC*, No. 2:12-CV-2063 WHW, 2013 WL 5567157, at *2 (D.N.J. Oct. 8, 2013); *McLennan v. LG Electronics USA, Inc.*, No. 2:10-CV-03604 WJM, 2012 WL 686020, at *10 (D.N.J. Mar. 2, 2012); *Weber v. Gov't Employees Ins. Co.*, 262 F.R.D. 431, 439, 451 (D.N.J. 2009); *Perry v. FleetBoston Fin. Corp.*, 229 F.R.D. 105, 110, 125 (E.D. Pa. 2005); *Nichols v. SmithKline Beecham Corp.*, No. CIV.A.00-6222, 2005 WL 950616, at *8 (E.D. Pa. Apr. 22, 2005).

order to obtain settlement proceeds,[7] including, most recently, in a related series of cases

challenging lenders' force-placed insurance practices.[8]

Claims-made settlements offer several distinct benefits over direct-payment settlements.

Claims-made settlements limit recovery to aggrieved class members,[9] "reduce the risk of fraud,

waste, and abuse that might arise from sending unsolicited checks to unverified addresses and

recipients,"[10] and control administrative costs.[11]   By doing so, a claims-made settlement

maximizes the recovery for those class members who submit claims.  *See Hamilton*, 2014 WL

5419507, at *6.

Indeed, Hung concedes that claims-made settlements are "unexceptional" "[a]s a general

matter," and "can be justified by the fact that the defendant is unable to identify specific class

members or is unable to identify the value of those class members' claims.  Hung Obj., 8.

---

[7]   "The Court finds it perfectly appropriate to require Class members to submit certain information proving that they are entitled to collect the relief awarded in this case." *Milliron v. T-Mobile USA, Inc.*, No. CIV.A. 08-4149 (JLL), 2009 WL 3345762, at *6 (D.N.J. Sept. 10, 2009), *as amended* (Sept. 14, 2009), *aff'd*, 423 F. App'x 131 (3d Cir. 2011); *accord*, *Trombley v. Nat'l City Bank*, 826 F.Supp.2d 179, 201 (D.D.C. 2011); *Schulte*, 805 F.Supp.2d at 593; *Lipuma v. Am. Express Co.*, 406 F.Supp.2d 1298, 1310, 1325 (S.D. Fla. 2005).

[8]   *See Saccocio v. JP Morgan Chase Bank, N.A.*, 297 F.R.D. 683 (S.D. Fla. 2014); *Hall v. Bank of America*, No. 1:12–cv–22700–FAM, 2014 WL 7184039, at *6 (S.D. Fla. Dec. 17, 2014); *Fladell v. Wells Fargo Bank, N.A.*, No. 0:13-cv-60721, 2014 WL 5488167, at *4 (S.D. Fla. Oct. 29, 2014); *Hamilton v. Sun Trust Mortgage, Inc.*, No. 13–60749–CIV, 2014 WL 5419507, at **5-7 (S.D. Fla. Oct. 24, 2014); *Casey v. Citibank, N.A.*, No. 5:12-CV-820, 2014 WL 4120599, at *2 (N.D.N.Y. Aug. 21, 2014).

[9]   *See Hall*, 2104 WL 7184039, at *6; *Fladell*, 2014 WL 5488167, at *4.

[10]   *See Hall*, 2104 WL 7184039, at *6; *Fladell*, 2014 WL 5488167, at *4; *Hamilton*, 2014 WL 5419507, at *6; *see also In re Lawnmower Engine Horsepower Mktg. & Sales Practices Litig.*, 733 F.Supp.2d 997, 1010 (E.D. Wis. Aug. 16, 2010); *In re Educational Testing Service Praxis Principles of Learning and Teaching, Grades 7–12*, MDL No. 1643, 2006 WL 3332829, at *2 (E.D. La. Nov. 15, 2006).

[11]   *See Hamilton*, 2014 WL 5419507, at *6; *see also In re Lawnmower Engine Horsepower Mktg. & Sales Practices Litig.*, 733 F.Supp.2d at 1010.

**B.**     **Use Of A Claims-Made Process Is Reasonable In This Case**

Hung argues only that a "superfluous" or "gratuitous" claims procedure designed to reduce the defendant's total payout is an abuse of an otherwise unobjectionable and common feature of class action settlements.[12]   Hung Obj., 8-12.   Even if that premise is conceded, and it is not, for his objection to succeed, Hung must show that the claims-made procedure is "superfluous" or "gratuitous" in this case.   That he has not done and cannot do.

Instead, Hung constructs and demolishes a strawman.   "*If the parties contend* the claims process was necessary for those class members who changed their name and are unreachable with the defendant's record information," Hung has what he thinks to be devastating responses. Hung Obj., 10 (emphasis added).   However, the parties to *this* settlement never asserted that the claims process was needed because Wells Fargo's records were underinclusive in this manner.

