1              IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

3    THOMAS M. JACKSON and PATRICIA
     G. JACKSON, as individuals and
4    as representatives of the
     classes,                          Civil Action 12-1262
5                    Plaintiffs,
        vs.
6
     WELLS FARGO BANK, N.A., and
7    WELLS FARGO INSURANCE, INC.,
                     Defendants.
8

9        Transcript of Motion for Final Approval of Class Action
     Settlement Proceedings on Thursday, March 5, 2015, United
10   States District Court, Pittsburgh, PA, before David Stewart
     Cercone, District Judge.
11
     APPEARANCES:
12
     For the Plaintiffs:             Kai H. Richter, Esq.
13                                   NICHOLS KASTER, PLLP
                                     4600 South Eighth Street
14                                   Minneapolis, MN 55402

15
     For the Objector Wei Cyrus     Adam E. Schulman, Esq.
16   Hung:                          Center for Class Action
                                    Fairness
17                                  1718 M Street NW
                                    #236
18                                  Washington, D.C. 20036

19

20   Court Reporter:               Juliann A. Kienzle, RMR, CRR
                                    5300 USPO & Courthouse
21                                  700 Grant Street
                                    Pittsburgh, PA 15219
22                                  (412) 261-6122

23

24
         Proceedings recorded by mechanical stenography;
25   transcript produced by computer-aided transcription.

```
 1   APPEARANCES: (Cont'd.)

 2     For the Objectors Alex Diaz      Daniel M. Samson, Esq.
       and Mayda Nahhas:               SAMSON APPELLATE LAW
 3                                      201 S. Biscayne Blvd. #2700
                                        Miami, FL  33131
 4

 5

 6
       For the Defendants:             Michael J. Steiner, Esq.
 7                                      SEVERSON & WERSON
                                        One Embarcadero Center
 8                                      Suite 2600
                                        San Francisco, CA 94111
 9
                                        Steven J. Adams, Esq.
10                                      Stevens & Lee
                                        111 N. Sixth Street
11                                      P.O. Box 679
                                        Reading, PA  19603
12
                                        Janice Tucker, Esq.
13                                      Law Department Consumer
                                        Lending Litigation
14

15

16

17

18

19

20

21

22

23

24

25
```

1  (Proceedings held in open court; Thursday, March 5, 2015.)

2          THE COURT:  This court is convened in the matter of

3  Thomas and Patricia Jackson versus Wells Fargo Bank and Wells

4  Fargo Insurance.  The docket number is 12-1262 of our civil

5  case docket.

6          This is the time set for a hearing on whether a

7  proposed settlement between a class certified for the purpose

8  of settlement and the defendants should be entered as the final

9  settlement of the claims set forth in the first amended

10 complaint.

11          I just want to briefly put some procedural history

12 on the record.

13          The Court gave preliminary approval to the proposed

14 settlement through an order signed back on October 27th of

15 2014.  That order directed notice to be given of the proposed

16 settlement and set this date and time for the approval hearing.

17          The preliminary approval order of October 27, 2014

18 established deadlines for opting out of the class, the making

19 of objections, and filing motions for final approval.

20          Notice and a postcard requesting affirmative

21 information to receive payments was sent to 2,315,362

22 settlement class members.  Of those, 300,995 class members did

23 seek to participate in the proposed settlement, if approved.

24          354 opted out of the class, and 10 filed objections.

25          Objector Wei Cyrus Hung has filed a brief and

1   affidavit.

2                  Objectors Alex Alberto Diaz and Mayda Nahhas have

3   submitted their objections into the record.

4                  Objectors Douglas and Lorraine Porter have submitted

5   their pro se objections to the Court.

6                  Settlement class plaintiffs have submitted a motion

7   for final approval of the settlement and briefs in support, as

8   well as a motion for attorneys' fees and expenses.  I should

9   say brief, one brief filed.

10                 Defendants have filed a response in opposition to

11  Objector Hung's objections and in support of final approval of

12  the proposed settlement.

13                 The parties and objectors also have filed a number

14  of additional submissions.

15                 The Court has reviewed the submissions, is familiar

16  with the parties' positions as reflected in their submissions.

17  Counsel does not need to rehash their positions already stated.

18                 With that brief summary, we'll now proceed and hear

19  from counsel.

20                 I understand that an order of the presentation has

21  been worked out between counsel and Mr. Richter is to proceed

22  first.

23                 MR. RICHTER:  Thank you, Your Honor.

24                 THE COURT:  Mr. Richter is on behalf of the

25  plaintiff.

1          MR. RICHTER:  I want to start by just thanking the

2    Court for its patience.

3          THE COURT:  I want to thank you for your patience,

4    I'm 15 minutes late.

5          MR. RICHTER:  Fifteen minutes compared to two and a

6    half years since the case was filed is a short time to wait.

7          Your Honor knows this litigation has been hard

8    fought.  This litigation has been going on for quite some time.

9    The litigation in the related Morris matter I think went on for

10   I think four years and there were bitterly contested motions in

11   both cases and some very extensive overlapping discovery.

