IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **THOMAS M. JACKSON** and )<br>**PATRICIA G. JACKSON**, as individuals )<br>and as representatives of the classes, )<br> )<br>Plaintiffs, )<br> )<br>v. )<br> )<br>**WELLS FARGO BANK, N.A.** and )<br>**WELLS FARGO INSURANCE, INC.,** )<br> )<br>Defendants. ) | 2:12cv1262<br>**Electronic Filing** |

## OPINION

Thomas and Patricia Jackson ("plaintiffs") commenced this action individually and as purported members of three putative classes seeking to hold Wells Fargo Bank ("WFB") and Wells Fargo Insurance, Inc. ("WFI") (collectively "defendants") liable for alleged improper practices related to flood insurance undertaken in conjunction with the mortgage underwriting process. Presently before the court are plaintiffs' motions for final approval of class action settlement (Doc. No. 96) and attorneys' fees and expenses (Doc. No. 91). For the reasons set forth below, the motions will be granted.

This case arises from demands by WFB that plaintiffs obtain flood insurance on real property purchased with a mortgage from WFB. Similar demands were made on other mortgagors by WFB and other mortgage lenders throughout the United States following a change in protocol for flood insurance pertaining to the amount of flood insurance a mortgagor is required to maintain on eligible property. This practice was not unique to WFB and has become known as "force-placed flood insurance."

This action was filed as a case "related" to Morris v. Wells Fargo Bank, et al., 2:11cv474, under Local Rule 40(D)(2). That case also arose from force-placed flood insurance practices

that involved "alleged improper charges and expenses incurred as a result of unnecessary and unauthorized flood insurance placed on real estate that was purchased with a Federal Housing Administration ("FHA") mortgage" issued by WFB.   Opinion on Motion to Dismiss issued on September 7, 2012, in Morris, 2:11cv474 (Doc. No. 99 in 2:11cv474).  Plaintiffs in both the Morris action and this case were/are represented by Attorney Kai Richter ("Attorney Richter") and the law firm Nichols Kaster, PLLP ("Nichols Kaster").[1]

The claims the parties currently seek to compromise and settle through the pending motions pertain to fees that WFB charged for a Standard Flood Hazard Determination ("SFHD") made in conjunction with the National Flood Insurance Program ("NFIP").  As to these claims plaintiffs essentially maintain that WFB charged an excessive fee for the determination and then unlawfully engaged in a kickback or fee-splitting arrangement with WFI.  The arrangement purportedly was implemented through a "soft-dollar" accounting program utilized by defendants.

The pertinent allegations of plaintiffs' Amended Complaint are briefly summarized below.  On August 31, 2011, plaintiffs obtained a mortgage loan from WFB  for $107,500.00.  Amended Complaint at ¶ 7.  WFB charged plaintiffs $19.00 for a flood zone determination that was performed by WFI prior to closing.  Id. at ¶ 19.  The charge was reflected on plaintiffs' HUD-1 settlement statement.  Id.  Although WFB charged $19.00 for the SFHD, its actual cost to obtain the determination was closer to $5.00.  Id. at ¶ 23.

In conjunction with the mortgage plaintiffs received a Truth-in-Lending Act ("TILA") Disclosure ("TILA Disclosure").  Id. at ¶ 8.  The initial version of the TILA Disclosure stated that flood insurance was required for plaintiffs' property.  (Id. at ¶ 8; Pls' Ex. 2, (Doc. No. 18-2), at p. 3).  However, this error was later corrected with both parties' consent.   In its unaltered

---

[1] Attorney Richter is a partner at Nichols Kaster.

form, the TILA Disclosure provided that flood insurance "is required." But a handwritten alteration initialed by both plaintiffs purports to eliminate the requirement with the supporting text "n/a and confirmed NOT in a flood zone". (Pls' Ex. 2, at p. 3). The parties disagree as to both the erroneous nature of the TILA Disclosure's flood zone requirement and the legal effect of any attempted amendment. Compare (Amend. Compl., at ¶ 8), with (WFB's Answer, at ¶ 8).

Before closing plaintiffs obtained their own independent flood zone determination from CoreLogic Flood Services ("CoreLogic"). Id. at ¶ 17. CoreLogic determined that flood insurance was not required on plaintiff's property. Id.; Standard Flood Hazard Determination of August 26, 2011, Completed by CoreLogic (Doc. No. 18-9). This independent flood determination cost plaintiffs $6.00, which is the standard amount CoreLogic charges for this service. Id. at ¶¶ 17, 21.

At closing plaintiffs signed a SFHD which had been prepared by WFI for WFB. Id. at ¶ 9. The parties at closing treated the SFHD as indicating that flood insurance was not required for any portion of plaintiffs' property. Id.

On November 7, 2011, WFB sent plaintiffs a form letter stating that flood insurance "is a requirement of your loan." Id. at ¶ 10; Letter of November 7, 2011 (Doc. No. 18-4). The letter indicated that if plaintiffs did not provide proof of flood insurance WFB would purchase it at plaintiffs' expense. Id. Plaintiffs repeatedly objected to this demand. Id. at 11.

Plaintiffs wrote a letter to WFB on December 9, 2011, in which they asserted that flood insurance was not required for their loan. As proof they enclosed a copy of the SFHD that they and WFB had signed at closing. Id.; Thomas Jackson's Letter of December 9, 2011(Doc. No. 18-5). WFB did not immediately respond to plaintiffs' letter. Feeling as if they had no choice, plaintiffs purchased a policy providing $250,000.00 in coverage from NFIP in order to comply with WFB's November 7, 2011, demand. Id. at ¶ 12.

3

After purchasing the insurance plaintiffs sent a second letter to WFB on December 19, 2011, informing it that they had acquired the demanded insurance and providing proof of the same. Id.; Thomas Jackson's Letter of December 19, 2011(Doc. No. 18-6). The letter further explained that plaintiffs' property was not in a Special Flood Hazard Area ("SFHA"); the loan would not have been taken out if it had been known that flood insurance was required; and at closing WFB had assured that plaintiffs were not required to obtain such insurance prior to signing the settlement documents. Id.

WFB responded to plaintiffs in a letter dated January 5, 2012. Id. at ¶ 13. Therein WFB acknowledged plaintiffs' concerns about the flood insurance requirement and contended that the SFHD used at closing was for plaintiffs' garage only, and included with the letter a separate SFHD for plaintiffs' home. Id.; Letter of January 5, 2012, by Christopher Cory (Doc. No. 18-7). Plaintiffs had not received this separate determination for their residence at closing. Id. Further, the comment section of the SFHD form indicated that WFI had made the determination regarding the status of plaintiffs' residence on August 23, 2011; however, the date of determination listed on the form is August 17, 2011. Id.; Standard Flood Hazard Determination of August 23, 2011, Section E, Comments (Doc. No. 18-3).

Upon receiving this letter plaintiffs spoke to an executive mortgage specialist at WFB. Id. at ¶ 14. During the telephone conversation plaintiffs expressed their dismay that WFB had not disclosed its flood insurance requirement at closing. Id. Thereafter, WFB sent a letter to plaintiffs stating that "flood insurance was not required on your loan at the time of closing" and that this was reflected in both the SFHD and the TILA Disclosure provided at closing. Id.; Letter of February 17, 2012 (Doc. No. 18-8). WFB avers that this letter was the product of an inadequate investigation by the employee who authored it. (WFB's Answer, at ¶ 14).

Plaintiffs further maintain that WFB charged $19.00 for the SFHD. WFI received this

fee and kicked-back or split the charge with WFB or WFB received the fee and did not pay the full amount to WFI. Id. at ¶¶ 24, 26. This practice repeatedly has been utilized by defendants. Id. at ¶¶ 25, 27. Through its "soft dollars" program WFI typically kicks back a portion of the charge it earns from referral business from WFB and the pass-back of these amounts is reflected on the general ledger and is reported on a "Profitability Passback Report." Id. at ¶ 25. This charge did not reflect a reasonable fee in compliance with those authorized under the National Flood Insurance Act ("NFIA") and the practice of kick-backs or fee-splitting constituted an illegal arrangement under the Real Estate Settlement Procedures Act ("RESPA"). Id. at ¶¶ 22, 26.

Defendants counter in part by asserting that plaintiffs' house is within a SFHA but their garage is not. The August 17, 2011, determination by WFI thus properly determined that plaintiffs were required to obtain flood insurance as a condition of their loan. A TILA disclosure was prepared in accordance therewith. The SFHD was refined by a re-assessment on August 23, 2011, which determined that only plaintiffs' garage was not within the applicable SFHA. Thereafter, the August 17, 2011, determination improperly was displaced by using the August 23, 2011, SFHD at closing and amending the TILA disclosure by hand to indicate plaintiffs were not required to obtain flood insurance on the entire property.

WFB further contends that it is required by federal law to monitor the flood zone status of improved property throughout the life of any mortgage it issues. Pursuant to this duty it was required to rectify the mistake made at closing and have plaintiffs obtain the proper insurance coverage if the home was within a SFHA, which it was according to both determinations made by WFI in August of 2011. And plaintiffs agreed to expressed contractual provisions which authorized the $19.00 charge for a life-of-the-loan SFHD. As a result they will be unable to establish that the fee charged for the "life-of-the-loan" SFHD was unreasonable, which in turn

5

will undermine the ability to prove liability on all of their claims, including their fee splitting/kickback claim(s).

In their Amended Complaint plaintiffs assert four causes of action. First, they contend that WFB violated the Truth in Lending Act, 15 U.S.C. § 1601-1667f ("TILA"), by forcing class members to purchase flood insurance without disclosing the requirement to do so in a TILA disclosure. (Amend. Compl., at ¶¶ 39-45). Second, defendants violated Sections 8(a) and 8(b) of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2607(a), (b), by orchestrating a scheme to split or kickback a portion of the $19 received for SFHD flood zone determinations. (Id. at ¶¶ 46-54). Third, WFB breached mortgage contracts by charging fees prohibited "by applicable law." (Id. at ¶¶ 57-59). It also breached the covenant of good faith and fair dealing. (Id. at ¶ 60). Finally, plaintiffs claim that WFI was enriched unjustly at the expense of class members by its receipt of the SFHD fees. (Id. at ¶¶ 67-71).