Quite to the contrary, the problem here is that Wells Fargo's records are over-inclusive. Certainly on the class' common law claims and likely on its RESPA claims as well, only bor- rowers who actually paid the $19 flood hazard determination charge are entitled to any recovery. Not all borrowers paid the fee.   In some cases, sellers paid it.   In others, Wells Fargo waived it as an accommodation to the borrower.   Wells Fargo's loan records do not reliably show via electronic query which borrowers paid the charge and which did not.

---

[12]     The out-of-circuit cases that Hung cites for this proposition do not support it.   At most, they express doubts about particular claims processes under the circumstances of the specific case while disapproving proposed settlements on other grounds.   *See Pearson v. NBTY, Inc*., 772 F.3d 778, 783 (7th Cir. 2014); *Smith v. Levine Leichtman Capital Partners, Inc*., 3:10-cv-00010-JSW, Order Denying Motion for Approval of Class Action Settlement, Dkt. 291 (N.D. Cal. Nov. 15, 2012) at 2-5; *De Leon v. Bank of America*, No. 6:09-cv-1251, 2012 WL 2568142, at **9-20 (M.D. Fla. Apr. 20, 2012); *Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 385-91 (C.D. Cal. 2007).

The settlement administrator recently reviewed Wells Fargo's loan records for the over 240,000 claims it had then received.  *See* Botzet Decl. re Response Hung Objection at ¶ 4 .  The loan records contain fields that are intended to reflect who (borrower, lender, seller or third party) paid the flood hazard determination charge and how much they paid.  But the settlement administrator found that those fields were completely empty for roughly a fourth of the claimants, so that the administrator could not tell whether the borrower or someone else paid the charge.  *Id.* at ¶ 6.  For slightly less than another fourth of the claimants, Wells Fargo's loan records showed that the borrower had paid $0.00 for the flood hazard determination service.  *Id.* at ¶ 7.  In other instances, the loan records show the borrower paid amounts that bear no apparent relationship to the $19 flood hazard determination fee:  $0.01 in one case, $3,625.55 in another.  *Id.* at ¶ 8.

Apart from a claims process, the only reliable means of determining which borrowers paid the fee would be to manually audit each borrower's account records.  However, that process would be prohibitively expensive and time-consuming, particularly considering the relatively small charge at issue in this case.  Thus, a claims process is reasonably required in this case to decide who is entitled to receive a settlement payment.  The problem is not finding added claimants who no longer appear accurately or at all on Wells Fargo's records, as Hung hypothesizes, but rather in weeding out borrowers who have suffered no injury and are not entitled to a settlement payment for that reason.

The dramatically lower administrative cost of the claims-made process in this case provides another compelling justification for its use in preference to the direct-payment model that Hung champions.  The administrative cost of printing and mailing checks to claimants is estimated to be about $235,000.  *See id.* at ¶ 10.  By contrast, to print and mail checks to all 2.3

million class members would cost about $1.6 million.  *See id.* at ¶ 11.  Money does not grow on trees.  During the extended settlement negotiations, Wells Fargo made it clear it was unwilling to contribute more to the settlement than the amount ultimately agreed upon.  Hence, the added $1.3 million in administrative cost of a direct-payment settlement could only be paid from settlement proceeds that will be paid to class members under the proposed claims-made procedure.

Under the proposed claims-made structure, the approximately 300,000 borrowers who have submitted timely valid claims will be paid a total of about $2.8 million in settlement benefits.  By contrast, a direct payment settlement would distribute only $1.5 million in settlement proceeds to the 2.3 million class members—or roughly $0.65 each.  *Id.*

Of course, Hung would like this Court to believe that if it disapproves the currently proposed settlement that Wells Fargo will somehow re-evaluate the case and agree to pay the currently promised $9.50 not just to the borrowers who file valid claims but to every potential class member, claimant or not.  Direct payment of $9.50 to each potential class member would increase the total cost of the settlement by more than 400%—from about $6 million to over $24 million.[13]  Wells Fargo has no intention of paying such a large sum for the relatively weak claims asserted in this suit.

As already stated—and as Hung concedes—the total sum Wells Fargo has agreed to pay is fair.  It was a sum extensively negotiated in adversarial fashion before a neutral mediator.  Given that fact, the choice before this Court is not between the settlement that the parties have

---

[13]  Under the proposed settlement, Wells Fargo will pay almost $6 million, including approximately $2.8 million to class members who filed timely claims, approximately $1.6 million in settlement administration costs, and up to $1.5 million in attorney fees and costs.  Under a settlement directly paying $9.50 to each class member, settlement payments would increase to $22 million, administrative costs would climb to about $3 million, and attorney fees and costs would remain at $1.5 million.

proposed and the Center's dream settlement but between the proposed settlement and none at all. That choice is easily made.  Once it is, a claims-made settlement that spends more on claims payments and less on administrative costs is by far the preferable procedure.