12         If this was a sweetheart deal, I would say it was a

13   long and very rocky courtship.  I think it was more akin to --

14   if I were to analyze, it is more like an arranged marriage that

15   the Court asked the parties to engage in early mediation

16   following the order on the motions to dismiss.

17         We did that, worked through a very experienced

18   mediator and came to a deal that I can certainly say as class

19   counsel that I believe is fair, reasonable, and adequate to the

20   class.  I say that for three reasons, Your Honor.

21         First of all, in terms of the monetary relief, I

22   believe it's really quite good when you look at the dollar

23   value of the claims at issue.  Really, when you look at it, it

24   came to about two-thirds of the damages for the class members

25   in this case.  I get to that result, flood zone determination

fees here were $19.  The amount paid back to class members who
submit claims, as Your Honor is aware, is $9.50.  That is 50
percent, and, obviously, the soft dollar portion of the $19 is
not the full amount, it's something less than that.  So,
really, about two-thirds here recovery.  It's a full recovery
for class members, no further deductions for attorneys' fees
because we negotiated that Wells Fargo would pay those
separately, it wouldn't come out for relief of the class.  Also
no deductions for administrative expenses, which given a
settlement of 2.3 million class members is significant in terms
of the class members when notice goes out.

        The third reason I say that the settlement is
excellent in this case, although there's no injunctive relief,
per se, in the settlement, that's because the issue has already
been addressed.  After the lawsuit was filed, Wells Fargo
stopped the soft dollars practice or management accounting
credits practice in connection with flood zone determination.
So both on damages and in terms of stopping the practice, I
think the lawsuit has been quite effective.

        I think that's also borne out by the class response
to the settlement.  I thank Your Honor for covering the
particulars.  I'll go through them very briefly.  2.3 million
class notices, as Your Honor mentioned, only 10 objectors, and
by comparison, 300,000 claims filed.  So no matter how you look
at it, the response the favorable here.  The claimants

1  outnumber the objectors by my math 30,000 to 1.  The class

2  members outnumber the objectors almost a quarter million to

3  one.

4           So, we're going to hear from some objectors here in

5  a moment, but I think it's important to put the objections in

6  some perspective because although they're entitled to be heard,

7  they're certainly not, I think, based on those numbers,

8  representative of the class.

9           So, let me talk briefly about the objections for a

10 moment.

11          To me, they're a bit reminiscent of the wintry

12 weather we had here overnight and early this morning.  As the

13 old adage goes, March comes in like a lion and goes out like a

14 lamb, and I think in this case, these objections are really no

15 different.  There was a 35-page objection for the Center for

16 Class Action Fairness, a 10-page objection from the other

17 objectors, but I think after you consider them in light of the

18 settlement factors, and I'm not going to go through each of the

19 Girsh factors, we covered them in our brief, I think the Court

20 will find that the objections are really pretty tame.

21          Let's just briefly cover them.  They really fall

22 into three basic groups.  The first set of objections relates

23 to the claims-made structure of the settlement.  With respect

24 to that objection, even the Center concedes that claims-made

25 settlements are not, per se, invalid, in fact, they're commonly

1  approved.  In fact, the Ninth Circuit just approved a similar

2  claims-made settlement where the Center and its founder stepped

3  in and asserted objections to that settlement in the Ninth

4  Circuit.  I'm referring to the In re Online DVD settlement that

5  was the focus of our notice of supplemental authority earlier

6  this week.  That settlement required class members to submit a

7  claim form by mail to get $12 cash.  So, really, quite similar

8  in terms of the substance.

9              Notwithstanding the Center's objections to the

10  settlement in that case, the Ninth Circuit affirmed the

11  district court order approving a settlement.  I think there's

12  no reason to reach a different result here, Your Honor.

13              The claims process here, this is not a settlement

14  where the claims process was designed to depress claims.  What

15  we had here was a postcard notice that was easy as can be to

16  return, and, in fact, the claims rate here was higher than in

17  other typical class action settlements, about 13 percent.  In

18  fact, just a moment ago, in speaking with Mr. Schulman, he was

19  commenting, we were talking amongst each other, he mentioned he

20  was surprised the claims rate was so high.  So I think even the

21  Center here would acknowledge the claims rate is higher than a

22  typical class action settlement.  As we note in our briefs, the

23  Court has already found in its preliminary approval order that

24  the claims form was not burdensome and that the claims process

25  was appropriate.

1          Second, the claims process here was reasonable for a

2   number of reasons.  First, to ensure that only people who paid

3   are people who get reimbursed.  So, class members attested on

4   the bottom of the form that they actually paid the amounts at

5   issue.

6          Second, it's important in a case like this to ensure

7   that -- to avoid unnecessary settlement administration costs

8   and assure that people who are sent a check actually get a

9   check.  So if somebody is not going to fill out, sign and

10  return a postcard to get their money, there is no reason to

11  believe they're going to open the envelope with a check in it.

12  Basically, all of that money would be likely -- much of that

13  money would likely be wasted if there were unsolicited checks

14  that were sent out.

15         And third, also necessary in this case and

16  appropriate, to prevent fraud.  So you could have a situation

17  where somebody doesn't open the unsolicited settlement check,

18  we also have a situation where it's sent to an address, person

19  has moved, and somebody else goes ahead and forges their name,

20  signs a check.  If you have people who submit claims, you know

21  that they're going to be sent to the proper addresses.