Defendants filed motions to dismiss on December 20, 2012. (Doc. Nos. 28, 30). Pursuant to an opinion issued on November 6, 2013, the motions were granted in part and denied in part. WFB's motion was granted as to plaintiffs' breach of contract claim to the extent it (1) seeks to advance a cause of action for breach of the covenant of good faith and fair dealing as an independent basis for recovery and (2) is predicated on a violation of the reasonable fee authorization in section 4012a(h) of the FDPA. WFI's motion was granted as to plaintiffs' unjust enrichment claim to the extent it seeks relief based solely on a showing that the SFHA determination was inaccurate or the SFHD fee was unreasonable. The motions were denied in all other aspects.

Pursuant to discussions with counsel, the parties were permitted to defer their participation in this court's mandatory Alternative Dispute Resolution Program until the pending motions to dismiss were resolved. As part of those discussions the court suggested and

recommended that the parties consider using Louis B. Kushner, Esquire ("Attorney Kushner") as the designated neutral for that process.[2]  Following the opinion and rulings on November 6, 2013, the parties were referred to mediation with Attorney Kushner.  (Doc. No. 50).

Prior to starting mediation the parties continued to litigate the matter.  Plaintiffs served interrogatories and requests for production of documents on November 15, 2013.  (January 16, 2015, Richter Declaration (Doc. No. 93), at ¶ 14).  Defendants responded to these requests on December 23, 2013 and "produced a significant number of documents" over the next two months.  (Id.).  The parties also negotiated and agreed that for the purposes of mediation plaintiffs could use over 200,000 pages of documents produced in the Morris case.  (Id. at ¶¶ 1, 15).  Plaintiffs additionally served deposition notices on each defendant and four individuals during this timeframe.  (Id. at ¶ 16).

Mediation was commenced on February 26, 2014, and continued for the full day.  (Id. at ¶ 17).  During the session Attorney Kushner acted as an intermediary between the parties.  (Id.).  The parties failed to reach an agreement in principle that day.  Attorney Kushner continued the process through a series of telephonic discussions.  In the interim plaintiffs' counsel continued to litigate the case through  following up on outstanding discovery requests and pursuing depositions.  After lengthy negotiations under the auspice of Attorney Kushner an agreement in principle was reached on May 12, 2014.  (Id. at ¶¶ 18-19).  The parties then exchanged a number of drafts in an effort to arrive at a comprehensive settlement agreement and related court

---

[2]      This recommendation was made in part because lead counsel for both parties did not practice in the Western District frequently and thus had a limited familiarity with nature, quality and style of the services provided by the various neutrals in the court's program.  It also was made because of the notable excellence and earnest commitment that Attorney Kushner provides in fulfilling a referral under the program.

submissions. The parties executed the Settlement Agreement in August of 2014. (Id. at ¶ 19).

The motion for preliminary approval was filed on October 27, 2014.

The Settlement Agreement defines the Settlement Class as:

> All persons who obtained a loan from [WFB] that was secured by a
> first or subordinated lien on residential real property who were
> charged by [WFB] for a Flood Hazard Determination between
> August 30, 2011 and December 31, 2013, inclusive.

(Settlement Agreement, (Doc. No. 87-1), at ¶ 2(cc)). Pursuant to this agreement, class members

who submit a valid claim form certifying that they paid WFB for their flood zone determination

are entitled to a settlement payment of $9.50.[3] (Id. at ¶ 32).

In exchange, class members who do not validly opt-out agree to release defendants from

all claims "based upon the same factual predicates as those alleged" in the action which were or

could have been asserted as of the date the Settlement Agreement was executed. (Id. at ¶

1(y)(2)). These include claims arising from or related to "Flood Hazard Determinations

performed or procured" by defendants and any communications relating to such determinations,

and any charges relating to such determinations, "including . . . any overcharges or markups by

defendants of or related to any Flood Hazard Determinations; any alleged "kickbacks" or alleged

improper payments of anything made by or received by Defendants or either of them in

connection with Flood Hazard Determinations; and/or any payment by or to Defendants or either

of them to or from any third party in connection with the performance or provision of Flood

Hazard Determinations." (Id.)

This release does not, however, extend to claims that defendants required borrowers to

maintain flood insurance in "an amount that the Settlement Class Member believes is greater

---

[3]     Per the Settlement Agreement, a valid claim form is one that is: (1) signed; (2) submitted
within 60 days of the class notice date; and (3) submitted by a class member who did not submit
a timely and valid opt-out. (Settlement Agreement, at ¶¶ 1, 29-31).

than what is required or permitted by applicable law or is greater than what is necessary to protect the lender's interest in the Settlement Class Member's property securing his or her loan" and any right to pursue relief on the premise that "Wells Fargo require[ed] a borrower who obtained a loan from Wells Fargo secured by residential real property to, after loan closing, obtain flood insurance for the property securing the loan where Wells Fargo informed the borrower at the time the borrower's loan closed that the borrower did not need to obtain flood insurance and there was no intervening change in FEMA's flood zone map affecting the property." (Id.).

Settlement Class members were provided with notice sent to their last-known address that included a claim form consisting of a two-sided postcard. (Id. at ¶¶ 15-19; Claim Form, (Doc. No. 87-1), at pp. 38-39). The claims administrator was to use change of address information and utilize automated skip traces to ensure that notice had the best possible chance of reaching class members. (Settlement Agreement, at ¶¶ 18, 20). The claims administrator was required to set up an informational website and toll-free telephone call center under the Settlement Agreement. (Id. at ¶¶ 21-23, 30). Nevertheless, mailing a physical copy of the enclosed claim form was the only method made available for filing a valid claim.

In comparison with the specific release that settlement class members must provide, plaintiffs have agreed to execute a general release under the Settlement Agreement. (Id. at ¶ 1(y)(1)). Subject to court approval plaintiffs are to receive $25,000 in exchange for this release. (Id. at ¶ 43). In addition to any other potential claims plaintiffs might have, plaintiffs' TILA claim pertaining to the disclosures they received regarding the actual need for flood insurance is referenced as a basis for this payment. (Id.).

Beyond the settlement payments to class members and plaintiffs, the Settlement Agreement provides that subject to court approval defendants also will bear the costs of

settlement administration and attorneys' fees and expenses up to $1,500,000.00. (Id. at ¶¶ 36, 38). Defendants agree not to oppose plaintiffs' request for attorneys' fees in any way. (Id. at ¶ 38). With respect to settlement administration, the costs include those necessary to (1) set up the settlement website and toll-free call center (2) provide notice to potential class members, (3) review claim forms, and (4) ultimately mail checks. (Id. at ¶ 36). Such costs are expected to exceed $1,500,000.00. (January 16, 2015 Richter Declaration, at ¶ 22).

Pursuant to Federal Rule of Civil Procedure 23, the court certified the proposed Settlement Class on October 27, 2014, for the sole purpose of effectuating settlement. (Preliminary Approval Order, (Doc. No. 89), at ¶¶ 2-3). Plaintiffs were designated as class representatives, Nichols Kaster was appointed as class counsel for the Settlement Class, and Rust Consulting, Inc. ("Rust") preliminarily was approved as claims administrator. (Id. at ¶¶ 6-7, 10). The Settlement Agreement was given preliminary approval and the parties were directed to begin the class notice process. (Id. at ¶¶ 8, 11-12).

On December 1, 2014, notice was sent to 2,315,364 Settlement Class members. (Botzet Declaration, (Doc. No. 99), ¶ 7).[4] Of these, 11,572 were undeliverable despite Rust's best efforts to update class member addresses. (Id. at ¶ 10). As of February 18, 2015, over two weeks after the established deadline for responses, Rust had received 300,995 timely claim forms. (Id. at ¶ 17). In contrast, 354 opt-out requests and ten objections were submitted.[5] (Id. at ¶¶ 14-15).

Per the Preliminary Approval Order, a Final Approval Hearing was held on March 5, 2015. (Preliminary Approval Order, at ¶ 17). Plaintiffs, defendants and representatives for objectors Alejandro Diaz, Mayda Nahhas, and Wei Cyrus Hung argued their respective

---

[4]     Joel Botzet is a senior project administrator at Rust with personal knowledge of the company's undertakings as settlement administrator. (Botzet Declaration, at ¶¶ 1, 3).
[5]     Only nine separate objections were submitted as two Settlement Class members jointly submitted a single objection. (Id. at ¶ 15).

positions. (Hearing Transcript, (Doc. No. 113), at pp. 4-33). The objectors assert that the settlement is unfair because insufficient relief is provided to class members, receiving relief has been unduly restricted, plaintiffs' receipt of additional relief renders them inadequate class representatives, and a review of class counsel's request for "excessive" fees improperly has been sheltered from the adversarial process and court review. Class counsel and defendants continue to maintain that approval of the settlement and fee request is warranted.

Class actions settlements are distinguished from those in most normal suits because Federal Rule of Civil Procedure 23(e) mandates that "[a] class action shall not be dismissed or compromised without the approval of the court." Fed. R. Civ. P. 23(e); In re GMC Pick-Up Truck Fuel Tank Products Liability Litigation, 55 F.3d 768, 785 (3d Cir. 1995) ("G.M. Trucks"). This rule "imposes on the trial judge the duty of protecting absentees, which is executed by the court's assuring the settlement represents adequate compensation for the release of the class claims." In re Prudential Ins. Co. American Sales Litigation, 143 F.3d 283, 316 (3d Cir. 1998) (quoting G.M. Trucks, 55 F.3d at 805).

In order to fulfill this duty the court is required to "independently and objectively analyze the evidence and circumstances before it in order to determine whether the settlement is in the best interest of those whose claims would be extinguished." In re Cendant Corp. Litig., 264 F.3d 201, 231 (3d Cir. 2001), cert. denied sub nom., Mark v. California Public Employees' Retirement Sys., 535 U.S. 929 (2002). "The court cannot accept a settlement that the proponents have not shown to be fair, reasonable and adequate." G.M. Trucks, 55 F.3d at 785. While the court is to employ a vigorous analysis in fulfilling its fiduciary duty to protect the rights of absent class members, it must also "guard against demanding too large a settlement based on its view of the merits of the litigation; after all, settlement is a compromise, a yielding of the highest

hopes in exchange for certainty and resolution." In re Prudential, 148 F.3d at 317 (quoting G.M. Trucks, 55 F.3d at 806).