## C.    The Claims Procedure Is Not Burdensome

Hung also wrongly complains that the claims procedure in this case is "disheartening" and "deleterious" because it required class members to mail their claim forms to the settlement administrator.  Hung Obj., 11-12.  Hung thinks class members should have been allowed to submit claims electronically.  *Id.*

In fact, the claims procedure was about as easy as it could be.  Class members only needed to state their name and address and their loan number, if they knew it, affirm that they had paid the $19 flood hazard determination fee, and drop the postcard claim form in the mail.

Needless to say, none of those actions are particularly burdensome, least of all mailing a postcard.  Hundreds of millions of letters and postcards are sent through the mail every day, even in this electronic age.  Post boxes stand on many corners; post offices, in every town.  And postal workers pick up mail from the mailbox of virtually every home in this country.

No legal authority supports Hung's notion that using the mails is an unduly burdensome requirement.  He cites none.  Of equal importance, the actual claims filings in this case disprove his argument.  About 300,000 class members—almost 13% of the class—managed the suppos-edly burdensome trek to a mailbox.  For a consumer class action promising $10 or less in settlement payments, 13% is an impressively high claims rate.[14]  Contrary to Hung's assertion, class members were not deterred from filing claims.

---

[14]    *See Fladell v. Wells Fargo Bank, N.A.*, No. 1:12-cv-22700, Dkt. No. 230-6 (declaration of Robert Taylor-Manning), ¶¶ 32-33 (S.D. Fla.) (stating that a payment of $15 or less to class members will normally generate a claim rate between 0 and 5%).

**IV.**

**THE ATTORNEY FEE PROVISIONS ARE NO REASON
TO DISAPPROVE THE PROPOSED SETTLEMENT**

The rest of Hung's objection is devoted to attorney fees.  He claims they are dispropor-

tionately high compared with the $2.8 million which Wells Fargo is committed to paying the

class, and he challenges what he calls "clear sailing" and "kicker" clauses in the settlement

agreement as unfairly shielding plaintiffs' attorney-fee request from scrutiny.  Hung Obj., 13-35.

The fees are not disproportionate to actual class recovery.  The clauses Hung challenges

have not harmed the class, as the Court can address fees in a fully adversarial setting.  And, the

Court is not constrained in setting fees within the parties agreed upon cap.  Settlement

Agreement, ¶ 42.  Hence this dubious fee dispute provides no rational for jettisoning a settlement

which benefits the class

**A.      The Attorney Fees Are Not Disproportionate To Actual Class Recovery**

Even were the proper yardstick for measuring proportionality of attorney fees the actual

payments to the class—rather than the settlement benefits made available to any class member

who files a claim—the attorney fees requested by plaintiffs' counsel fall within the reasonable

range of fee to recovery ratios.

By Hung's own argument the proper comparison is attorney fees to attorney fees plus

what class members receive.  Hung Obj., 16.  When administrative costs are considered as part

of the benefit to the class, as they should be, the ratio of attorney fees to the benefit to the class is

25%, which Hung concedes is appropriate.  *See* Hung Obj., 16.  Even if administrative costs are

excluded, the ratio works out to 35%:  $1.5 million in requested fees as compared to $4.3 million

($2.8 million in claims payments plus $1.5 million in fees).  The percentage is somewhat above

the Third Circuit's "presumptive" rate, but less than the ratio the Ninth Circuit found "clearly excessive" in *Dennis v. Kellogg Co.*, 697 F.3d 858, 868 (9th Cir. 2012).

**B.    The Clear Sailing And Kicker Clauses Caused No Harm**

Hung wrongly contends that "clear sailing" clauses—under which the settling defendant agrees not to contest the plaintiffs' fee request so long as it does not exceed an agreed amount—somehow increases the risk that the settlement proceeds will be misallocated and entice class counsel to settle lawsuits in a manner detrimental to the class.  Hung Obj., 18.

Hung also claims that the fact that Wells Fargo retains any amount less than $1.5 million awarded to plaintiffs' attorneys—the so-called "kicker" clause—somehow lessens the Court's ability to rectify a disproportionate fee request.  Hung Obj., 19-21.

Neither proposition is true.  To reiterate, Hung concedes—or at least does not challenge—the fact that the amount Wells Fargo has agreed to pay class members is fair recompense for the dismissal and release of their claims.  So the issue here is not whether plaintiffs' attorneys are seeking too much in fees at the class members' expense, but rather whether the fees sought are more than Wells Fargo should have to pay for the work plaintiffs' attorneys did on the class' behalf in securing them that fair settlement amount.