22         So all those reasons we think those are legitimate

23  reasons to have a claim form in this case.  Those are the same

24  types of reasons that the court in the Fladell versus Wells

25  Fargo case discussed in terms of the claims-made settlement in

1 that case dealing with forced-placed insurance, which I believe

2 was approved earlier this year.

3          Then finally, Your Honor, we put a little chart into

4 our brief.  I'm not going to go through it in detail, but if

5 you look at that chart in our final approval brief, you'll see

6 the claimants here are actually better off, close to four times

7 better off than they would be under Mr. Hung's proposal with a

8 common fund settlement.

9          So, for all of those reasons, we think that the

10 claims-made settlement structure here is appropriate and the

11 monetary relief is more than adequate.

12          Second objection is with respect to attorneys' fees.

13 With respect to that, I'll be pretty brief because I really

14 don't think much needs to be said on that score because the

15 fees are really reasonable, no matter how you look at it.

16          If you look at the amount relief that is available

17 to the class, it's approximately 25 million.  I get to that

18 number, 22 million that was subject to being claimed; 1.5

19 million in fees; 1.5 million settlement administration costs, a

20 constructive common fund of 25 million, 1.5 million, which, by

21 the way, includes expenses in addition to costs comes to about

22 6 percent of that.  In fact, I think exactly 6 percent of that.

23 Even if we were to look at the attorneys' fees in the manner

24 that the objectors suggest we should, which is just based on

25 the amount that has been claimed by the class, even there the

1  fees, based on this constructive fund approach, are still at

2  the benchmark of 25 percent.  You have here basically

3  $6 million that is going to be paid out, about 3 million

4  directly to the class, 1.5 million in fees, 1.5 million in

5  settlement administration costs.  So, even by their math, the

6  attorneys' fees based on a percentage of the constructive fund

7  are reasonable.

8          I know they have this argument where they say, well,

9  you shouldn't include settlement administration costs in the

10  calculus of the constructed common fund, but that's not how the

11  court looked at it in Lake Forest Partners here in this

12  district and that's not how the Ninth Circuit just looked at it

13  in the case that they just dealt with in the Online DVD case

14  where the Center objected.

15          So, there's no windfall here on percentage of the

16  fund approach and there's really not on lodestar approach

17  either.  Our lodestar in this case alone, as of our filing, was

18  $314,000, approximately $314,000.  If you add in the amount of

19  time spent on document review in the Morris case, which was

20  directly relevant to this case because documents that were

21  reviewed in Morris were used for mediation purposes in this

22  case, you come to a total lodestar of 531,000 and a multiplier

23  of 2.8, which is really within the range of reasonableness.

24  Typically, multipliers range anywhere from one to four, pretty

25  much in the center there.

1            I have to say if you're to look at the full Morris
2 lodestar, the amount of the award here is almost identical to
3 what the full lodestar is if you took the Morris case and the
4 Jackson case together.

5            I should emphasize we are not getting paid, not
6 getting paid any attorneys' fees in connection with the Morris
7 case, which highlights the risks that we took on in taking on
8 both of these cases on a contingent fee basis.  These cases can
9 be feast or famine.  I'm not going to say it's famine, but it
10 certainly wasn't feast in terms of the fee that we're
11 requesting.

12            Finally, Your Honor, on the class representative
13 compensation issue, I just want to emphasize, and I think this
14 is clear from the record, there is no class representative
15 service award in this case.  What the class representatives are
16 receiving in this case is compensation in connection with a
17 separate individual Truth in Lending Act claim that they
18 asserted.  The damages on that claim are significant, and we
19 asserted well before, well before the settlement in this case
20 that the damages were significant on their individual TILA
21 claim.  We said that in our first amended complaint, well
22 before this case settled.  So this isn't some contrived
23 after-the-fact thing.  It's totally supported by their
24 declarations.  They had what they did -- what happened was,
25 they had -- Wells Fargo treated them as being in a flood zone,

1  even though they were given a disclosure that said they

2  weren't.  In order to get out from under the Wells Fargo flood

3  insurance requirement, they went ahead and refinanced their

4  mortgage.  They had to take money out of their retirement

5  account to do that.  Maybe it wasn't the most prudent thing for

6  them to do financially, but that's what they decided to do,

7  and they took a huge hit.  They took a $25,000 tax hit and they

8  also lost out, because they took it out of their retirement

9  accounts, they also lost out on all the market appreciation

10 because they took the money out I believe the record reflects

11 in January 2012, so they lost out on all the appreciation from

12 early 2012 through 2014 when the settlement was consummated.

13         They're also giving a general release, which is much

14 broader than the release that the class is giving, which is

15 specific to flood zone determinations.  So for all those

16 reasons, we think that the settlement payment that was

17 negotiated for them on their individual TILA claim is fair and

18 reasonable and supported by the record.  And as they also say

19 in their declarations, their support for the class settlement

20 is in no way contingent on the $25,000 settlement payment that

21 they will receive on their separate and independent TILA claim

22 which, again, is just like the Online DVD case that the Ninth

23 Circuit approved where the court dealt with a similar issue in

24 that case.