Seeking class certification and settlement approval simultaneously heightens the court's obligation to undertake a scrupulous review to determine whether the proposed settlement is fair, reasonable and adequate for the class. In re Prudential, 143 F.3d 317. "This heightened standard is intended to ensure that class counsel has engaged in sustained advocacy throughout the course of the proceedings, particularly in settlement negotiations, and has protected the interests of all class members." In re Warfarian Sodium Antitrust Litig., 391 F.3d 516, 534 (3d Cir. 2004).

There is an overriding public interest in settling class action litigation, and it is to be encouraged by the courts, particularly in complex settings that will consume substantial judicial resources and have the potential to linger for years. In re Warfarin, 391 F.3d at 535 (collecting cases in support). A presumption of fairness attaches to a proposed settlement where (1) the settlement negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objects. Id. (citing In re Cendant, 264 F.3d at 232 n.18).

"The decision of whether to approve a proposed settlement of a class action is left to the sound discretion of the district court." In re Prudential, 148 F.3d at 317 (quoting Girsh v. Jepson, 521 F.2d 153, 156 (3d Cir. 1975)). The exercise of this discretion is guided by what have become known as the Girsh factors. In re Warfarin, 391 F.3d at 535. These are:

> (1) the complexity, expense and likely duration of the litigation;
> (2) the reaction of the class to the settlement;
> (3) the stage of the proceedings and the amount of discovery completed;
> (4) the risks of establishing liability;
> (5) the risks of establishing damages;
> (6) the risks of maintaining the class action through trial;

(7) the ability of the defendants to withstand a greater judgement;
(8) the range of reasonableness of the settlement fund in light of
the best possible recovery; [and,]
(9) the range of reasonableness of the settlement fund to a possible
recovery in light of all the attendant risks of litigation.

Girsh, 521 F.2d at 157.  The proponents of a settlement bear the burden of proving consideration

of these factors on balance warrants approval of the proposed settlement.  In re Cendant, 264

F.3d at 232; In re Rent-Way Sec. Litig., 305 F. Supp.2d 491, 499 (W.D. Pa. 2003).

The record here demonstrates circumstances that give rise to an initial presumption of

fairness.  First, settlement negotiations were conducted at arm's length.  Nearly three months

elapsed from the beginning of mediation until the parties reached an agreement in principle.

(See January 16, 2015 Richter Declaration, at ¶¶ 17-19).  At all times negotiations were

conducted through Attorney Kushner, an experienced, court-ordered mediator.  (Id.).  Once

Attorney Kushner facilitated the forging of a settlement in principle, the parties exchanged

multiple revisions of the material settlement terms before arriving at the version of the

Settlement Agreement which was ultimately executed.  (Id.).

Second, sufficient discovery provided a foundation for negotiating the Settlement

Agreement.  Class counsel asserts that defendants responded to discovery requests by providing

"a significant number of documents" which were specifically related to the asserted claims.  (Id.

at ¶¶ 14).  The negotiated use of over 200,000 documents originally produced in the Morris case

provided additional support to class counsel during mediation.  (Id. at ¶ 15).  Finally, two

depositions conducted within the context of the Morris case of individuals who were also noticed

in the instant matter also provided some additional clarity to the strengths and weaknesses of the

claims.  (Id. at ¶ 16).

Third, those endorsing the settlement are quite experienced in similar litigation. Both class counsel and counsel for defendants have practiced extensively in class action litigation, a substantial amount of which has involved claims against consumer mortgage lenders.

Finally, the percentage of class members who have objected is incredibly small. The ten objectors amount to approximately .0004% of the Settlement Class.

Given these facts, the Settlement Agreement enjoys an initial presumption of fairness. Application of each of the <u>Girsh</u> factors further cements the determination that the proposed settlement is fair, reasonable and adequate for the class and should be approved.

<u>The complexity, expense and likely duration of the litigation</u>

"The first [<u>Girsh</u>] factor 'captures the probable costs, in both time and money, of continued litigation.'" <u>In re Warfarin</u>, 391 F.3d at 535-36 (quoting <u>In re Cendant</u>, 264 F.3d at 233). "By measuring the costs of continuing on the adversarial path, a court can gauge the benefit of settling the claim amicably." <u>G.M. Trucks</u>, 55 F.3d at 812. Here, there is little question that litigating this matter to its conclusion would be time-consuming and expensive and require the resolution of multiple unsettled questions of fact and law.

It is important to note that, despite nearly 3 years having elapsed since its initiation, this case is still in a relatively early stage. Previously noticed depositions have yet to be conducted, (January 16, 2015 Richter Declaration, at ¶ 16), and there would unquestionably be additional document discovery. Class counsel has yet to move for unconditional class certification, which defendants have promised to contest. (Defs' Response to Objections, (Doc. No. 100), at p. 6). Motions for summary judgment would likely be filed. It is not unreasonable to expect that the ultimate trial and any subsequent appeal could take years to be resolved.

Further, as was discussed in the adjudication of defendants' motions to dismiss, attaining favorable resolutions of several complex questions of fact and law stand between the class and

any recovery at trial. (See generally, M.D. Opinion (Doc. No. 46)). For example, plaintiffs'

RESPA claim is dependent on a finding that WFB was given or retained "a payment or thing of

value" in connection with flood zone determinations for which WFI was paid. (Id. at p. 16).

Defendants consistently have maintained that the so-called "management accounting credits"

("MACs") allocated to WFB for referring the determinations are not things of value. (Defs'

Response to Objections, at p. 11). Instead, MACs are simply a mechanism for tracking revenue

in Wells Fargo's accounting system. (Id.). Resolution of this complex issue would likely require

expert testimony at substantial additional cost in terms of time and money to both parties. As

such, the first Girsh factor clearly points in favor of approving the settlement.

<u>Reaction of class members to the proposed settlement</u>

The second factor in the Girsh analysis "attempts to gauge whether members of the class

support the settlement" based on their overall response. In re Prudential, 148 F.3d at 318.

Although the practical realities of a class action dictate a cautious approach to recognizing an

inference of support based on the lack of a significant number of objectors, the receipt of only a

small number of objections provides some support for the approval of a proposed settlement. Id.

Such is the case here.

The 10 objections and 354 opt-out requests received in response to the proposed

settlement amount to approximately .0004% and .02% of the Settlement Class of 2,315,362

members, respectively. By any measure, these results are a positive indicator of fairness. See In

re Cendant, 264 F.3d 201, 234-35 (3d Cir. 2001) (finding that the second Girsh factor "weighed

strongly in favor of the Settlement," where .0008% of the class objected and .04% opted-out);

NEWBERG ON CLASS ACTIONS § 13:54 (5th ed. 2011) (explaining that on average 1% of a class

objects and less than 1% opts-out). By comparison, the 300,995 claims filed equates to 13% of

the Settlement Class. While this response rate might seem low at first glance, there is nothing to

15

suggest that it is in any way abnormal given the relatively small individual payouts here.  See NEWBERG ON CLASS ACTIONS § 12:17 (explaining that "[h]igher claiming rates tend to correspond with smaller classes and larger payouts").  Given all of this, the response of the class to the proposed settlement clearly weighs in favor of approval.

The stage of the proceedings and the amount of discovery completed

This <u>Girsh</u> factor permits the court to take into account the degree of case development that has occurred prior to reaching a compromise.  <u>In re Cendant</u>, 264 F.3d at 235.  Its purpose is to assure that the parties had an "'adequate appreciation of the merits of the case before negotiating.'"  <u>In re Prudential</u>, 148 F.3d at 319 (quoting <u>G.M. Trucks</u>, 55 F.3d at 813).  The pertinent assessment concerns the degree to which counsel have been able to gain access to sufficient information to permit an informed, competent and supported evaluation of the legal and factual issues involved.

The parties litigated the instant matter for 18 months before beginning mandatory mediation.  During this time they gained a solid understanding of the relative strengths and weaknesses of the claims.  Following the resolution of the motions to dismiss, "Wells Fargo produced a significant number of documents relating to flood zone determinations, related charges, soft dollars/[MACs, plaintiffs' loan file, and other matters relevant to the litigation." (August 15, 2014 Richter Declaration, at ¶ 16).  These documents, as well as the 200,000 documents previously reviewed in the <u>Morris</u> action, were available to plaintiffs for the purposes of mediation.  (<u>Id.</u> at ¶¶ 16-17).  All of this supports a finding that class counsel "adequately appreciated the merits of the case before negotiating."  <u>In re Warfarin Sodium</u>, 391 F.3d at 537. Accordingly, "this factor strongly favors approval of the settlement."  <u>Id.</u> (citing <u>In re Prudential</u>, 148 F.3d at 319).

The risks of establishing liability and damages

The fourth and fifth <u>Girsh</u> factors provide the means to balance the likelihood of success and the potential damage award if the case were to proceed to trial against the benefits of an immediate settlement. <u>In re Prudential</u>, 148 F.3d at 319. Through this lens the court can review "'what the potential rewards (or downside) of litigation might have been had class counsel decided to litigate the claims rather than settle them.'" <u>In re Cendant</u>, 264 F.3d at 237 (quoting <u>G.M. Trucks</u>, 55 F.3d at 814).

Plaintiffs would face significant risks in establishing defendants' liability under each of its asserted claims.[6] With respect to plaintiffs' RESPA claim, defendants have continued to maintain that the MACs provided to WFB in conjunction with flood zone determinations performed by WFI are not "things of value," and that the $19 paid by borrowers for those determinations was passed by WFB to WFI, untouched. (Defs' Response to Objections, at p. 11). If a finder of fact were to determine that WFB neither received from WFI nor retained from the borrowers anything of value as part of these transactions, plaintiffs' RESPA claim would fail. <u>See</u> Opinion of November 6, 2013 (Doc. No. 46 in 2:12cv1262) at 14-16) (citing <u>Galiano v. Fidelity National Title Ins. Co.</u>, 684 F.3d 309, 314 (2d Cir. 2012) ("[a] violation of § 8(a) involves three elements: (1) a payment or thing of value; (2) given and received pursuant to an agreement to refer settlement business; and (3) an actual referral."); <u>Santiago v. GMAC Mortgage Grp., Inc.</u>, 417 F.3d 384, 389 (3d Cir. 2005) (A violation of § 8(b) involves: (1) a payment or thing of value; (2) given and received for the completion of a settlement service; and (3) the retention of a portion of the payment or thing of value by the recipient without the recipient providing any part of the settlement service used in the closing.)).