One would think that Wells Fargo is best situated to answer that question.  It has done so by agreeing to pay up to $1.5 million in fees, if the Court awards that amount.  The clear sailing provision merely confirms that agreement.  It protects both plaintiffs' attorneys and Wells Fargo. Having agreed to pay up to $1.5 million, Wells Fargo cannot contest the attorneys' application for fees at or under the agreed maximum.  But Wells Fargo is also protected against—and need not pay—any award in excess of the agreed sum.  *See* Settlement Agreement, ¶ 38.

The so-called "kicker" provision is also reasonable.  It merely provides that Wells Fargo will pay only the fees that the Court awards—up to the $1.5 million cap.  As Hung concedes (or

does not contest) the fact that class members are adequately compensated by the settlement's other provisions, there is no reason why they should gain a windfall were the Court to award less than $1.5 million in fees to plaintiffs' attorneys.

Importantly, the principal objection other courts have voiced to clauses of this type is that they may deprive the court of a full adversarial review of the plaintiffs' attorney fee request. That has not happened here.  Hung has entered the fray—as class members now do with increasing frequency.  So the Court has a fully adversarial presentation on the attorney fee application.  In this appropriately adversarial setting, the Court can judge whether the plaintiffs' attorneys have truly earned the $1.5 million that Wells Fargo agreed to pay.

The so-called "kicker" clause does not disable the Court from achieving the right proportion between plaintiffs' attorney fees and actual class recovery, as Hung claims.  It merely prevents one sort of adjustment—one that would increase class members' recovery beyond the amount Hung concedes is reasonable.

The settlement agreement provides the Court complete discretion to approve fees within the parties agreed upon cap.  It provides that the settlement "is not conditioned upon Court approval of attorneys' fees and costs in any amount, and this Settlement Agreement shall remain in full force and effect even if the Court declines to award attorneys' fees in the amount requested by Class Counsel, and/or awards a lesser amount than the amount requested by Class Counsel."  Settlement Agreement, ¶ 42.

Hung's overblown disagreement with the fee request should not interfere with confirmation of a settlement agreement that is in the best interests of the class.[15]

---

[15]   Hung also challenges the requested $25,000 payment to the class representatives.  Hung Obj., 21-24.  Compared to the other sums payable under the settlement agreement, this requested award is minimal.  Its grant or denial will not affect the sums paid any class member.  Nor has

(Fn. cont'd)

## V.

## THE ADDITIONAL OBJECTIONS ARE MERITLESS

Of the eight other objections, only that submitted by Alejandro Diaz and Mayda Nahhas (the "Diaz Objection") deserves brief discussion. The Diaz Objection appears to be based on the erroneous belief that the settlement is a "common fund" settlement in which a fund is established to pay claims. *See* Diaz Objection, p. 2. This is not a common fund settlement. Rather, under the settlement Wells Fargo will pay $9.50 to each class member who submits a valid claim. Because there is no "common fund," there will be nothing to "revert" to Wells Fargo after it pays claims. So the Diaz Objection – and the authorities cited therein – are inapposite.

Though not entirely clear, it appears that Mr. Diaz and Ms. Nahhas may believe that the settlement is unfair because Wells Fargo will pay less than it would have if 100% of class members had submitted claims. They argue that Wells Fargo's "savings" should be paid to class members who submit claims or to a *cy pres* recipient. *See id.*, pp. 6-7. So construed, the Diaz Objection is another general attack on claims-made settlements, would produce absurd results, and fails for the same reasons that Mr. Hung's objection fails.[16]

---

(Fn. cont'd)
the requested award silenced opposition to the settlement.  Also, the Court is free to approve, lower, or completely disapprove the proposed payment to class representatives without affecting the rest of the settlement.  *See* Settlement Agreement, ¶ 43.

[16]   The remaining objections are either duplicative of the Hung and Diaz objections or misunderstand the claims being settled.

# VI.

## CONCLUSION

For all the reasons state above, the Court should overrule Hung's objection and approve the proposed settlement.


Dated:  February 19, 2015

Respectfully submitted,

SEVERSON & WERSON

*/s/ Michael J. Steiner*
Michael J. Steiner (*pro hac vice*)
mjs@severson.com
Mark D. Lonergan (*pro hac vice*)
mdl@severson.com
One Embarcadero Center, Suite 2600
San Francisco, California 94111
Telephone: (415) 677-5611
Facsimile: (415) 956-0439

STEVENS & LEE, P.C.
Steven J. Adams (Attorney Id. No. 56293)
sja@stevenslee.com
111 North Sixth Street
P.O. Box 679
Reading, PA  19603-0679
Telephone:  (610) 478-2133
Facsimile:  (610) 988-0841

*Attorneys for Defendants Wells Fargo Bank,*
*N.A., and Wells Fargo Insurance, Inc.*