25         So, Your Honor, just in summary, it's no secret that

1  the Center for Class Action Fairness has a history of

2  challenging class action settlements and attorneys' fees in

3  particular.  They're certainly entitled to weigh in.  And in

4  some cases, those challenges may be warranted.  But this isn't

5  that case and I don't think that it fits their formula.  It's

6  not a case where the claims procedure was burdensome or

7  designed to depress claims, it's not a class where class

8  counsel was seeking a disproportion fee award, even if you only

9  look at the claims that were filed, and it's not a case where

10 class representatives are seeking an excessive service award,

11 in fact, they're seeking no service award at all.

12             So for all those reasons, we respectfully request

13 the Court approve the settlement in this case and I appreciate

14 the opportunity to comment this morning.  Thank you.

15             THE COURT:  Mr. Schulman.

16             MR. SCHULMAN:  Thank you, Your Honor.  Good morning.

17             I'll try not to belabor what we wrote in our

18 objection.  What I really want to do today is be a resource if

19 you have any questions about the objections, so feel free to

20 interrupt me at any time.

21             Otherwise, what I'd like to do is dispel some of

22 what I think are misconceptions in the parties' responses to

23 our objection.

24             The first one of those is in -- you heard some of

25 them from Mr. Richter today, the idea that there was no

1   deduction for attorneys' fees just because it's a separate

2   payment.  That just means it's a constructive common fund and

3   not a common fund.  Wells Fargo doesn't care that -- just

4   because it's formally segregated doesn't mean that

5   realistically their concern isn't the sum total of the

6   settlement.  Third Circuit has adopted that approach.  Many

7   other circuits, most recently in the Pearson case out of the

8   Seventh Circuit have adopted that approach.  That's why in

9   Wells Fargo's response papers, they say they're best situated

10  to answer the question of what the reasonable attorneys' fee

11  is, but their concern is the sum total of the payouts.  There

12  wasn't even, I don't believe, they can correct me if I'm wrong,

13  I don't believe there was a representation on the record that

14  the fees were even negotiated separately.  It was a sum total.

15  And even if it had been negotiated separately, the Third

16  Circuit in a case In re Community Bank, I think it was 2005,

17  held that just temporal segregation doesn't mean that it's not

18  a constructive common fund.  What their concern is is the sum

19  total of the payment.  They don't care about the allocation

20  between the class members and class counsel.  That's what our

21  main concern is coming in.  We see this as a settlement where

22  class counsel is getting 35 percent.  That's above benchmark.

23  We think that they do -- we don't think they should get any

24  less than 25 percent.  We would concede that, that they should

25  be getting 25 percent of the $4.35 million constructive common

1   fund for reasons we briefed.  We briefed them in the response

2   to the Online DVD notice that Mr. Richter filed earlier in

3   week.  We do not believe that the notice and administrative

4   costs should be included.  The Seventh Circuit held that

5   squarely in two cases.  The Third Circuit hasn't definitively

6   decided the issue, but we think that the policy reasons make a

7   lot of sense for why those costs should not be included in the

8   class benefit.

9           The Third Circuit has been steadfast in saying that

10  an adherence to the percentage of the fund methodology, which

11  is for the alignment of interest between class counsel and

12  their clients, the class members, and excluding notice costs

13  is -- follows from that policy reason.

14          So, we disagree with the fact that Wells Fargo is in

15  the best situated position to analyze the reasonableness of the

16  fees.  The Court has an independent fiduciary duty to do that.

17          The plaintiffs asserted in their responses to

18  Mr. Hung's objection that In re Prudential held that clear

19  sailing clauses were okay.  That's not exactly what In re

20  Prudential did.  If you look at that Third Circuit case, what

21  it says was that it doesn't make the class counsel inadequate

22  representatives just because there's a clear sailing award, but

23  Mr. Hung never challenged that class counsel was adequate

24  representatives.

25          Rather -- and another point there, Mr. Hung's

1  objection is not that a clear sailing call in a vacuum is a

2  problem, it's only clear sailing when you combine it with a

3  segregated fee so the reversion can't go back to class members,

4  a segregated and disproportionately large fee.  When those

5  elements combine, that's when you have the problem of an unfair

6  slanted -- settlement that is slanted in class counsels'

7  interest and against class members.

8          It's important to realize the difference between a

9  challenged settlement adequacy on the whole, the sum adequacy.

10  That's what Mr. Hung isn't challenging.  But he is challenging

11  the reasonableness, the fairness of the allocation.  Those are

12  two separate inquiries and they're both -- they're both

13  necessary conditions for an approvable settlement under 23(e).

14          Another thing that I would like to dispel is this

15  idea that Mr. Hung is alleging a collusive bargain.  They use

16  that term.  They also use the term conspiracy theories.

17  Mr. Hung wasn't present for the negotiations, he has no doubt

18  that they were hard fought, but, again, the hard-fought

19  negotiations only go to the sum total of the settlement.  The

20  defendant has -- the hard-fought negotiations can't assure that

21  the class is getting a reasonable portion of that total

22  $4.3 million net settlement fund.  That's the objection to

23  that.