---

[6]     Because force-placed flood insurance practice claims specifically are excepted from the claims being released by class members, plaintiffs' TILA claim based on this ground need not be discussed in this context.

Further, defendants have set forth multiple legal defenses to plaintiffs' RESPA claim, including that any payments made by WFI to WFB were pursuant to an "affiliated business arrangement" and therefore exempt from liability under 12 U.S.C. § 2607(c)(4).[7] (See WFB's Answer, at p. 20). Payments which defendants could prove WFI made to WFB in observance of the requirements of § 2607(c)(4) would fall into a safe-harbor, and could not be the basis for RESPA liability. See § 2607(c)(4). Given all of this, a verdict that defendants are liable under RESPA is less than assured.

Plaintiffs' remaining claims for breach of contract and unjust enrichment both are premised on the assertion that the $19 charged by WFB was somehow improper under the terms of the relevant mortgages, being either illegal or set in bad faith. (Amend. Compl., at ¶¶ 58, 68). As just discussed, a finding that these fees were illegal under RESPA is far from certain, and there does not appear to be another law that prohibited the transferring of the fees.

A determination that WFB set fees for flood zone determinations in bad faith likewise stands on less than secure footing. Defendants have continued to argue that its $19 fee is not unreasonable when compared with CoreLogic's $6 charge for a one-time determination, as their $19 SFHD additionally provides for WFI's continued performance of "life-of-loan monitoring

---

[7] Affiliate business arrangements should be recognized when:
  (A) a disclosure is made of the existence of such an arrangement to the person being referred and, in connection with such referral, such person is provided a written estimate of the charge or range of charges generally made by the provider to which the person is referred . . .
  (B) such person is not required to use any particular provider of settlement services, and
  (C) the only thing of value that is received from the arrangement, other than the payments permitted under this subsection, is a return on the ownership interest or franchise relationship[.]
12 U.S.C. § 2607(c)(4).

and re-determinations of flood risk." (Defs' Response to Objections, at p. 10). A finding that such a fee is lawful and reasonable is well within the realm of possibility. Given the uncertainty as to defendants' liability, the fourth <u>Girsh</u> factor militates in favor of settlement approval.

Plaintiffs' risks with respect to establishing damages, however, do not appear to be nearly as great. Section 8(d) sets out in detail what the possible damages are in relation to a RESPA claim. 12 U.S.C. § 2607(d). Damages stemming from WFB's breaches of contract or the unjust enrichment of WFI would be only slightly more nebulous. WFB is generally required by the NFIP to conduct a flood zone determination in conjunction with its decision "to make, increase, extend, or renew" a mortgage. 42 U.S.C. § 4012a(b)(1). The NFIP permits WFB to charge the borrower a "reasonable fee" for such a determination. 42 U.S.C. § 4201a(h)(1). As such, damages with respect to plaintiffs' breach of contract claim and unjust enrichment claims would necessarily equal the amount that each borrower paid for the flood zone determination minus the amount of the fee determined to be reasonable. As there would be very little risk concerning the establishment of damages, the fifth <u>Girsh</u> factor weighs against the settlement. However, because proving damages is contingent upon first proving liability, the net effect of the fourth and fifth <u>Girsh</u> factors continues to provide support for approval of the settlement. <u>Compare Erie Cnty. Retirees Ass'n v. Cnty. of Erie, Pennsylvania</u>, 192 F. Supp. 2d 369, 375 (W.D. Pa. 2002) (noting that "[i]n the normal course, proving damages involves many of the same risks as proving liability because the former is contingent upon the latter" and highlighting that proving damages frequently carries formidable risk on a number of separate variables as well) (citing <u>In re Safety Components, Inc. Sec. Litig.</u>, 166 F. Supp. 2d 72, 90 (D.N.J. 2001)).

<u>The risks of maintaining the class action through trial</u>

"Because 'the prospects for obtaining certification have a great impact on the range of recovery one can expect to reap from the [class] action,' this factor measures the likelihood of

obtaining and keeping a class certification if the action were to proceed to trial." In re Warfarin, 391 F.3d at 537 (quoting G.M. Trucks, 55 F.3d at 817) (alteration in original). However, "[t]here will always be a 'risk' or possibility of decertification," given that district courts have the ability, under Rule 23, to "decertify or modify a class at any time during the litigation if it proves to be unmanageable." In re Prudential, 148 F.3d at 321. Because courts generally can claim it weighs in favor of settlement, "the manageability inquiry in settlement-only class actions may not be significant." Id.

Whatever weight the sixth Girsh factor carries, it falls in favor of settlement approval here. The Settlement Class has only been certified for the purposes of settlement. (Preliminary Approval Order, at ¶¶ 4-5). Defendants have indicated that any general class certification motion would be contested. (Defs' Response to Objections, at pp. 11-12). In particular, defendants argue that determining class membership will be difficult because WFB's records do not reliably reflect which borrowers paid the fee or, if they did, how much each applicant paid. (Id. at p. 12). The settlement circumvents this obstacle by allowing Settlement Class members to self-certify that they paid the fee. As obstacles exist that could prevent the certification of the class at trial, the sixth Girsh factor supports settlement approval.

### The ability of the defendants to withstand a greater judgment

This factor focuses on "whether the defendants could withstand a judgment for an amount significantly greater than the settlement." In re Cendant, 264 F.3d at 240. Defendants freely admit that they "would be able to bear any judgment likely to be rendered in this case." (Defs' Response to Objections, at p. 12 n.4). However, just because defendants *could* pay more does not necessarily mean they should *have to* pay more than the parties negotiated to settle these claims. See In re Warfarin, 391 F.3d at 538. Further, there is no indication that defendants'

financial resources factored into the settlement in any way.  Id.  Accordingly, while the seventh

Girsh factor leans against settlement in a general sense, little weight is accorded to it.

The range of reasonableness of the settlement fund in light
of the best possible recovery and all the attendant risks of litigation

"The last two Girsh factors ask whether the settlement is reasonable in light of the best

possible recovery and the risks the parties would face if the case went to trial."  In re Prudential,

148 F.3d at 322.  In cases seeking primarily monetary relief, courts should compare "the present

value of the damages plaintiffs would likely recover if successful, appropriately discounted for

the risk of not prevailing, . . . with the amount of the proposed settlement."  In re Warfarin, 391

F.3d at 538.  In conducting this economic valuation, a court must "guard against demanding too

large a settlement based on its view of the merits of the litigation."  G.M. Trucks, 55 F.3d at 806.

Under optimal circumstances at trial, the class' best possible recovery would be under

RESPA.  With the full amount paid for the flood zone determinations and trebled damages, the

class' recovery under RESPA theoretically could exceed $131 million.[8] See § 2607(d)(2); Kahrer

v. Ameriquest Mortgage Co., 418 F. Supp. 2d 748, 756 (W.D. Pa. 2006) ("the proper measure of

damages under RESPA is three times the entire amount paid for the settlement services

involved").  At first glance, the $2,859,452.50 that actually will be put into the hands of class

members appears small in comparison.[9]  This perception disappears however when these two

numbers are considered in context.

First, $131 million is far too high a recovery to evaluate the benefit to the class.   To

begin with, "we know of no authority that requires a district court to assess the fairness of a

settlement in light of the potential for trebled damages."  In re Cmty. Bank of N. Virginia, 622

---

[8]    (2,315,362 class members) x ($19 per flood zone determination) x (3) = $131,975,634
[9]    (300,995 claims filed) x ($9.50) = $2,859,452.50

F.3d 275, 312 (3d Cir. 2010) (citing cases).  Beyond that, without fully evaluating the class'

RESPA claim, the defenses advanced could very realistically result in no class recovery under

that claim.  If otherwise successful, the class' actual damages would likely be determined to be

the amount cumulatively paid for flood zone determinations to WFI minus what those

determinations reasonably should have cost.  At best, this would amount to $13 per

determination, or $30,099,706 in total.[10]  This calculation of the class' best possible recovery,

which is based on actual damages, is the appropriate one to use in assessing the fairness of the

settlement.  But even this amount could be further reduced or eliminated pursuant to defendants'

assertion that WFI was to provide "life-of-loan monitoring and re-determinations of flood risk,"

whereas the $6 charge by CoreLogic was for only a "single flood hazard determination."  (Defs'

Response to Objections, at p. 10).  Thus, the mathematical calculations pertaining to potential

damages must be viewed circumspectly in light of the attendant risks in proceeding with the

litigation

Second, the $2.8 million to be paid directly to Settlement Class members represents less

than half of the total value of the settlement.  Under the Settlement Agreement, defendants also

will pay $1.5 million for attorneys' fees and expenses and what is estimated to be at least $1.5

million for the costs of administering the settlement.  These are costs for which  the class would

otherwise be responsible, and therefore properly are considered in valuing the settlement.  These

amounts bring the total value of the settlement to, at minimum, $5,859,452.50.  This equals

approximately 19.5% of the class' best possible recovery at trial based on its actual damages.[11]

After considering the present-day-value of money, the likelihood that the class would recover

---

[10]      (($19 per determination to WFI) – ($6 charged by CoreLogic)) x (2,315,362 class
members) = $30,099,706

[11]      $5,859,452.5 / $30,099,706 = 19.467%

22

less than its maximum actual damages, all of the attendant risks of litigation, and the interests in resolution, such a recovery is well within the range of reasonableness.

This finding is made notwithstanding the fact that only approximately 13% of the Settlement Class filed claims and will receive a recovery.[12] Under the Settlement Agreement $9.50 was made available to any Settlement Class member who submitted a valid claim form. (Settlement Agreement, at ¶ 32). This amount represents half of the total amount paid for each of the subject flood zone determinations and approximately 73% of each member of the class' actual damages.[13] Assuming there were more members who actually paid the $19 fee, the fact that $9.50 was not enough to motivate them to write their name, address, and signature on the provided postcard and mail it is no indication that the settlement, which offers such a high percentage of actual damages, is somehow unreasonable. Further, there is no indication, given the relatively small amount of each individual recovery, that the 13% response rate was unusually small. See Zimmer Paper Products, Inc. v. Berger & Montague, P.C., 758 F.2d 86, 93 (3d Cir. 1985) (accepting a 12% response rate where the settlement's opponent "has come forward with nothing to suggest that the rate is uncharacteristically low"); Gascho v. Global Fitness Holdings, LLC, 2014 WL 1350509, at *30 (S.D. Ohio Apr. 4, 2014) (accepting expert testimony "that response rates in class actions generally range from one to 12 percent with a median response rate, and a normal consumer response rate, of approximately five to eight percent"). To the contrary, by percentage the response rate appears to be fairly high in the area of consumer lending and supports settlement.