24          On the claims process, the defendants make the

25  argument that it's an over -- that defendants' records are

overinclusive so there is a necessity for having an independent
claims process, but I point the Court to Guerrero v. Wells
Fargo, a case negotiated by Mr. Steiner, I believe, which was a
class of California mortgagees and they did a direct payment
there for flood insurance claims, and there was -- I don't
believe they objected -- they didn't have an objection in that
case to the idea of making direct payments based on the records
of the defendants.  So I don't see where the difference is.  If
he answered that question, that would appease us as to that
contention, possibly.

       Similarly, the objection to the class
representatives isn't that they were acting in bad faith or
somehow didn't have the class' best interest in mind.
Mr. Richter says that it's okay because they didn't get a
service award, what they got was a completely separate
settlement.  They got a settlement of their separate claims for
$25,000.  To be an adequate class representative, they can't
have that on the table.  That can't be included in this
settlement.  That's a serious issue.  Dry Max Pampers from the
Sixth Circuit talked about where the class members offered a
separate release, a broader general release.  That doesn't make
it fair, that just exacerbates the problem.  That means that
they have their separate claims tied up.  They need to have the
same, they have to have typicality as well under (a)(3), they
have to be adequate under (a)(4), and both aren't going to be

1 present if they have these much, much more valuable claims,

2 which it seems like they do.  Reading through their

3 declaration, I would tend to agree their claims are much more

4 valuable than a typical class member, but that's a problem with

5 them as the representative for this class.

6          On the issue -- another thing to dispel, the idea

7 that there are few objectors, you can approve the settlement

8 because of that.  The Third Circuit is very good on this point

9 In re GM Pickup Truck, a fuel tank product liability

10 litigation, a case from 1995.  They say that few objections, as

11 long as the objection that does exist is vigorous, then few

12 objections you're going to get that in any single case, you

13 have to be realistic and see that that is -- that is a factor

14 that almost never counts against the approval of any

15 settlement.  It's not a reason sufficient to approve the

16 settlement.

17          The idea that the settlement -- this is just a pure

18 legal issue -- the idea that -- they have repeated this again

19 and again, that it's a $25 million constructive common fund.

20 That's pure fiction.  That was rejected by the Seventh Circuit

21 in Pearson very clearly where they rejected the obligation of

22 Supreme Court's Boeing case to this type of a constructive

23 common fund settlement.  It has no applicability, for the

24 reasons given in the opinion and in our briefing.

25          The real value of the constructive common fund, as

1  we've said, is $4.35 million and they're taking 35 percent of

2  it, above benchmark.

3         A fair settlement here would be for them to reduce

4  their fee by a few hundred thousand, maybe to a million dollars

5  and that 500,000 they could use it either to pay additional

6  claimants or to augment the claimants that have already been

7  paid.  As he said, they're only getting two-thirds of their

8  damages and in their complaint, they pled treble damages on the

9  respite claim.  So there's no windfall if you augment every

10  claim by a few dollars more by reducing their fee

11  proportionately.  I'm sure the plaintiffs wouldn't probably be

12  willing to do that, but that's, in our view, what a fair

13  settlement would be in this case.  They're not actually that

14  far away from that, I would admit that.

15         Another factor that I'd like to -- so if the Court

16  decides to approve the settlement, reaches fees, the Third

17  Circuit has been very good, again, on lodestar cross-check.

18  They strongly suggest a multiplier of three.  Here, if you

19  consider the lodestar should not include the Morris time, it

20  was a separate action, it wasn't like DVD.  Online DVD was a

21  joint consolidated MDL for the time that was spent in that MDL.

22  Here you have a separate action.  So the lodestar is roughly

23  300,000, so you're talking about a multiplier of five.  That's

24  almost double the strongly suggested ceiling.  If you bring it

25  down to the strongly suggested ceiling, that's around $900,000

1  or a million dollars, which is roughly just over 20 percent.

2  It works out.  The only problem with doing that is that they

3  have segregated the fee so the excess can't revert to the

4  class.  If they got rid of that, then you could have a fair

5  settlement without a problem.

6          Is there anything I could tell you?  I'd love to

7  answer your questions.  I have come a long way from Alexandria

8  in the snow.  Took me a half hour to get out of my

9  grandmother's driveway this morning.  What can I tell you?

10          THE COURT:  You understand, though, that if the

11  Court were to reject this settlement, then the case is ready

12  for trial.

13          MR. SCHULMAN:  Right.

14          THE COURT:  Eventually, it may get there if it's not

15  settled, and the risk factor --

16          MR. SCHULMAN:  -- of going to trial.  I agree there

17  would be such a risk factor, but our objection isn't to the

18  total adequacy of the settlement.  So if you reject that, they

19  should be able to reach another settlement, just with a slight

20  tinkering to the reallocation.