---

[12]  (300,995 claims filed) / (2,315,362 class members) = 12.999%
[13]  $9.50 / $13.00 = 73.077%

In summary, review of the <u>Girsh</u> factors clearly supports the conclusion that the proposed settlement is fair, reasonable and adequate. <u>See</u> <u>G.M. Trucks</u>, 55 F.3d at 785. With this backdrop, we turn to the objections.

Ten objections were submitted. Of these, two challenge the settlement with no further explanation and four others assert at least some argument that the settlement is unfair.[14]

The first objection pertaining to the fairness of the proposed settlement was submitted by Douglas H. and Lorraine K. Porter (the "Porters"). (Porter Objection, (Doc. No. 94)). The Porters argue that $9.50 is inadequate compensation when compared with the $600 it cost them "for a land survey company to come out and survey [their] property" after WFB told them they "had to pay for flood insurance," apparently inaccurately. <u>Id.</u> The Porters misunderstand the nature of this settlement. Claims arising out of a requirement by WFB that borrowers maintain unnecessary flood insurance are explicitly excepted from those released by the Settlement Class. (Settlement Agreement, at ¶ 1(y)(2)). Any claim the Porters may have for costs incurred to escape from an errant requirement of flood insurance is unaffected by the settlement. As such, the costs asserted by the Porters are irrelevant to the proposed Rule 23(e) determination.[15]

Alejandro Diaz and Mayda Nahhas ("Diaz and Nahhas") jointly submitted the second and third objections to the proposed settlement. (Diaz/Nahhas Objection, (Doc. No. 99-31), at pp. 8-17). The appeared through counsel at the March 5, 2015, hearing. Their sole objection is that "[t]he proposed settlement is violative of the well-established doctrine that unclaimed settlement

---

[14]     The two objections that summarily challenge the proposed settlement as unfair were submitted by Anne J. Edouard and Joel Masamvu. (Doc. Nos. 99-31, at p. 21; 99-33, at p. 20). According to this court's preliminary approval order, objectors who do not "state the basis for the objection . . . shall be deemed to have waived any objections to the Settlement." (Doc. No. 89, at ¶ 16). Consequently, neither of these objections requires further discussion.

[15]     The Porters also "object to the attorney being paid $1.5 million and we only receive $9.50 for our cost of $600." To the extent they intended to challenge the request for attorneys' fees, consideration and assessment of the same is undertake *infra*.

funds must first be utilized to make class members whole before being put to a secondary use," (Id. at p. 8), which they further augmented at the hearing. Specifically, Diaz and Nahhas argue that those Settlement Class members who filed a claim should receive an additional $9.50 to "make them whole" before "unclaimed funds . . . revert to the defendant." (Id.). This objection ignores the structure of the proposed settlement.

Diaz and Nahhas cite to In re Baby Products Antitrust Litigation for the proposition that "[r]eversion to the defendant risks undermining the deterrent effect of class actions by rewarding defendants for the failure of class members to collect their share of the settlement." 708 F.3d 163, 172 (3d Cir. 2013). Holding that a *cy pres* distribution is superior to a reversion of funds to the defendant, the United States Court of Appeals for the Third Circuit was considering a settlement fund established with a $35,500,000 deposit from the defendants, from which some residual amount potentially could remain after all claims filed by the class were paid. Id. The instant settlement fund is distinguishable. By entering into the Settlement Agreement, defendants agreed to pay "a sum equal to the total amount of settlement payments due to all Settlement Class members who submitted a valid claim form." (Settlement Agreement, at ¶ 34). Where defendants will pay the exact amount necessary to satisfy the claims filed, there can be no residual amount which would revert to defendants. The objection of Diaz and Nahhas therefore is irrelevant to the settlement at issue.

The final objection relating to the fairness of the proposed settlement was submitted by Wei Cyrus Hung ("Hung").[16] (Hung Objection, (Doc. No. 95)). Hung first argues that the

---

[16]     Hung initially submitted a single page *pro se* objection which was postmarked on December 19, 2014. (Doc. No. 99-31, at pp. 23-24). This was later superseded by a 45-page objection filed on Hung's behalf by the Center for Class Action Fairness. (Doc. No. 99-33, at p. 15). As Hung's later submission reflects and builds upon each of his earlier arguments, Hung's counseled submission will be utilized in referencing and analyzing Hung's position.

claims process is unnecessary and intentionally designed to depress class relief.[17] (Hung Objection, at pp. 14-20). Plaintiffs are also inadequate representatives of the class given the $25,000 individual award under the Settlement Agreement. (Id. at pp. 28-31). Further, the Settlement Agreement's inclusion of a "clear sailing" provision is also a "telltale indication of an unfair deal." (Id. at p. 25). Finally, Hung contends that the use of a "constructive common fund" prevents the court from directly correcting insufficient awards to class members by reducing awards to class counsel and/or plaintiffs. (Id. at pp. 26-28).

The parties to the Settlement Agreement respond that there is nothing inherently suspect about a claims process. (Pls' Final Approval Brief, (Doc. No. 97), at p. 23). Requiring Settlement Class Members to submit a claim form was necessary in order to determine the right of each to receive payment under the settlement because the available records do not reflect which of the class members paid the $19 charge. (Defs' Response to Objections, at p. 16). The $25,000 awarded to plaintiffs is in settlement of their separate TILA claim, and thus does not undermine the adequacy of their representation of the class. Lastly, the settling parties argue that the proposed settlement's segregated fund does not make the class recovery unfair, and any perceived excess in the requested fee award can still be eliminated despite the "clear sailing" clause. (Defs' Response to Objections, at pp. 21-22).

Hung fails to cite any controlling authority in support of his argument that the use of a claims process makes the settlement unfair. After warning the court to "Be alert!" to the likelihood that the proponents of the settlement would focus on the Girsh factors in support of settlement approval, Hung then ignores those factors completely in his own analysis. (Hung

---

[17] Hung explains that "[h]is cardinal objection is that the settlement is unfair because class counsel is appropriating an excessive amount of the existing settlement value for itself." (Hung Objection, at p. 14). Hung's arguments related to attorneys' fees will be considered separately below.

Objection, at pp. 13). Instead, he relies on the premise that a settlement in which a $9.50 check is simply issued and sent to each class member would be *more fair* than the one proposed. (Id. at pp. 14-18). This premise is based, at least in part, on the belief that the claims process "is employed for no ostensible reason other than to depress class recovery (and thus maximize the share of the settlement received by the attorneys)." (Id. at p. 15). Hung's argument is wide of the mark.

Hung concedes that "a claims-made structure can be justified by the fact that the defendant either is unable to identify specific class members or is unable to identify the value of those class members' claims." (Id.). This concession is appropriate given that "there is nothing inherently suspect about requiring class members to submit claim forms in order to receive payment." Schulte v. Fifth Third Bank, 805 F. Supp. 2d 560, 593 (N.D. Ill. 2011) (citing Milliron v. T–Mobile, 2009 WL 3345762, *6 (D.N.J. 2009)). This is particularly true when, as here, the claim submission process places very little burden on class members. As discussed above, to submit a claim class members simply had to write their name, address, Wells Fargo Loan number (if known), and date on a postcard attached to the notice sent to them. After signing the completed form in attestation that the class member paid WFB flood zone determination fees, the borrower only had to place it in the mail. (See Claim Form, at p. 39).

The number of class members who would receive payment would certainly be higher if defendants were to send each of the 2,315,362 Settlement Class members a check without requiring the submission of claim forms. However, the fact that some conceivable arrangement would have been "more fair" from the perspective of one class member does not necessarily suggest that the proposed settlement is unfair. As defendants very aptly put it, the choice here "is not between the settlement that the parties have proposed and [Hung's] dream settlement but between the proposed settlement and none at all." (Defs' Response to Objections, at pp. 18-19);

see In re Prudential Ins., 962 F. Supp. 450, 534-35 (D.N.J. 1997) ("the issue is whether the settlement is adequate and reasonable, not whether one could conceive of a better settlement.") (citing Cotton v. Hinton, 559 F.2d 1326, 1331 (5th Cir. 1977) (in assessing fairness and reasonableness of settlement, the court is "not free to delete, modify or substitute certain provisions of the settlement")).

There is no indication that should the proposed settlement be disapproved, defendants would consider direct payments to Settlement Class members, which of course would roughly quadruple the value of the settlement. (Defs' Response to Objections, at p. 18). To the contrary, they have repeatedly affirmed that they have no intention of paying more to settle these claims than the amount already negotiated. (Id.). Thus, the possibility that class members could have fared better has virtually no impact on the determination at hand where the application of the Girsh factors has revealed that the proposed settlement is fair, reasonable and adequate notwithstanding the claims process.

Further, contrary to Hung's assertion, the use of a claims process does appear to have served a legitimate purpose. Under the Settlement Agreement, only those who obtained a loan from WFB and "were charged by [WFB] for a flood hazard determination between August 30, 2011 and December 31, 2013" are entitled to a settlement payment. (Settlement Agreement, at ¶ 1(aa)). According to Botzet, defendants' records do not contain the information necessary to produce an accurate list of such individuals. (See Botzet Declaration Re: Hung Objection, (Doc. No. 100-1), at ¶¶ 4-8). Rust reviewed the 244,610 claims which had been submitted as of January 20, 2015 and found that defendants' records pertaining to 60,911 of the subject mortgages reflect no information related to flood zone determinations. (Id. at ¶ 5-6). Another 64,946 records show that the borrower paid "$0.00" for their determinations. (Id. at ¶ 7). Based on these findings and the criteria of the proposed settlement, over half of the filed claims likely

28

would have been excluded by direct payments based on defendants' records. Instead, the claims process provided a way to overcome this deficiency in defendants' records by simply asking potential class members to attest that they paid for a flood zone determination.