21          Wells Fargo isn't going to object if the class

22  counsel gives a little bit of their fee back to the class to

23  make it a fair settlement.  It's only the class counsel that is

24  going to do that.  Are they going to want to prepare for trial

25  to save a few hundred thousand?  Probably not.  So, if our

1 objection was to adequately --

2              THE COURT:  I've seen cases go to trial over less.

3              MR. SCHULMAN:  If our objection was to adequacy of

4 the total, I understand that objection.  That would be a good

5 response, but our objection is not to the sum total adequacy.

6              Is there anything else that I can help you talk

7 through?  I'd love to do it, if I could.

8              THE COURT:  Nothing.

9              As I go through the briefs again, I'll probably

10 think of half dozen things, but at this point, I don't have

11 anything else.

12             MR. SCHULMAN:  Sure.  And I'm happy to give more

13 briefing.

14             THE COURT:  Thank you.

15             Next I understand we're going to hear from

16 Mr. Samson.

17             MR. SAMSON:  Yes, Your Honor.

18             May it please the Court, the objection of Mr. Diaz

19 and Ms. Nahhas is foundationally different from the objection

20 from Mr. Hung.  The objection is not to the claims made

21 structurally, per se, but to the fact that this Court

22 preliminarily approved what it was told was approximately a

23 $25 million settlement.  And what today the Court has been told

24 gives a direct benefit to the class of between two and

25 $6 million, depending on whether or not attorneys' fees and

associated costs are included.  In re Baby Products Antitrust
Litigation, the Third Circuit directed district courts in this
circuit to look at the direct benefit to the class.  And in
fact, stated that courts should consider conditioning approval
of a settlement on the inclusion of a mechanism for additional
payments to individual class members if the number of claimants
turns out to be insufficient to deplete a significant portion
of the total settlement fund.

Both the plaintiffs and the defense say we don't
know what we're talking about.  This isn't a common fund case,
this is a case in which the defendant has agreed to pay only
those claimants who come forward and make a claim.  We
understand that.  But there's no logical, legal or practical
distinction between a case in which the defendant puts
$25 million into a fund.  Class members make claims against
that fund.  Only 13 percent of them do so.  And $17 million
reverts to the defendant.

As to this situation, in which the defendant only
pays out to begin with those class members who come forward,
the direct benefit to the class here is very small.  Only 13
percent of the class members came forward.  So, the defendant
is being permitted to keep their money, which is exactly what
the Third Circuit said in Baby Products, that permitting such
reversionary settlement agreements undermines the deterrent
effect of class action lawsuits.  The defendant -- Wells Fargo

1  shouldn't have been able to bank on the fact that such a small
2  number of class members would come forward.  That's probably
3  why they agreed to the settlement in the first place.  They
4  knew that they were only -- they weren't really going to have
5  to pay $25 million, they were only going to have to pay
6  attorneys' fees, costs, and a few of the settling class
7  members' claims.  But the case law, and the circuits are
8  aligned on this, the Third Circuit, the Fifth Circuit, and the
9  Eighth Circuit have all agreed that when there are additional
10 funds left over, that claiming class members have to be made
11 whole before anything else is done with settlement funds.  So,
12 what this Court did is preliminarily approved an illusory
13 settlement.  This isn't actually $25 million, as even the final
14 approval papers continue to say that the monetary benefit
15 available to the class is 25 million.  This is a $6 million
16 settlement in which only 13 percent of the class gets any sort
17 of benefit.
18          That brings me to the Tariecki case cited in
19 Mr. Diaz's and Ms. Nahhas' papers, which is the exact same
20 settlement structure as the Court sees here today, a structure
21 in which there is no fund, and so all money that isn't claimed
22 reverts to the defendant.  A very small number of claims and a
23 settlement that looks a lot like that it isn't to make or
24 address the damages of the class members but is primarily for
25 class counsel and the defendant to extinguish claims at the

1 most minimal rate possible.

2          So, I would strongly urge the Court to reject the

3 settlement as against the Third Circuit's specific direction,

4 that the Court look at the direct benefit made to the class.

5 Thank you.

6          THE COURT:  Thank you, sir.

7          MR. STEINER:  Good morning, Your Honor, Michael

8 Steiner on behalf of the Wells Fargo defendants.

9          Your Honor, I would submit that the objectors are

10 not really looking at the right question here.  The critical

11 question here is what is being offered to the class as

12 compensation fair, adequate and reasonable?  We have the Center

13 for Class Action Fairness that seems to have what I would call

14 somewhat academic objections to very specific features of the

15 settlement, and we have the Diaz/Nahhas objectors who have what

16 seem to me to be almost sort of ideological objections because

17 they seem to think that Wells Fargo should just have to pay a

18 lot of money and it's just not a good settlement of a class

19 action if a corporate defendant doesn't just pay a lot of

20 money.  That seems to be the perspective.

21          But what the Court is supposed to look at here is is

22 this compensation fair, adequate, and reasonable with respect

23 to what is being offered to the settlement class members?  We

24 would submit, Your Honor, it's very fair and adequate and

25 reasonable.  To understand that, you have to understand a

1 little bit about the merits of the case.  You can't just look

2 at all of these aspects of the settlement and all of these

3 intellectual debates about --

4          THE COURT:  That's where I was going when I talked

5 about the risks of the trial.