Hung also points to the inability of class members to file a claim electronically as supporting the notion that the proposed settlement is unfair. (Hung Objection, at pp. 18-19). In so arguing, Hung attempts to draw a distinction between electronic and physical claims processes, characterizing the latter as "requir[ing] class members to expend unnecessary time, effort, and expense trekking over to their post office to return the claim form by postal mail." (Id. at p. 18). In reality, any additional effort associated with completing and filing a paper claim form is far from onerous. Ignoring any negligible differences between typing information and handwriting it, the only plausible distinction of a physical claims process is the necessity of mailing the completed claim form as opposed to clicking "submit" on a website form. Despite Hung's assertion, the "trek" required for this endeavor is generally no further than to one's own mailbox. The assertion that it is unduly burdensome to utilize mail as opposed to electronic submission also reflects a disregard for the potential that a certain segment of class members may not be readily able to use a computer to file the form due to the lack of technical familiarity or accessibility. Against this backdrop, the additional time, effort and expense to complete and mail a post card is insignificant in assessing an otherwise fair, reasonable and adequate settlement let alone a sound basis to invalidate such an agreement.

Hung also takes aim at the additional $25,000 payment requested by plaintiffs. He contends that this "incentive award" "renders the representatives inadequate under Rule 23(a)(4) and the settlement unfair under Rule 23(e)(2)." (Hung Objection, at p. 28). This argument mischaracterizes the nature of this payment.

An "incentive award" is a sum that is separately granted "to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation." In re Flonase Antitrust Litig., 951 F. Supp. 2d 739, 751 (E.D. Pa. 2013). Requests for such awards are generally approved when they are "reasonable." Id. However, it has been posited that circumstances in which large awards are requested or *de minimis* relief is offered to absent class members tend to "suggest that the payment to the class representatives may not have been an incentive for them to invest effort in the class's litigation but rather an incentive for them to support a weak settlement." NEWBERG ON CLASS ACTIONS § 13:59. Such concerns do not arise here as the payment in question is not an incentive award.

Per the Settlement Agreement, defendants have agreed to pay plaintiffs $25,000 in settlement of their TILA claim. That claim is related to WFB's requirement that plaintiffs obtain flood insurance. It thus is independent of the services plaintiffs provided as class representatives. (Settlement Agreement, at ¶ 43). Plaintiffs are providing a general release of all of their claims against defendants in consideration for this settlement, (id.), whereas claims related to flood insurance by WFB are expressly excepted from the release provided by Settlement Class members, (id. at ¶ 1(y)(2)). Thus, class members may still pursue any such claims separately.[18]

With respect to the claims arising out of payments to WFB for flood zone determinations performed by WFI, the only ones being settled on a class basis, there is an exact "alignment of interests and incentives between the representative plaintiffs and the rest of the class." Dewey v.

_____

[18] As the $25,000 payment to defendants is in settlement of an individual claim and not related to the compromise of "claims, issues, or defenses of a certified class," court approval of it is not required. FED. R. CIV. P. 23(e). But even assuming that approval would be necessary, this award is reasonable in light of the claims being compromised, the claimed damages and the scope of the release provided in exchange.

Volkswagen Aktiengesellschaft, 681 F.3d 170, 183 (3d Cir. 2012).  As to these claims plaintiffs will receive the same amount in settlement that was offered to every other class member: $9.50.  Plaintiffs' recovery on these claims was and remains co-extensive with all other participating class members.  It follows that plaintiffs had every "incentive to represent the claims of the class vigorously."  Id. at 184.  Moreover, plaintiffs' TI:A claim is premised on alleged facts and circumstances that are unique to their mortgage transaction.  The mere presence of a reasonable payment for resolution of this claim does not give rise to an inference that impropriety is afoot.  Under these circumstances, the $25,000 award requested by plaintiffs on a distinct, individual claim does not undermine this court's prior certification of the class for settlement purposes, (see Preliminary Approval Order, at ¶ 3), or the fairness of the proposed settlement.

Hung posits that the presence of a "clear sailing" provision in the Settlement Agreement renders the proposed settlement is unfair.  (Hung Objection, at p. 25).  This provision provides that defendants will pay attorneys' fees and costs up to $1.5 million and "stipulates that attorney awards will not be contested by the defendants."  (Id. (citing Settlement Agreement, at ¶ 38)).  Hung advances two grounds to show this provision is improper.  First, he relies on non-controlling authority for the proposition that a "clear sailing" clause "lays the groundwork for lawyers to 'urge a class settlement at a low figure or on a less-than-optimal basis in exchange for red-carpet treatment on fees' and 'suggests, strongly,' that its associated fee request should go 'under the microscope of judicial scrutiny.'"  (Id. (quoting Weinberger v. Great N. Nekoosa Corp., 925 F.2d 518, 524-25 (1st Cir. 1991); citing Redman v. RadioShack Corp., 768 F.3d 622, 637 (7th Cir. 2014))).  Second, he asserts that "'[s]uch a clause by its very nature deprives the court of the advantages of the adversary process.'"  (Id. (quoting Weinberger, 925 F.2d at 525)).

While Hung's concerns about the "clear sailing" provision raise general concerns about collusion and self-dealing in an area that is susceptible to mischief, it is unclear how those

31

concerns are manifest in the instant matter. First, There is no *per se* rule against "clear sailing" provisions in the Third Circuit. <u>See</u> <u>In re Prudential</u>, 148 F.3d 283, 335 n.112 (3d Cir. 1998) ("The Supreme Court has . . . held that parties may simultaneously negotiate a 'defendant's liability on the merits and his liability for his opponents' attorney's fees.'") (quoting <u>Evans v. Jeff D.</u>, 475 U.S. 717, 738 n.30 (1986)). And Hung made it clear during the Final Approval Hearing that he was not "alleging a collusive bargain" here. (Hearing Transcript, at p. 17). In addition, the timing of fee negotiations is only "'a factor in our review of the adequacy of the class's representation.'" <u>In re Cmty. Bank of N. Virginia</u>, 418 F.3d 277, 308 n.25 (3d Cir. 2005) (quoting <u>G.M. Trucks</u>, 55 F.3d at 804). Where there is no claim or indication of collusion between class counsel and defendants, the mere presence of a "clear sailing" provision does not undermine what is otherwise a fair, reasonable and adequate settlement.[19]

Hung's fears about the effects of "clear sailing" clauses on the adversarial process similarly are inapplicable. Per the Settlement Agreement, defendants cannot "object to, oppose, or comment upon" class counsel's attorneys' fee request. (Settlement Agreement, at ¶ 38). Certainly, without a challenge to the fairness of the proposed settlement and the reasonableness of a fee award, the court seemingly would be deprived "of the advantages of the adversary process." <u>Weinberger</u>, 925 F.2d at 525. But Hung's efforts have alleviated any such concerns. His challenge has assured that the court will scrutinize the fee petition carefully. Any generalized concerns or dissatisfaction beyond the ensuing microscopic review is abstract and insufficient to support a finding that the proposed settlement has been rendered unfair.

---

[19] To the extent the incorporation of the "clear sailing" clause necessitates "that the fee request be placed under the microscope of judicial scrutiny," <u>Weinberger</u>, 925 F.2d at 525, such scrutiny is given to that request *infra*.

The proposed settlement's use of a "constructive common fund" is the basis for Hung's final argument. He specifically asserts that "[a] constructive common fund structure is an inferior settlement structure for one principal reason - the segregation of parts means that the court cannot remedy any allocation issues by reducing fee awards and/or named representative payments." (Hung Objection, at pp. 26). While other courts have expressed concerns about this limitation and potential abuses of it, see Pearson v. NBTY, Inc., 772 F.3d 778, 786 (7th Cir. 2014), there is no indication of any such undue limitation or actual abuse here.

As discussed above, the amounts to be paid to the Settlement Class as a whole and individually to each class member who filed a claim have already been determined to be fair, reasonable and adequate. The inability to reduce the separately requested attorneys' fee award in favor of directing *additional* funds to Settlement Class members does not invalidate or diminish the force of this determination. Furthermore, there is nothing about the segregation of the fee award which prevents the court from reducing it should such a reduction be warranted. And the fact that the amount of any reduction would be retained by defendants does not impact the level of scrutiny to be given to the fee request, despite the assertions to this effect advanced by Hung. (See Hung Objection, at p. 27). As there are no "allocation issues" inherent to the proposed settlement, its utilization of a constructive common fund does not render it unfair to the Settlement Class.

Notwithstanding the arguments in the relevant objections, the parties have satisfied their burden of proving that the proposed settlement is fair, reasonable and adequate. The objections related to the fairness of the settlement by the Porters, Diaz and Nahhas, and Hung will be overruled. Plaintiffs' motion for final approval of class action settlement will therefore be approved.

33

Consideration of Plaintiffs' motion for attorneys' fees and expenses also requires "a thorough judicial review." In re Prudential, 148 F.3d at 333. The two basic methods for conducting this review are the percentage-of-recovery method and the lodestar method. Id. While the lodestar method "is more typically applied in statutory fee-shifting cases," "[t]he percentage-of-recovery method is generally favored in common fund cases." In re Rite Aid Corp. Sec. Litig., 396 F.3d 294, 300 (3d Cir. 2005). Whichever method is chosen, the use of the other "to cross-check the initial fee calculation" is recommended. Id. (citing In re Prudential, 148 F.3d at 333).

The Settlement Agreement does not create a pure common fund given its separation of the amounts to be paid for (1) satisfaction of timely claims, (2) attorneys' fees and (3) administration of the settlement. However, given that each of these amounts will be paid by defendants, the economic effect essentially is that of a common fund. G.M. Trucks, 55 F.3d at 821. Consequently, "common fund principles" will be utilized. Id.

In analyzing a fee award in a common fund case a court should consider:

> (1) the size of the fund created and the number of persons benefitted;
> (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel;
> (3) the skill and efficiency of the attorneys involved;
> (4) the complexity and duration of the litigation;
> (5) the risk of nonpayment;
> (6) the amount of time devoted to the case by plaintiffs' counsel; and
> (7) the awards in similar cases.

In re Rite Aid, 396 F.3d at 301 (quoting Gunter v. Ridgewood Energy Corp., 223 F.3d 190, 195 n.1 (3d Cir. 2000)). If relevant, the court may also weigh

> (1) the value of benefits accruing to class members attributable to the efforts of class counsel as opposed to the efforts of

other groups, such as government agencies conducting
investigations;

(2) the percentage fee that would have been negotiated had the
case been subject to a private contingent fee agreement at
the time counsel was retained; and

(3) any "innovative" terms of settlement.