6          MR. STEINER:  Exactly, Your Honor.  This is a case

7 which is -- fundamentally, it's a respite claim, but you can't

8 have a respite claim for an overcharge because a respite is not

9 a price control statute.  There is no markup claim here, not a

10 viable one because Wells Fargo Bank charged $19 for this flood

11 zone fee and paid $19 for it, it didn't markup anything, so

12 that leaves us with a kickback.

13          The kickback here is premised on something called a

14 management accounting credit.  A management accounting credit

15 is an internal bookkeeping device that Wells Fargo uses within

16 its business enterprises to track the source of revenue.  So

17 you have one company over here that has a lot of money, but the

18 only reason they're earning it is because you have another

19 division, another company over here that is doing something

20 that allows the other company to earn it.  So Wells Fargo has a

21 system which tracks that.  They're called management accounting

22 credits.  But you can't take a management accounting credit and

23 go to the store and buy a gallon of milk, you can't pay your

24 heating bill, you can't pay a loan officer's salary, you can't

25 do anything with it.  Therefore, we are going to argue, Your

1  Honor, we think quite convincingly, if we have to, that this is

2  not a thing of value.  There is no kickback claim here.

3           As an overcharge, Mr. Richter has conceded the

4  overcharge claim is, at best, for $13, but it's based upon what

5  we contend is an inappropriate comparison of the cost of a

6  one-time flood zone certification fee versus a life of loan

7  flood zone certification fee, so you're comparing apples and

8  oranges.  This is a whole product, service that's at issue

9  here, is not something that Wells Fargo dreamed up.  It is

10 required by federal law.  Wells Fargo has to go out and get

11 flood zone certifications in order to make a loan because it

12 has to determine whether or not flood insurance is required.

13 That's why this whole thing exists.  So, when you ask yourself,

14 is this a fair, adequate, reasonable settlement?  You have to

15 look at the merits of the case and say what is the likelihood

16 of the plaintiffs prevailing?  What is the likelihood of

17 defendants prevailing?  And they don't have anything to say

18 about that.  I don't think any of these objectors because they

19 don't understand the case, as they said they do.  I just heard

20 Mr. Schulman concede that well, this probably is an adequate

21 settlement amount, he has no dispute with the $6 million, he's

22 just the disputing the allocation of it.

23           So, they have in some sense sort of abandoned the

24 game before it even gets started.  Certainly, the Center for

25 Class Action Fairness because they're not disputing what is

1 being offered to the class is fair, adequate, and reasonable

2 compensation.

3          So, what we come down to here is sort of academic

4 debate about claims, having the claims-made settlement.  There

5 is plenty of evidence in the record, Mr. Richter has addressed

6 it.  Wells Fargo's business records are overinclusive.  We

7 can't just push a computer button and say everybody paid $19

8 and everyone didn't.  Some people the computer records don't

9 show anything about who paid it, some show the borrower paid

10 zero for it, some show the borrower paid a penny, some show

11 $3.000.  So we need a claims procedure so people who believe

12 they paid this fee can come forward and attest they paid it and

13 make a claim to get their money back.

14          We need a claims procedure here for another very

15 important reason, which is this case just wouldn't settle

16 without it.  The direct payment method, which seems to be what

17 the objectors are advocating, would require Wells Fargo to pay

18 a vast sum of money, far in excess of the value of the case,

19 which it's not going to do, it's not going to pay that much

20 money, $24 million to give everybody $9.54.  And if we kept the

21 $6 million that Wells Fargo is committed to pay and added in

22 the 1.5 million fees and added out the administrative costs,

23 what would be left would be about 90 cents to all the class

24 members out of that $6 million because the administrative

25 expenses go up dramatically if you have to mail a check to 2.3

1  million households.  So, there's no practical way to settle

2  this case other than using a claims procedure, which allows

3  people who are prepared to attest that they paid the $19 fee,

4  believe they're aggrieved, and want the $9.50.  They submit the

5  claim and they get it.  Those are the people who should get the

6  $9.50.  And the people who can't be bothered to file a claim,

7  who aren't interested enough to submit a claim, why should they

8  get paid?  Even if we could locate them and send them the

9  check, they're not interested in this case.  So why should the

10 taxpayers dollars be devoted to prosecuting a lawsuit on behalf

11 of people who aren't interested in it?  That makes no sense to

12 say, oh, no, we have to do this a different way.  We have to

13 continue with this litigation.  There's no real rationale for

14 it.  So we're left with this issue about the allocation of the

15 fees.  That is primarily Mr. Richter's issue, but I'll make a

16 few comments on that.

17           Attorneys' fee of 6 percent of the total potential

18 benefit available to the class is obviously a reasonable fee.

19 In terms of the number of claims that got submitted, the cost

20 of the settlement to Wells Fargo is going to be $6 million.

21 $1.5 million is 25 percent of that.  Everyone concedes that is

22 within the benchmark.  I don't see the issue why that should

23 interfere with the Court's approval of this settlement.