In re AT & T Corp., 455 F.3d 160, 165 (3d Cir. 2006) (quoting In re Prudential, 148 F.3d at 338,

39, 40). These "fee award reasonableness factors 'need not be applied in a formulaic way'

because each case is different, 'and in certain cases, one factor may outweigh the rest.'" Id. at

166 (quoting In re Rite Aid, 396 F.3d at 301).

<u>The size of the fund created and the number of persons benefitted</u>

As discussed above, the proposed settlement will pay out a total of $2,859,452.50 for the

300,995 claims timely filed. In addition to this amount, defendants have agreed to pay the class'

attorney fees and expenses, up to $1.5 million (Settlement Agreement, at ¶ 38), and the costs of

settlement administration, estimated to equal at least $1.5 million (January 16, 2015 Richter

Declaration, at ¶ 22). These are sums that class members would otherwise be responsible for and

therefore are part of the total benefit to the class. See Lake Forest Partners, L.P. v. Sprint

Communications Co. L.P., No. 2:12-CV-00999, 2013 WL 3048919, at *2 (W.D. Pa. June 17,

2013) (the size of the fund should include the "separate payment of attorney's fees and expenses,

and the expenses of administration") (citing Boeing Co. v. Van Gernert, 444 U.S. 472, 479

(1980)). Thus, the total size of the fund created is at least $5,859,452.50.

This recovery amounts to $19.47 to each of the 300,995 Settlement Class members who

paid WFB for a flood zone determination and provided the information needed to determine they

potentially were a mortgagor that was interested in participating in the settlement. The total

individual recovery thus actually exceeds the amount that class member paid to WFB for the

subject flood determination. Given the previously-discussed hurdles which would have to be

overcome before any recovery for the class would be obtained at trial, this result is exceptional. This first <u>Gunter</u> factor clearly weighs in favor of approving the fee request.

**The presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel**

As mentioned in reference to the second <u>Girsh</u> factor, only 10 of the 2,315,362 Settlement Class members filed an objection. Of these, 6 objected solely to the request for attorneys' fees. Only the objection by Hung provides more than a single sentence asserting that the attorneys are being paid "too much." The quantity and content of these objections are simply insubstantial, especially in comparison to the 300,995 timely claims filed by the class. This <u>Gunter</u> factor therefore also supports approval of the fee request.

**The skill and efficiency of the attorneys involved**

The law firm of Nichols Kaster has extensive class action experience, having initiated over 40 national class action suits. (Nichols Kaster Firm Resume, (Doc. No. 87-2), at p. 5). Several of these have been consumer cases against mortgage lenders and servicers, including multiple actions against WFB. (January 16, 2015, Declaration of Kia Richter at ¶¶ 10, 12). This experience has been evident in the handling of the instant matter.

The firm's knowledge of defendants' business practices in particular also has aided in its efficient handling of this case. The case was developed in the pleading stage with the vigor, tact and strategy that can only be delivered by skilled counsel armed with such experience, knowledge and understanding. Similarly, the negotiated use for mediation purposes of over 200,000 pages of documents produced in the <u>Morris</u> action saved time and effort by avoiding unnecessary repetition and duplication which would have surely occurred had plaintiffs been required to initiate that process once again. In short, the skill and efficiency of class counsel support the approval of the fee request.

The complexity and duration of the litigation

As previously noted, this matter was initiated nearly 3 years ago and has involved several complex questions of law and fact. These facts weigh in favor of approving plaintiffs' fee request.

The risk of nonpayment

The fifth <u>Gunter</u> factor takes into consideration "the risk that counsel takes in prosecuting a client's case." <u>Gunter</u>, 223 F.3d at 199. Once again, this factor was subsumed within the analysis of the <u>Girsh</u> factors above. While there is little concern that defendants would have been unable to pay any judgment that might have been entered, there would be substantial risks in establishing liability and damages at trial. Further, there would be a risk in obtaining and thereafter maintaining class certification throughout trial. Any of these risks could have resulted in a reduction or elimination of the recovery from which class counsel could have collected its fees. In other words, there was no shortage of risks facing counsel and these risks became and would have become more concrete with each formal step in the litigation. Given this reality, plaintiffs' fee request also is supported by this factor.

The amount of time devoted to the case by plaintiffs' counsel

As of February 18, 2015, the time-keeping records of plaintiffs' counsel show that they have invested 732.2 hours in this matter. (February 19, 2015 Richter Declaration, (Doc. No. 98), at ¶¶ 8-9). An additional 847 hours were spent reviewing the more than 200,000 documents which were produced in the <u>Morris</u> action and then used for among other things preparing for the mediation session. (January 16, 2015 Richter Declaration, at ¶ 27). Because this effort clearly benefitted the class, these hours properly are considered in determining a reasonable fee. After taking the relevant <u>Morris</u> hours into account, the requested $1.5 million fee award requested equates to an hourly rate of $949.95. As this rate would be clearly excessive, the sixth <u>Gunter</u>

37

factor weighs against approving the fee request.  This factor is not dispositive, however, given the weight of the remaining factors in favor of approval.

The awards in similar cases

"While there is no consensus as to the method for determining a reasonable percentage of attorney fees under the 'percentage-of-recovery' approach, 'several courts in this circuit have observed that fee awards under [that] approach typically range from 19% to 45% of the settlement fund, with 25% being the median award.'" Frederick v. Range Res.-Appalachia, LLC, No. C.A. 08-288 ERIE, 2011 WL 1045665, at *9 (W.D. Pa. Mar. 17, 2011) (quoting Lazy Oil Co. v. Witco Corp., 95 F. Supp.2d 290, 341 (W.D. Pa. 1997) (alteration in original); see In re Rite Aid, 396 F.3d at 303 (finding no abuse of discretion where the district court relied on a survey which showed "a median percentage recovery range of 27–30%" for all class actions resolved or settled over a four-year period).  "In most instances, [the determination] will involve a sliding scale dependent upon the ultimate recovery, the expectation being that, absent unusual circumstances, the percentage will decrease as the size of the fund increases." In re Cendant Corp. PRIDES Litig., 243 F.3d 722, 736 (3d Cir. 2001).  It is the "mega funds," those in excess of $50 million, which tend to be at the low end of this sliding scale.  In re Rent-Way, 305 F. Supp. 2d at 513 (citing cases).

At $1.5 million, the requested fee award would represent 25.6% of the total settlement fund.  This percentage, given the total value of the nearly $6 million fund, is "well within the range of reasonable percentage-fee awards in this Circuit." Lake Forest Partners, L.P., 2013 WL 3048919, at *3 (approving a fee award of 26.8% of a $7,003,000 settlement).  The reasonableness of the requested award in comparison with those approved in similar cases supports approval.

Other factors

Of the three "other factors" mentioned in <u>In re Prudential</u>, two are relevant to the present inquiry and counsel in favor of approving the fee request.  <u>See</u> <u>In re AT & T Corp.</u>, 455 F.3d 160, 165 (3d Cir. 2006) (citing <u>In re Prudential</u>, 148 F.3d at 338, 39, 40).  First, no other group can claim responsibility for any portion of the benefits accruing to the class.  The proposed settlement purely is the product of the effort of class counsel.  Second, the percentage that would have been negotiated as part of a private contingent fee agreement at the time class counsel was retained likely would have been substantially higher.  In contrast to the 25.6% all-inclusive fee requested here, class counsel asserts that its typical contingent fee is 33%, which is not inclusive of expenses.  (Pls' Attorney Fee Brief, (Doc. No. 92), at p. 27).

In summary, despite the hourly rate produced when the time invested by class counsel is examined in relation to the size of the fee requested, the overall weight of the <u>Gunter</u> and relevant <u>In re Prudential</u> factors strongly favors approving the requested award.  When subjected to the recommended lodestar cross-check, this assessment is confirmed.

### Lodestar cross-check

"[T]he lodestar cross-check calculation need not entail 'mathematical precision' or 'bean-counting,' and is 'not a full-blown lodestar inquiry.'"  <u>In re AT & T Corp.</u>, 455 F.3d 160, 169 (3d Cir. 2006) (quoting <u>In re Rite Aid</u>, 396 F.3d at 306, 307 n.16).  It "is calculated by multiplying the number of hours reasonably worked on a client's case by a reasonable hourly billing rate for such services based on the given geographical area, the nature of the services provided, and the experience of the attorneys."  <u>In re Rite Aid</u>, 396 F.3d at 305.  The "reasonable hourly billing rate" should consist of "blended billing rates that approximate the fee structure of all the attorneys who worked on the matter."  <u>Id.</u> at 306.  Dividing the requested fee award by the result of this calculation produces a "multiplier."  <u>Id.</u>  "[T]he resulting multiplier need not fall within any pre-defined range," so long as an analysis of the award reveals that it is justified.  <u>Id.</u>

at 307.  A multiplier should not be permitted automatically, but instead should be used "to account for the contingent nature or risk involved in a particular case and the quality of the attorneys' work."  Id. at 306.  If the resulting "multiplier is too great, the court should reconsider its calculation under the percentage-of-recovery method, with an eye toward reducing the award."  Id.

Class counsel has produced timekeeping summaries and details demonstrating that a total of 1579.9 hours have been expended, which includes document review within and from the Morris action which was used to benefit the Settlement Class.  (Jackson January 15, 2015 Time Records (Doc. No. 93-1); Morris Document Review Time Records (Doc. No. 93-3); Jackson February 18, 2015 Time Update (Doc. No. 98-3)).  In making this submission class counsel has affirmed that all time entries that counsel believes are "redundant, excessive, or non-essential to the action" have been eliminated.  (January 16, 2015 Richter Declaration, at p. 11 n.10).  The court is satisfied that the reported hours appropriately are considered.