24           The agreement that Wells Fargo won't object to the

25 attorneys' fee request, as long as it's within 1.5 million,

which the Center for Class Action Fairness seems to focus on,
it's commonplace, it's reasonable.  The parties want to be done
with disputing.  That's why they entered into a settlement.
And there's been no impact or potential damage to the judicial
process from this provision because objectors have come
forward.  There's a full adversarial process here.  The fact
that Wells Fargo isn't commenting on it hasn't prevented other
people from opposing it, letting the Court hear opposing
viewpoints.  The segregation of attorneys' fees and class
payments also makes a lot of sense for the reasons Mr. Richter
pointed out.  It doesn't impinge on whatever the class members
will get if they submit a claim.  It allows the parties to tell
the class members this is exactly, precisely what you'll get.
It's not going to be reduced by some unknown attorney fee award
in the future, so there's good rationale for segregating the
class payments and the fee payments.  And most importantly,
given that the Center for Class Action Fairness has conceded
that the compensation being offered the class is adequate, why
should the class get more in the event that the Court were to
reduce the attorneys' fees?  I'm not saying it should, but
there's no real rationale for increasing compensation to the
plaintiff class if it's already adequate.

            So, Your Honor, we would submit that the settlement
should be approved.  The compensation being offered to the
class is fair, it's reasonable, it's adequate, and the only

1 alternative is to devote more of the taxpayers resources to

2 litigation on behalf of people who have shown no interest in

3 it.  For that reason, Your Honor, we would ask Your Honor

4 approve the settlement.

5          THE COURT:  Thank you.

6          I understand, Mr. Richter, you reserved some time

7 for rebuttal or it was agreed to that you would be given some.

8          MR. RICHTER:  I have just a few brief comments.

9          THE COURT:  You may proceed at this time.

10          MR. RICHTER:  I think Mr. Steiner probably covered

11 most of what I already would have covered in rebuttal, but I

12 just want to address this Dry Max Pampers case on the issue of

13 the class representative maintenance.  That case is just not

14 even close to on point.  I'm just going to quote three passages

15 from the opinion.

16          In the Dry Max Pampers case, the court said, quote,

17 provides the unnamed class members with nothing but nearly

18 worthless injunctive relief.

19          This case is nothing like that.

20          Second, Procter & Gamble filed a motion to dismiss.

21 Before plaintiffs responded to the motion, however, and indeed

22 before any formal discovery in the case, the parties began

23 discussing settlement.

24          Again, not at all like this case.  We had a

25 vigorously contested motion to dismiss.  A 43-page opinion on

1   the motion to dismiss.  There were no settlement sessions until

2   after the motion to dismiss was decided and until after the

3   Court directed the parties to go through the ADR process.

4            Third, quote, the parties -- this is in Pampers,

5   quote, the parties agree to seek certification of a class under

6   Rule 23(b)(2) under which absent class members cannot opt-out

7   of a deal.

8            If anybody didn't like the deal, they could have

9   opted out of it in this case.  This is not a (b)(2) settlement,

10  it is a (b)(3) settlement.  So for those three reasons, among

11  many, the Pampers case is not on point at all.

12           The second point I'll make is one I think the Court

13  is probably as familiar with already but I'll make it anyway.

14           The arguments here from both objectors, and

15  particularly I think from the Center, are just based on a

16  misconception of what the standard of review is on approval.

17  It's not whether there might have possibly been some better

18  terms somewhere that could have been negotiated, this is a

19  straight up or down vote.  There are no amendments available on

20  the floor.  Even the Center concedes that -- I think the words

21  were "not that far" from where they would have thought a fair

22  settlement would be, and, in fact, they even say that they're

23  not contesting the adequacy of the settlement.  That's the test

24  under Rule 23(e).

25           So, for that reason as well, we think the settlement

1  should be approved.

2            Finally, I'm not going to say really much of

3  anything on the other objection.  The only thing I will note on

4  that is the Center's client offered to enter into an injunction

5  or some sort of tie-his-hands thing about making clear that

6  they were not in this for a monetary payment.  I don't know

7  what the rationale is for somebody to come up from Florida to

8  object over a $9.50 settlement, but I would just encourage the

9  Court to review a law review article by former Third Circuit

10 Judge Brooks Smith on objections to settlement.  I think it's

11 called -- there are two of them, I can't remember if his is

12 called Flies in the Ointment or if it is the other one, but

13 anyway, there's a Third Circuit law review that deals with

14 objections to class action settlements.

15            THE COURT:  What law review?

16            MR. RICHTER:  I don't remember.  I don't have the

17 cite.

18            THE COURT:  I'll find it.

19            MR. SCHULMAN:  I think that's in the record law

20 review, if that's the one I'm thinking of, the Smith article.

21            THE COURT:  I'd like to read it.

22            MR. RICHTER:  Thanks, Your Honor.

23            THE COURT:  Gentlemen, thank you for your thoughtful

24 arguments.  I'm going to take the matter under advisement.  In

25 due course, we'll give you a decision.

1    (Court adjourned.)

2                                  -----

3

4                            CERTIFICATE

5

6        I, Juliann A. Kienzle, certify that the foregoing is
     a correct transcript from the record of proceedings in the
7    above-titled matter.

8
     s/Juliann A. Kienzle, RMR, CRR
9    _____
     Juliann A. Kienzle, RMR, CRR
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25