Details provided for each time entry include the relevant task, the responsible employee, that employee's billing rate, and the amount of time expended.  (Jackson January 15, 2015 Time Records; Morris Document Review Time Records; Jackson February 18, 2015 Time Update).  The provided rates range from $175.00 for support staff to $525.00 for partners.  (Id.).  Given the geographical areas in which class counsel practices, San Francisco and Minneapolis, these rates fall within the range of reasonableness.  See Bayat v. Bank of the W., No. C-13-2376 EMC, 2015 WL 1744342, at *9 (N.D. Cal. Apr. 15, 2015) (approving blended hourly rates of $440 and $514 per hour) (citing cases); Fancher v. Klann, No. CIV. 13-435 DSD/JJK, 2015 WL 1810235, at *2 (D. Minn. Apr. 21, 2015) (approving rates "ranging from $225 to $650 for counsel and $125 for paralegals") (citing cases).

The Third Circuit Court of Appeals has noted that "'[m]ultiplers ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied.'" In re Cendant PRIDES, 243 F.3d at 742 (quoting In re Prudential, 148 F.3d at 341). Against this backdrop it has been "strongly suggest[ed] that a lodestar multiplier of 3 is the appropriate ceiling for a fee award." (Id.).

Here, multiplying class counsel's total billable hours by the applicable billing rate for each produces a lodestar of $530,852.50. (Morris Document Review Time Records, at p. 2; Jackson February 18, 2015 Time Update, at p. 2). When compared with the requested fee award, the resultant multiplier is 2.83. In addition to falling within the acceptable range identified in In re Cendant, the use of a 2.83 multiplier is further supported by the excellent result achieved for the class and the efficiency with which class counsel resolved the matter. The lodestar cross-check thus confirms the reasonableness of the 25.6% percentage-of-recovery fee award based on the Gunter factors.

Although Settlement Class members filed 6 relevant objections, only Hung offers any substantive argument as to why an award of $1.5 million in attorneys' fees and expenses would be improper.[20] He asserts that $1.5 million is "disproportionate" to the class' recovery. (Hung

---

[20]    Billy and Carolyn Arnold, James S. Johnson, Jr., John and Caroline Metcalf, and the Porters all offer single-sentence objections to the effect that class counsel is being paid too much and the class members should be getting more. (See Doc. Nos. 99-31, at p. 5; 99-33, at p. 16, 21; 94). Muvjot Singh takes a slightly different path, arguing that class counsel should have to "provide detailed reports on why 1.5MM is justified for legal expenses." (Doc. No. 99-33, at p. 28). As discussed in conjunction with the lodestar cross-check, class counsel provided such documentation in conjunction with each of the pending motions. (See Jackson January 15, 2015 Time Records; Morris Document Review Time Records; Jackson February 18, 2015 Time Update). And of course, the fact that in combination defendant actually is paying more than the $19.00 fee for each member of the class who supplied the information needed to identify them as suffering a financial loss from the challenged practice (and thus allegedly suffering the same injuries as the Jacksons) diminishes in large measure the assertion that the class members should be getting more.

Objection, at pp. 20-24). From his perspective the fee award should be reduced to 25% of the settlement fund, which should include only the value of claims actually filed and being paid. (<u>Id.</u> at pp. 31-38). Hung also contends that the need to reduce the award is confirmed by a lodestar cross-check, which should not incorporate a multiplier. (<u>Id.</u> at pp. 38-42).

The proponents of the settlement assert that the entire value of settlement fund available to class members should be considered when evaluating the reasonableness of a fee award. (Pls' Attorney Fee Brief, at pp. 14-17). Defendants also argue that a lodestar-cross-check that properly includes all hours consumed for the benefit of the class supports the reasonableness of the fee award. (<u>Id.</u> at pp. 27-30).

Hung failed to analyze the specific <u>Girsh</u> factors in support of his contention that the proposed settlement is unfair. He likewise has failed to even mention the <u>Gunter</u> factors in asserting that the requested fee award is "disproportionate." Instead, he relies exclusively on non-binding authority from other circuits to support the proposition that costs of administration and the value of unfiled class claims must be excluded from the evaluation of an attorneys' fee award for reasonableness. (Hung Objection, at p. 23 (citing <u>Pearson</u>, 772 F.3d at 781 ("the 'ratio that is relevant . . . is the ratio of (1) the fee to (2) the fee plus what the class members received'") (quoting <u>Redman v. RadioShack Corp.</u>, 768 F.3d 622, 630 (7th Cir. 2014)). This argument is not persuasive.

Holding that costs of administration should not be factored into the value of a settlement fund when determining the reasonableness of an attorney fee award, the <u>Pearson</u> court explained that "[n]otice and fees . . . are costs, not benefits." <u>Pearson</u>, 772 F.3d at 781. What the court appears to have overlooked is that, absent some agreement by the defendant to cover such costs, the *costs* necessarily would be subtracted from the recovery actually made available to class members. The absorption of these costs by the defendant clearly adds to the settlement's value

42

and this value inures to the class.  This is why Judge Schwab previously has held that "[u]nder the percentage-of-fund method, it is appropriate to base the percentage on the gross cash benefits available for class members to claim, plus the additional benefits conferred on the class by the settling defendants' separate payment of attorney's fees and expenses, and the expenses of administration."  Lake Forest Partners, L.P., 2013 WL 3048919, at *2 (citing Boeing Co., 444 U.S. at 479).[21]

In light of this determination, Hung's contention that the fee award should be limited to "25% of the true constructive common fund" is based on an equation with an improper denominator.  (See Hung Objection, at p. 31).  Excluding costs of settlement administration, Hung represents that the requested fee award eclipses 40% of the settlement's value.  (Id.).  As previously explained, the value of the settlement fund is $5,859,452.50, inclusive of the amounts to be paid for actual class member claims, attorneys' fees and costs of administration.  At $1.5 million, the requested fee award equates to 25.6% of this value.  This slight increase above what Hung refers to as "the 25% of the fund benchmark" (Hung Objection, at p. 23) is warranted based on consideration of the Gunter factors.

The use of an incorrect denominator also undermines Hung's argument related to the lodestar cross-check.  He asserts that a multiplier of 5.68 indicates the requested fee is unreasonable in light of the "strongly suggested ceiling" announced by the Third Circuit Court of Appeals.  (Hung Objection, at p. 40 (citing In re Cendant PRIDES, 243 F.3d at 742)).  In arriving at this multiplier, Hung excluded the Morris document review hours, contending that "[w]ork

---

[21]     Given that the requested fee award is reasonable when compared to the sum of only the fee itself, actually filed class claims, and the costs of administration, and the court has not used the potential payment defendant agreed to pay before class members who paid the $19.00 fee were identified ($9.50 x 2,315,362 plus administration costs).  Consequently, there is no reason to address Hung's argument that the value of unfiled claims should not factor into this determination.

spent on other cases is non-compensable." (<u>Id.</u> at p. 42 (citing <u>In re Infospace, Inc.</u>, 330 F. Supp. 2d 1203, 1214 (W.D. Wash. 2004)). Once again, Hung cites no mandatory authority for this proposition. Further, the <u>In re Infospace</u> court based its exclusion of such hours from the lodestar calculation on the knowledge that the other case was "still pending . . . and that a request for fees will be made upon resolution of the case." <u>Id.</u> This reasoning does not apply here. Class counsel has declared that it "is not seeking and will not seek a 'double recovery' in connection with time spent on document review in the <u>Morris</u> action." (February 19, 2015 Richter Declaration, at ¶ 12). Furthermore, the <u>Morris</u> action has been resolved and the relationship of its underpinnings to this action is readily apparent. Given this and the direct benefit that Settlement Class members received from these efforts, there is a sound basis for including the <u>Morris</u> document review in calculating class counsel's lodestar.

Including all hours applicable to this matter, class counsel's lodestar is $530,852.50. (Morris Document Review Time Records, at p. 2; Jackson February 18, 2015 Time Update, at p. 2). The multiplier of 2.83 necessary to reach the requested $1.5 million fee award is under the <u>In re Cendant PRIDES</u> "ceiling" discussed by Hung and is otherwise reasonable as explained above.

Hung's only remaining argument pertaining to the lodestar cross-check is that the use of *any* multiplier here is improper in light of the "Supreme Court's forceful admonition against the excessive use of lodestar multipliers in <u>Perdue v. Kenny A.[ ex rel. Winn</u>, 559 U.S. 542 (2010).]" (Hung Objection, at p. 41). Although Hung does admit that <u>Perdue</u> was "an 'analogous statutory fee-shifting case,'" <u>id.</u> at p. 41 n.24 (quoting <u>In re Pet Food Products Liab. Litig.</u>, 629 F.3d 333, 361 (3d Cir. 2010)), he fails to recognize that the lodestar method is applied quite differently in common fund cases. While the lodestar method generally is the primary analysis in statutory fee-shifting cases, in common fund cases it serves only to cross-check the reasonableness of the

results of a percentage-of-recovery method.  See In re Rite Aid, 396 F.3d at 300.  When used as a cross-check, the lodestar method is not to be used to demand "mathematical precision" or engage in "bean-counting."  Milliron v. T-Mobile USA, Inc., 423 F. App'x 131, 136 (3d Cir. 2011) (quoting In re Rite Aid, 396 F.3d at 306) (alteration in original).  Consequently, even after Perdue the Third Circuit has continued to hold that a District Court need only "explain[] the reasonableness of the multipliers" utilized in common fund cases.  Id.  As explained, a multiplier of 2.83 is reasonable and is permissible when cross-checking the reasonableness of the requested fee award.

Having considered the Gunter and In re Prudential factors and all of the relevant objections, class counsel has met its burden of showing that its requested fee award is reasonable.  The objections to the fee award by Hung, Billy and Carolyn Arnold, James S. Johnson, Jr., John and Caroline Metcalf, the Porters, and Muvjot Singh will be overruled.  Plaintiffs' motion for attorneys' fees and expenses in the amount of $1,500,000 will be approved.

For the reasons set forth above, the  pending objections will be overruled and plaintiffs' motions for final approval of class action settlement and attorneys' fees and expenses will be granted.  An appropriate order will follow.

Date: September 30, 2015

                                        s/ David Stewart Cercone
                                        David Stewart Cercone
                                        United States District Judge

cc:     Michele R. Fisher, Esquire
        E. Michelle Drake, Esquire
        Kai H. Richter, Esquire
        Jonah S. Van Zandt, Esquire
        Mark D. Lonergan, Esquire
        Michael J. Steiner, Esquire
        Philip Barilovits, Esquire
        Steven J. Adams, Esquire
        (*Via CM/ECF Electronic Mail*)